## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| SHIQIONG HUANG, CHRIS R. STOKOWSKI, EVERETT UHL, MARK J. HEARON and MARY T. PATTERSON, individually and on behalf of all others similarly situated,<br><br>  Plaintiffs,<br><br> v.<br><br>TRINET HR III, INC., TRINET HR IV, INC., THE BOARD OF DIRECTORS OF TRINET HR III, INC., THE BOARD OF DIRECTORS OF TRINET HR IV, INC., THE INVESTMENT COMMITTEE OF TRINET GROUP, INC. and JOHN DOES 1-30.<br><br>  Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) **CLASS ACTION COMPLAINT**<br><br>**CASE NO:** |

## COMPLAINT

Plaintiffs Shiqiong Huang, Chris R. Stokowski, Everett Uhl, Mark J. Hearon and Mary T. Patterson ("Plaintiffs"), by and through their attorneys, on behalf of the TriNet 401(k) Plan ("TriNet III Plan") and the TriNet Select 401(k) Plan ("TriNet IV Plan") referred to collectively as (the "Plans"),[1] themselves and all others similarly situated, state and allege as follows:

### I.    INTRODUCTION

---

[1] The Plans are legal entities that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plans are not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plans and its participants. During 2016, the TriNet Select 401(k) Plan was known as the Ambrose Multiple Employer Retirement Savings Plan. The Ambrose Multiple Employer Retirement Savings Plan, the TriNet Select 401(k) Plan and the TriNet 401(k) Plan will be referred to collectively herein as the Plans.

1.      This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plans' fiduciaries, which include TriNet HR III, Inc., ("TriNet III[2]"), TriNet HR IV, Inc., ("TriNet IV[3]") (TriNet III and TriNet IV will be referred to collectively as "TriNet" or the "Companies"), the Board of Directors of TriNet HR III, Inc., ("Board III") the Board of Directors of TriNet HR IV, Inc. ("Board IV") ") (Board III and Board IV will be referred to collectively as the "Board") and the Investment Committee of TriNet Group, Inc., and its members during the Class Period[4] ("Committee") for breaches of their fiduciary duties.

2.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.   29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *ITPE Pension Fund v. Hall*, 334 F.3d 1011, 1013 (11th Cir. 2003); *Pledger v. Reliance Trust Co.*, 240 F. Supp. 3d 1314, 1321 (N.D. Ga. 2017).  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope.  29 U.S.C. § 1104(a)(1)(B).

3.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

---

[2] During and prior to 2016, TriNet III was known as TriNet HR Corporation. Both will be referred to collectively here as TriNet III.

[3] During and prior to 2016, TriNet  IV was known as Ambrose Employer Group, LLC. Both will be referred to collectively here as TriNet IV.

[4] Class Period is defined below as September 29, 2014 through the date of judgment.

4.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[5]

5.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time."  *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

6.      Most participants in defined contribution plans like the Plans expect that their accounts will be their principal source of income after retirement.  Although at all times accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

7.      The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See,* "*A Look at 401(k) Plan Fees*," *supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

---

[5] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

8.     The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment.   *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses* (July 2016), at 4.   "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id.*, at 5.

9.     Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their defined contribution plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

10.     At all times during the Class Period (September 29, 2014 through the date of judgment) the TriNet III Plan had at least $964 million dollars in assets under management.  At the end of 2017 and 2018, the TriNet III Plan had over $2.7 billion dollars and $2.9 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plans' fiduciaries.  At all times during the Class Period, the TriNet IV Plan had over $535 million dollars in assets under management.  At the end of 2017 and 2018, the TriNet IV Plan had over $1 billion dollars and $1.2 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plans' fiduciaries.  The Plans total assets under management qualifies them as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As jumbo plan, the Plans had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did

not try to reduce the Plans' expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plans to ensure it was prudent.

11.     Plaintiffs allege that during the putative Class Period Defendants, as "fiduciaries" of the Plans as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plans, to Plaintiffs, and to the other participants of the Plans by, *inter alia*, (1) failing to objectively and adequately review the Plans' investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plans despite the availability of identical or materially similar investment options with lower costs and/or better performance histories.

12.     Defendants' mismanagement of the Plans, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.  Their actions were contrary to the actions of a reasonable fiduciary and cost the Plans and its participants millions of dollars.

13.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.     JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction over actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

15.     This Court has personal jurisdiction over Defendants because they are headquartered and transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

16.     Venue is proper in this District pursuant to ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III.     PARTIES

**Plaintiffs**

17.     Plaintiff Shiqiong Huang ("Huang") resides in Jersey City, New Jersey.  During her employment, Plaintiff Huang participated in the Plans, investing in the options offered by the Plans and which are the subject of this lawsuit.

18.     Plaintiff Chris R. Stokowski ("Stokowski") resides in Denver, Colorado.  During his employment, Plaintiff Stokowski participated the Plans, investing in the options offered by the Plans and which are the subject of this lawsuit.

19.      Plaintiff Everett Uhl ("Uhl") resides in Raleigh, North Carolina.  During his employment, Plaintiff Uhl participated the Plans, investing in the options offered by the Plans and which are the subject of this lawsuit.

20.     Plaintiff Mark J. Hearon ("Hearon") resides in Weehawken, New Jersey.  During his employment, Plaintiff Hearon participated in the Plans, investing in the options offered by the Plans and which are the subject of this lawsuit.

21.     Plaintiff Mary T. Patterson ("Patterson") resides in Aliso Viejo, California. During her employment, Plaintiff Patterson participated the Plans, investing in the options offered by the Plans and which are the subject of this lawsuit.

22.     Each Plaintiff has standing to bring this action on behalf of the Plans because each of them participated in at least one of the Plans, which were both administered in the same manner by the same fiduciaries and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

23.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plans, comparisons of the costs and investment performance of the Plans' investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

24.     TriNet is the sponsor of the Plans and a named fiduciary. 2018 Form 5500 of the TriNet Select 401(k) Plan ("2018 TriNet IV Form 5500") and the 2018 Form 5500 of the TriNet 401(k) Plan ("2018 TriNet III Form 5500") filed with the United States Department of Labor (referred to collectively as the "2018 Forms 5500") at 1. Its corporate headquarters is located at 900 Town Center Parkway, Bradenton, Florida 34202. TriNet describes itself as "a leading

provider of HR expertise, payroll services, employee benefits and employment risk mitigation services for SMBs [small to medium businesses]." The December 31, 2019 10-k filing of TriNet Group, Inc ("2019 10-K") at 5. TriNet reports that "[f]or the year ended December 31, 2019, we processed $41.7 billion in payroll and payroll taxes for our clients and ended 2019 with approximately 18,900 clients and 340,000 WSEs, primarily in the U.S." *Id.*

25.     TriNet appointed the Committee to purportedly select and monitor the funds in the Plans and to ensure that the Plans paid no more in expenses than was necessary to prudently manage the Plan. However, in practice, the Committee fell short of these fiduciary duties. The Plan Document states that TriNet: "will administer the Plan for the exclusive benefit of the Plan Participants and Beneficiaries, and in accordance with the terms of the Plan." The Defined Contribution Volume Submitter Plan and Trust, Basic Plan Document, as Amended and Restated on April 1, 2015 ("Plan Doc.") at 117. The Plan Document goes on to grant TriNet the authority to delegate these broad fiduciary responsibilities to a Committee. As described in the Plan Document, TriNet "may delegate its duties, powers or responsibilities to one or more persons." *Id.* TriNet did in fact delegate its responsibilities to the Committee. *See*, the Investment Policy Statement as revised February 7, 2019 ("IPS"). The IPS covers both the TriNet III Plan and the TriNet IV Plan.

26.     Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

27.     Additionally, at all times, TriNet acted through its officers, including the Committee, to perform fiduciary functions related to the Plans.

28.     For all the foregoing reasons, the Company is a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

29.     TriNet, acting through the Board, appointed the Committee to purportedly select and monitor the funds in the Plan and to ensure that the Plan paid no more in expenses than was necessary to prudently manage the Plan. However, in practice, the Committee fell short of these fiduciary duties. The Plan Document states that TriNet, acting through the Board, "will administer the Plan for the exclusive benefit of the Plan Participants and Beneficiaries, and in accordance with the terms of the Plan." Plan Doc. at 117. The Plan Document goes on to grant TriNet and its Board the authority to delegate these broad fiduciary responsibilities to a Committee. As described in the Plan Document, TriNet "may delegate its duties, powers or responsibilities to one or more persons." *Id.* TriNet did in fact delegate its responsibilities to the Committee. *See*, the IPS.

30.     Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

31.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority to appoint and/or monitor the Committee, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

32.     The unnamed members of the Board during the Class Period are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

33.     Pursuant to the Investment Policy Statement, the Committee is responsible for selecting and purportedly monitoring the performance of and fees charged by the funds in the

Plan. However, as will be described in more detail below, the Committee fell short of its fiduciary responsibilities. IPS at 5. As detailed in the IPS: "[t]he investment alternatives selected and offered to Plan Participants will be selected with the care, skill and diligence that would be applied by a prudent person acting in a like capacity and knowledgeable in the investment of retirement funds." *Id.*

34.     With regard to monitoring the performance of the funds in the Plans and the overall expenses paid by the Plans, the Committee may, in theory, remove funds from the Plans for any of the following enumerated reasons:  "failure to follow investment guidelines; turnover among key personnel; a change in investment style or strategy; insufficient infrastructure to keep pace with asset growth; significant increase in expenses or fees; … ." IPS at 5-6.  In practice, the Committee failed to prudently carry out these fiduciary duties.

35.     Each member of the Committee during the putative Class Period (referred to herein as John Does 11-20) is/was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because each exercised discretionary authority over management or disposition of the Plans' assets.

36.     The Committee and its members during the Class Period are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

37.     To the extent that there are additional officers and employees of TriNet who are/were fiduciaries of the Plans during the Class Period, or other individuals who were hired as investment managers for the Plans during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe"

Defendants 21-30 include, but are not limited to, TriNet officers and employees who are/were fiduciaries of the Plans within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

## IV.   THE PLANS

38.     The Plans are multiple employer plans or MEPs. 2018 Auditor Reports at 5. Multiple-employer plans are typically used by outsourced human resource providers know as professional employer organizations or PEOs like TriNet. TriNet offers the Plans to its clients as a means of attracting and retaining business. As stated in a marketing brochure published by TriNet: "How important are benefits to attracting and keeping the talent your business needs to thrive? In a word: very." *The Benefits That Drive Your Team*, published by TriNet at 2.

39.     According to the American Institute of CPAs or AICPA, PEO's "provide a means by which an employer can outsource employee management tasks, such as payroll, employee benefits, workers' compensation, recruiting, risk/safety management, and training and development." AICPA Topix Primer Series, *Multiple Employer Retirement Plans and Multiple Employer Welfare Arrangements*, AICPA 2017[6] ("AICPA") at 1.  Where a MEP is offered by a PEO the "MEP is sponsored by the PEO and adopted by the PEO's clients." *Id.*  At its most basic level, a MEP is "a retirement plan that is adopted by two or more employers that are unrelated for income tax purposes." *Id.*

40.     As described in the 2018 Auditor Reports: "[t]he Plan is a multiple-employer defined contribution plan which is offered to the employees of participating client employers (collectively, the "Employers")." 2018 Auditor Reports at 5. The 2018 Auditor Reports go on to

---

[6] Available at
https://www.aicpa.org/content/dam/aicpa/interestareas/employeebenefitplanauditquality/resources/ebpaqc primers/downloadabledocuments/ebpaqc-multiple-employer-plans-primer.pdf last accessed on September 27, 2020.

further define a multiple-employer plan as follows: "A participating client employer is a company that has entered into a co-employment arrangement with the Company [TriNet]." *Id.* Participating client employers ("Client Employers") make matching contributions to the Plan on behalf of their employees as opposed to TriNet. *Id.*

41.     TriNet established the Plans for the purpose of helping the employees of their Client Employers "save for retirement." Summary Plan Description for the TriNet Select 401(k) Plan effective January 1, 2017 ("SPD") at 1.

42.     The Plans are "defined contribution" or "individual account" plans within the meaning of ERISA Section 3(34), 29 U.S.C. § 1002(34), in that the Plans provide for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Plan Doc. at 109. Consequently, retirement benefits provided by the Plans are based solely on the amounts allocated to each individual's account. *Id.*

### *Eligibility*

43.     As detailed in the 2018 Auditor Reports, participants of the Plans "are eligible to participate in the Plan after attainment of age 21 and one hour of service." 2018 Auditor Reports at 5.

### *Contributions and Vesting*

44.     There are several types of contributions that can be added to a participant's account, including, but not limited to, an employee salary deferral contribution, an employer matching contribution made by a Client Employer and employer nonelective contributions. 2018

Auditor Reports at 6.  Participants can also roll over amounts from other qualified benefit or defined contribution plans.  *Id.*

45.     With regard to contributions made by participants: "Participants may elect to contribute a portion of their pretax compensation up to limits allowed by the Internal Revenue Service (IRS)." *Id.* Whether or not to make employer matching contributions is left to the discretion of the Client Employers of TriNet as described, above. As detailed in the 2018 Auditor Report: "[t]he Employers [client employers of TriNet] may, at their discretion, make matching contributions to the Plan as defined by the terms of their respective participation agreements." *Id.*

46.     With regard to vesting: "[p]articipants are immediately vested in their voluntary contributions and safe harbor employer match and non-elective contributions plus actual earnings thereon." 2018 Auditor Reports at 6. Each Client Employer of TriNet may "elect an alternative vesting schedule for additional discretionary contributions." *Id.*

### *The Plans' Investments*

47.     Several investments were available to participants of the Plans for investment each year during the putative Class Period. The Committee determines the appropriateness of the Plans' investment offerings and monitors investment performance. For 2018, the TriNet III Plan offered a total of 27 investment options.  For 2018, the TriNet IV Plan offered a total of 32 investment options.

48.     The assets under management in the TriNet III Plan for all funds as of the end of 2018 was $2,913,109,232. The December 31, 2018 Report of Independent Auditor for the TriNet 401(k) Plan ("TriNet III 2018 Auditor Report") at 3.  From 2014 to 2017 the Plans' assets under management ranged from more than $960 million dollars to more than $2.7 billion dollars. The assets under management for the TriNet IV Plan at the end of 2018 was $1,127,332,817. The

December 31, 2018 Report of Independent Auditor for the TriNet Select 401(k) Plan ("TriNet IV 2018 Auditor Report") at 3.  From 2014 to 2017 the Plan's assets under management ranged from more than $534 million dollars to more than $1 billion dollars.

*Expenses of the Plans*

49.    As detailed in the 2018 Auditor Reports, "[m]anagement fees and operating expenses are paid out of the Plan." 2018 Auditor Reports at 8-9.

## V.    CLASS ACTION ALLEGATIONS

50.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[7]

> All persons, except Defendants and their immediate family
> members, who were participants in or beneficiaries of the Plans, at
> any time between September 29, 2014 through the date of judgment
> (the "Class Period").

51.    The members of the Class are so numerous that joinder of all members is impractical.   The 2018 TriNet III Form 5500 lists 88,647 Plan "participants with account balances as of the end of the plan year."  2018 TriNet III Form 5500 at 2. The 2018 TriNet IV Form 5500 lists 14,420 Plan "participants with account balances as of the end of the plan year." 2018 TriNet IV Form 5500 at 2.

52.    Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plans.  Defendants treated Plaintiffs consistently with other Class members and managed the Plans as a single entity.  Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged

---

[7] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

53.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

  A.     Whether Defendants are/were fiduciaries of the Plans;

  B.     Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

  C.     Whether the Company and the Committee Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plans were being managed in compliance with ERISA;

  D.     The proper form of equitable and injunctive relief; and

  E.     The proper measure of monetary relief.

54.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

55.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to

individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

56.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VI.     DEFENDANTS' FIDUCIARY STATUS AND OVERVIEW OF FIDUCIARY DUTIES

57.     As described in the "Parties" section above, Defendants were fiduciaries of the Plans because:

      (a)     they were so named; and/or

      (b)     they exercised authority or control respecting management or disposition of the Plans' assets; and/or

      (c)     they exercised discretionary authority or discretionary control respecting management of the Plans; and/or

      (d)     they had discretionary authority or discretionary responsibility in the administration of the Plans.

58.     As fiduciaries, Defendants are/were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plans, and the Plans' investments, solely in the interest of the Plans' participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

16

These twin duties are referred to as the duties of loyalty and prudence and are "the highest known to the law." *ITPE Pension Fund*, 334 F.3d at 1013 (11th Cir. 2003).

59.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram*, 530 U.S. at 224 (quotation marks and citations omitted). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . . A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." *Dep't of Labor ERISA Adv. Op. 88-16A*, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

60.     In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries and set aside the consideration of third persons.

61.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828.

62.     In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary") further provides that:

17

> [I]n addition to any liability which he may have under any other
> provision of this part, a fiduciary with respect to a plan shall be
> liable for a breach of fiduciary responsibility of another fiduciary
> with respect to the same plan in the following circumstances: (A) if
> he participates knowingly in, or knowingly undertakes to conceal, an
> act or omission of such other fiduciary, knowing such an act or
> omission is a breach; (B) if, by his failure to comply with section
> 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his
> specific responsibilities which give rise to his status as a fiduciary,
> he has enabled such other fiduciary to commit a breach; or (C) if he
> has knowledge of a breach by such other fiduciary, unless he makes
> reasonable efforts under the circumstances to remedy the breach.

63.     During the Class Period, Defendants did not act in the best interests of the Plans' participants.  Investment fund options chosen for a plan should not favor the fund provider over the plan's participants.  Yet, here, to the detriment of the Plans and their participants and beneficiaries, the Plans' fiduciaries included and retained in the Plans many mutual fund investments that were more expensive than necessary and otherwise were not justified on the basis of their economic value to the Plans.

64.     Based on reasonable inferences from the facts set forth in this Complaint, during the Class Period, Defendants failed to have a proper system of review in place to ensure that participants in the Plans were being charged appropriate and reasonable fees for the Plans' investment options.  Additionally, Defendants failed to leverage the size of the Plans to negotiate for (1) lower expense ratios for certain investment options maintained and/or added to the Plans during the Class Period; and (2) a prudent payment arrangement with regard to the Plans' recordkeeping and administrative fees.

65.     As discussed below, Defendants breached fiduciary duties to the Plans and its participants and beneficiaries, and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. § 1104(a)(1) and 1105(a).

18

## I.   SPECIFIC ALLEGATIONS

### A.   Defendants Breached Their Fiduciary Duties in Failing to Investigate and Select Lower Cost Alternative Funds

66.   Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in the selection (and maintenance) of several funds in the Plans throughout the Class Period, including those identified below, that wasted the Plans and participants' assets because of unnecessary costs.

67.   Under trust law, one of the responsibilities of the Plans' fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs."  Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.").  Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings.  *Pension Ben. Gaur. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

68.   Investment options have a fee for investment management and other services. With regards to investments like mutual funds, like any other investor, retirement plan participants pay for these costs via the fund's expense ratio evidenced by a percentage of assets. For example, an expense ratio of .75% means that the plan participant will pay $7.50 annually for every $1,000 in assets.  However, the expense ratio also reduces the participant's return and the compounding effect of that return.  This is why it is prudent for a plan fiduciary to consider

the effect that expense ratios have on investment returns because it is in the best interest of participants to do so.

69.     When jumbo plans, particularly those with over a billion dollars in assets like the Plans here, have options which approach the retail cost of shares for individual investors or are simply more expensive than the average or median institutional shares for that type of investment, a careful review of the plan and each option is needed for the fiduciaries to fulfill their obligations to the plan participants.

70.     One indication of Defendants' failure to prudently monitor the Plans' funds is that the Plans have retained several actively-managed funds as the Plans' investment options despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, and despite ample evidence available to a reasonable fiduciary that these funds had become imprudent due to their high costs.

71.     Another indication of Defendants' failure to prudently monitor the Plans' funds is that several funds during the Class Period were more expensive than comparable funds found in similarly sized plans (plans having over 1 billion dollars in assets in the case of the TriNet III Plan and $500 million and $1 billion in the case of the TriNet IV Plan).

72.     In 2018, for example, many of funds in the Plans had expense ratios well above the median expense ratios for similarly sized plans.

73.     The expense ratios for funds in the TriNet III Plan were in some cases **320%** above the ICI Median (in the case of Transamerica Invesco International Growth Ret Acct PX)

and *297%* above the ICI Median (in the case of Henderson Triton Ret Acct) in the same category. [8] These excessively high expense ratios are detailed in the chart below:

| TriNet III Plan -- Current Fund | ER[9] | Category | ICI Median |
|---|---|---|---|
| Transamerica Janus Henderson Triton Ret Acct | 1.31 % | Domestic Equity | 0.33% |
| Transamerica American Funds New Perspective Ret Acct | 1.35 % | International Equity | 0.50% |
| Transamerica DFA US Small Cap Value Ret Acct | 0.51 % | Domestic Equity | 0.33% |
| Transamerica State Street International Index Ret Acct | 0.95 % | International Equity | 0.50% |
| Transamerica Invesco International Growth Ret Acct PX | 2.10 % | International Equity | 0.50% |
| Transamerica Vanguard Institutional Target Retirement Income Ret Opt | 0.50 % | Target-date | 0.47% |
| Transamerica State Street Emerging Markets Index Ret Acct | 0.99 % | International Equity | 0.50% |
| Transamerica Oakmark International Ret Acct | 0.98 % | International Equity | 0.50% |
| Schwab Charles Family Funds - Retirement Government Money Fund | 0.19 % | Money Market | 0.11% |

74.     The expense ratios for funds in the TriNet IV Plan were in some cases *112%* above the ICI Median (in the case of JPMorgan Small Cap Growth) and *79%* above the ICI

---

[8] *See*  BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2016* at 62 (June 2019) (hereafter, "ICI Study") available at https://www.ici.org/pdf/19_ppr_dcplan_profile_401k.pdf

[9]  The listed expense ratios are taken from summary prospectuses published in 2020.

Median (in the case of Cohen & Steers Realty Shares) in the same category.[10] These excessive expense ratios are detailed in the chart below:

| TriNet IV Plan -- Current Fund | ER[11] | Category | ICI Median |
|---|---|---|---|
| JPMorgan Small Cap Growth | 0.89 % | Domestic Equity | 0.42% |
| American Funds New World | 0.45 % | International Equity | 0.54% |
| American Funds Europacific Growth | 0.49 % | International Equity | 0.54% |
| Baird Aggregate Bond | 0.30 % | Domestic Bond | 0.43% |
| BlackRock High Yield Bond | 0.63 % | Domestic Bond | 0.43% |
| DFA US Small Cap Value I | 0.51 % | Domestic Equity | 0.42% |
| Cohen & Steers Realty Shares | 0.75 % | Domestic Equity | 0.42% |
| Pimco Low Duration | 0.46 % | Domestic Bond | 0.43% |
| Templeton Global Bond | 0.71 % | International Bond | 0.58% |

75.     The above comparisons understate the excessiveness of fees in the Plans throughout the Class Period.  That is because the ICI Median fee is based on a study conducted in 2016 when expense ratios would have been higher than today given the downward trend of expense ratios the last few years.  Indeed, the ICI median expense ratio for domestic equity funds for plans with between $500 million dollars and $1 billion dollars in assets was 0.52% using 2015 data compared with 0.42% in 2016.  Accordingly, the median expense ratios in 2020, or for that matter 2019, utilized by similar plans would be lower than indicated above, demonstrating a

---

[10]  *See*  BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2016* at 62 (June 2019) (hereafter, "ICI Study") available at https://www.ici.org/pdf/19_ppr_dcplan_profile_401k.pdf

[11]  The listed expense ratios are taken from summary prospectuses published in 2020.

greater disparity between the 2019 expense ratios utilized in the above chart for the Plans' funds and the median expense ratios in the same category.

76.     Further, median-based comparisons also understate the excessiveness of the investment management fees of the Plans' funds because many prudent alternative funds were available that offered lower expenses than the median.

### *Failure to Utilize Lower Fee Share Classes*

77.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.  Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets, generally 1 million or more, and therefore greater bargaining power. There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

78.     Jumbo defined contribution plans such as the Plans have sufficient assets to qualify for the lowest cost share class available.  Even when a plan does not yet meet the investment minimum to qualify for the cheapest available share class, it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a jumbo plan adding the fund in question to the plan as a designated investment alternative.  Simply put, a fiduciary to a large defined contribution plan such as the Plans can use its asset size and negotiating power to invest in the cheapest share class available.  For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

79.     Indeed, recently a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would

know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017).

80.     Here, had the Plans' fiduciaries been faithfully selecting and monitoring the funds in the Plans "with the care, skill and diligence that would be applied by a prudent person acting in a like capacity and knowledgeable in the investment of retirement funds," as their own Investment Policy states, they would have selected the lower-priced identical funds. IPS at 5.

81.     As demonstrated by the chart below, in several instances during the Class Period, Defendants failed to prudently monitor the Plans to determine whether the Plans were invested in the lowest-cost share class available for the Plans' mutual funds.  The charts below use 2020 expense ratios to demonstrate how much more expensive the funds were than their identical counterparts. The chart below analyzes the funds in the TriNet III Plan:

| TriNet III -- Current Fund | ER | Lower Share Class | ER | Excess Cost |
|---|---|---|---|---|
| Transamerica Janus Henderson Triton Ret Acct | 1.31 % | Janus Henderson Triton N | 0.66 % | 98% |
| Transamerica American Funds New Perspective Ret Acct | 1.35 % | American Funds New Perspective R6 | 0.42 % | 221% |
| Transamerica Invesco International Growth Ret Acct PX | 2.10 % | Invesco Oppenheimer International Gr R6 | 0.69 % | 204% |
| Transamerica Vanguard Institutional Target Retirement Income Ret Opt | 0.50 % | Vanguard Instl Trgt Retire Inc Instl | 0.09 % | 455% |
| Transamerica State Street Emerging Markets Index Ret | 0.99 % | State Street Emerging Markets Eq Idx K | 0.17 % | 482% |

| TriNet III -- Current Fund | ER | Lower Share Class | ER | Excess Cost |
|---|---|---|---|---|
| Acct | | | | |
| Transamerica Oakmark International Ret Acct | 0.98 % | Oakmark International Institutional | 0.81 % | 21% |

82.     Similarly, the funds in the TriNet IV Plan were unjustifiably more expensive than their nearly identical lower cost alternatives. The chart below demonstrates this:

| TriNet IV -- Current Fund | ER | Lower Share Class | ER | Excess Cost |
|---|---|---|---|---|
| American Funds New Perspective | 0.49 % | American Funds New Perspective R6 | 0.42 % | 17% |
| JPMorgan Small Cap Growth | 0.89 % | JPMorgan Small Cap Growth R6 | 0.74 % | 20% |
| American Funds New World | 0.64 % | American Funds New World R6 | 0.60 % | 7% |
| American Funds Europacific Growth | 0.49 % | American Funds Europacific Growth R6 | 0.46 % | 6% |
| BlackRock High Yield Bond | 0.63 % | BlackRock High Yield Bond K | 0.51 % | 23% |
| Templeton Global Bond | 0.71 % | Templeton Global Bond R6 | 0.56 % | 27% |

83.     The above is for illustrative purposes only.  At all times during the Class Period, Defendants knew or should have known of the existence of cheaper share classes and therefore also should have immediately identified the prudence of transferring the Plans' funds into these alternative investments.

84.     Qualifying for lower share classes usually requires only a minimum of a million dollars for individual funds.  However, it is common knowledge that investment minimums are often waived for jumbo plans like the Plans.  *See, e.g., Davis et al. v. Washington Univ. et al.*, 960 F.3d 478, 483 (8th Cir. 2020) ("minimum investment requirements are 'routinely waived' for individual investors in large retirement-savings plans"); *Sweda v. Univ. of Pennsylvania,* 923

F.3d 320, 329 (3d Cir. 2019) (citing *Tibble II*, 729 F.3d at 1137 n.24) (confirming that investment minimums are typically waived for large plans). The combined assets under management easily qualified the Plans for lower share classes. The following is a sampling of the assets under management as of the end of 2018:

| Plan Investment | 2018 Assets Under Management TriNet III Plan | 2018 Assets Under Management TriNet IV Plan |
|---|---|---|
| Transamerica Janus Henderson Triton Ret Acct | $80,935,989 | N/A |
| Transamerica American Funds New Perspective Ret Acct | $58,986,555 | N/A |
| Transamerica Invesco International Growth Ret Acct PX | $26,558,584 | N/A |
| Transamerica Vanguard Institutional Target Retirement Income Ret Opt | $25,502,120 | N/A |
| Transamerica State Street Emerging Markets Index Ret Acct | $24,509,062 | N/A |
| Transamerica Oakmark International Ret Acct | $22,604,783 | N/A |
| American Funds New Perspective | N/A | $25,912,741 |
| JPMorgan Small Cap Growth | N/A | $25,567,927 |
| American Funds New World | N/A | $24,216,390 |
| American Funds Europacific Growth | N/A | $18,093,518 |
| BlackRock High Yield Bond | N/A | $13,872,849 |
| Templeton Global Bond | N/A | $6,550,197 |

85. A prudent fiduciary conducting an impartial review of the Plans' investments would have identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into the lower share classes at the earliest opportunity.

86. There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment. Defendants have no

reasonable excuse for not knowing about the immediate availability of these lower cost share classes.  Moreover, the Plans did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for the Plans' participants.

87.     It is not prudent to select higher cost versions of the same fund even if a fiduciary believes – as it appears Defendants here did - fees charged to plan participants by the "retail" class investment were the same or better as the fees charged by the "institutional" class investment, net of the "revenue sharing" paid by the funds to defray the Plans' recordkeeping costs. *Tibble III*, 2017 WL 3523737, at * 8.  Fiduciaries should not "choose otherwise imprudent investments specifically to take advantage of revenue sharing." *Id.* at * 11.

88.     Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for participants of the Plans.  "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin     Pritchard,     "Revenue     Sharing     and     Invisible     Fees"     available     at http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited March 19, 2020).

89.     TriNet's retirement plans are large and have scale which affords the Plans' fiduciaries the opportunity to negotiate for lower recordkeeping costs and get access to the same investments with lower expense ratios which benefit the plan participants because the returns are higher and compounding greater.

90.     It is important to note that to the investment provider, a portion of the expense ratio is considered revenue, and possibly to the record-keeper as well, but is a detriment to the participant's return because it reduces it and the compounding effect.

91.     In other words, a more prudent arrangement in this case, also more transparent and easier to comprehend by participants, would have been to take advantage of the Plans' scale by selecting available lower cost investment funds that used little to no revenue sharing and for the Defendants to negotiate and/or obtain reasonable direct compensation per participant recordkeeping/administration fees.

92.     By failing to investigate the use of lower cost share classes Defendants caused the Plans to pay millions of dollars per year in unnecessary fees.

### *Failure to Utilize Lower Cost Passively Managed and Actively Managed Funds*

93.     As noted *supra*, ERISA is derived from trust law. *Tibble*, 135 S. Ct. at 1828. Accordingly, appropriate investments for a fiduciary to consider are "suitable index mutual funds or market indexes (with such adjustments as may be appropriate)." Restatement (Third) of Trusts § 100 cmt. b(1).

94.     While higher-cost mutual funds may outperform a less-expensive option, such as a passively-managed index fund, over the short term, they rarely do so over a longer term. *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market?  Hardly*, The Washington Post, available at https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices which looked at 2,862 actively managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year); *see also Index funds trounce actively managed funds:  Study*, available at http://www.cnbc.com/2015/06/26/index-funds-trounce-actively-

managed-funds-study.html ("long-term data suggests that actively managed funds "lagged their passive counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014.")

95.     Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

96.     During the Class Period, Defendants failed to consider materially similar but cheaper alternatives to the Plan's investment options.  This is just another manifestation of the imprudent process employed by the Plan's fiduciaries because the alternative funds in the chart below performed better than the Plan's funds net-of-fees.

97.     The chart below demonstrates that the expense ratios of the Plan's investment options were more expensive by multiples of comparable passively-managed and actively-managed alternative funds in the same investment style.  These alternative investments had no material difference in risk/return profiles with the Plan's funds and there was a high correlation of the alternative funds' holdings with the Plan's funds holdings such that any difference was immaterial.  A reasonable investigation would have revealed the existence of lower-cost and better performing alternatives to the Plan's funds.

98.     The chart below uses 2020 expense ratios as a methodology to demonstrate how much more expensive the Plan's funds were than their alternative fund counterparts.

| TriNet III – Current Fund | ER | Passive/Active Lower Cost Alternative[12] | ER | % Fee Excess |
|---|---|---|---|---|
| Transamerica Janus Henderson Triton Ret Acct | 1.31 % | Vanguard Small Cap Growth Index I | 0.06 % | 2,083% |
| | | Vanguard Explorer Adm | 0.34 % | 285% |
| | | | | |
| Transamerica American Funds New Perspective Ret Acct | 1.35 % | T. Rowe Price Global Stock | 0.82 % | 65% |
| | | | | |
| Transamerica DFA US Small Cap Value Ret Acct | 0.51 % | Vanguard Small Cap Value Index I | 0.06 % | 750% |
| | | | | |
| Transamerica State Street International Index Ret Acct | 0.95 % | Vanguard Total Intl Stock Index I | 0.08 % | 1,087% |
| | | Vanguard International Growth Adm | 0.32 % | 197% |
| | | | | |
| Transamerica Invesco International Growth Ret Acct PX | 2.10 % | Vanguard International Growth Adm | 0.32 % | 556% |
| | | | | |
| Transamerica Vanguard Institutional Target Retirement Income Ret Opt | 0.50 % | Vanguard Instl Trgt Retire Inc Inv | 0.12 % | 317% |
| | | | | |

[12] Where appropriate, each cell in this column references both a passively-managed fund (identified first) and an actively-managed fund (identified second). Where only one fund is listed, index funds are identified by the word "index" following the fund name. Actively managed funds don't have this designation.

| TriNet III – Current Fund | ER | Passive/Active Lower Cost Alternative[12] | ER | % Fee Excess |
|---|---|---|---|---|
| Transamerica State Street Emerging Markets Index Ret Acct | 0.99 % | Vanguard Emerging Mkts Stock Idx Instl | 0.10 % | 890% |
| | | | | |
| Transamerica Oakmark International Ret Acct | 0.98 % | Vanguard International Growth Adm | 0.32 % | 206% |
| | | Vanguard Developed Markets Index Instl | 0.05 % | 1,860% |
| | | | | |
| Schwab Charles Family Funds - Retirment Government Money Fund | 0.19 % | Vanguard Treasury Money Market Investor | 0.09 % | 111% |

99.     Similarly, the TriNet IV Plan failed to investigate appropriate lower cost alterative again demonstrating that the Defendants lacked a prudent process for managing the Plan's costs. The Chart below illustrates these failures in the TriNet IV Plan:

| TriNet IV -- Current Fund | ER | Passive/Active Lower Cost Alternative | ER | % Fee Excess |
|---|---|---|---|---|
| JPMorgan Small Cap Growth | 0.89 % | JPMorgan Small Cap Growth R6 | 0.74 % | 20% |
| | | | | |
| American Funds New World | 0.45 % | TIAA-CREF Emerging Markets Eq Idx Instl | 0.20 % | 125% |
| | | | | |
| American Funds Europacific Growth | 0.49 % | Vanguard International Growth Adm | 0.32 % | 53% |
| | | | | |
| Baird Aggregate Bond | 0.30 % | Vanguard Interm-Term Bond Index Adm | 0.07 % | 329% |
| | | Bridge Builder Core Bond | 0.14 % | 114% |
| | | | | |

| TriNet IV -- Current Fund | ER | Passive/Active Lower Cost Alternative | ER | % Fee Excess |
|---|---|---|---|---|
| BlackRock High Yield Bond | 0.63 % | Vanguard High-Yield Corporate Adm | 0.13 % | 385% |
| | | | | |
| DFA US Small Cap Value I | 0.51 % | Vanguard Small Cap Value Index I | 0.06 % | 750% |
| | | | | |
| Cohen & Steers Realty Shares | 0.75 % | TIAA-CREF Real Estate Sec Instl | 0.51 % | 47% |
| | | | | |
| Pimco Low Duration | 0.46 % | Vanguard Short-term Corp. Bond Idx Inst | 0.05 % | 820% |
| | | JPMorgan Short Duration Core Plus R6 | 0.33 % | 39% |
| | | | | |
| Templeton Global Bond | 0.71 % | Vanguard Total Int'l Bond Index I | 0.07 % | 914% |

100.    There is no good-faith explanation for utilizing high-cost share classes when nearly identical funds were available. Moreover, the Plans did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for the Plans' participants.

101.    The above alternative funds had better performances than the Plans' funds in their 3 and 5 year average returns as of 2020.  Moreover, these alternative investments had no material difference in risk/return profiles with the Plans' funds and there was a high correlation of the alternative funds' holdings with the Plans' funds holdings such that any difference was immaterial.

102.    With regard to the comparison of the actively managed funds to passively

managed funds, these results are not surprising given that in the long-term, actively managed funds do not outperform their passively-managed counterparts.  Indeed, the majority of U.S. equity funds did not outperform their index counterparts in the five years ending June 30, 2019:[13]

| Fund Category | Comparison Index | Percentage of Funds That Underperformed Their Benchmark  5 Yr (%) |
|---|---|---|
| Large-Cap | S&P 500 | 78.52 |
| Mid-Cap | S&P MidCap 400 | 63.56 |
| Small-Cap | S&P SmallCap 600 | 75.09 |
| Multi-Cap | S&P Composite 1500 | 82.79 |
| Domestic Equity | S&P Composite 1500 | 81.66 |
| Large-Cap Value | S&P Value | 84.74 |
| Mid-Cap Value | S&P MidCap 400 Value | 92.31 |

103.    A prudent investigation would have revealed the existence of these lower-cost and better performing alternatives to the Plans' funds.

104.    The above is for illustrative purposes only as the significant fee disparities detailed above existed for all years of the Class Period.  The Plans' expense ratios were multiples of what they should have been given the bargaining power available to the Plans' fiduciaries.

105.    Defendants' failure to investigate lower cost alternative investments (both actively and passively managed funds) during the Class Period cost the Plans and its participants millions of dollars.

**B.   Defendants Failed to Monitor or Control the Plans' Recordkeeping Expenses**

106.    The recordkeeper for the TriNet III 401(k) Plan during the Class Period was

---

[13] Source: https://us.spindices.com/spiva/#/reports

Transamerica. 2014 through 2018 Form 5500s filed with the United States Department of Labor for the TriNet 401(k) Plan ("2014-2018 TriNet III Form 5500s) at 1-2.  The recordkeeper for the TriNet IV 401(k) Plan during the Class Period was MassMutual. 2014 through 2018 Form 5500s filed with the United States Department of Labor for the TriNet Select 401(k) Plan ("2014-2018 TriNet IV Form 5500s) at 2.

107.    The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."  Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a broad range of services to a defined contribution plan as part of its package of services. These services can include claims processing, trustee services, participant education, managed account services, participant loan processing, QDRO[14] processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services.  Nearly all recordkeepers in the marketplace offer this range of services, and defined contribution plans have the ability to customize the package of services they receive and have the services priced accordingly.  Many of these services can be provided by recordkeepers at very little cost.  In fact, several of these services, such as managed account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.

108.    The cost of providing recordkeeping services depends on the number of participants in a plan.  Plans with large numbers of participants plans can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.    Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

---

[14] Qualified Domestic Relations Order.

109.    As referenced above, recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor). Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

110.    In this matter, using revenue sharing to pay for recordkeeping resulted in a worst-case scenario for the Plans' participants because they were saddled with outrageously high recordkeeping fees.

111.    In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

112.    Further, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available.  This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.  More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the

plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015); *see also* NEPC 2019 Defined Contribution Progress Report at 10 ("Best Practice is to compare fees and services through a record keeping vendor search Request for Proposal process). [15]

113.    In this matter, during the Class Period, there was no contractual recordkeeper fee per participant.  Rather, recordkeeping and administrative costs were paid using revenue sharing. The Plans reported the following revenue sharing payments during the Class Period on its 2014-2018 Form 5500s:

| Year | Assets TriNet III | Partic ipants | Direct TransAm | Direct TriNet | Total | $PP |
|------|------|------|------|------|------|------|
| 2014 | $956,107,454 | 31,840 | $3,000,768 | $154,084 | $3,154,852 | $99.08 |
| 2015 | $1,339,890,441 | 44,317 | $4,184,645 | $152,514 | $4,337,159 | $97.87 |
| 2016 | $1,874,038,569 | 57,110 | $4,180,721 | $299,635 | $4,480,356 | $78.45 |
| 2017 | $2,759,960,791 | 74,107 | $6,366,992 | $452,584 | $6,819,576 | $92.02 |
| 2018 | $2,886,542,111 | 88,647 | $8,466,241 | $415,575 | $8,881,816 | $100.19 |

| Year | Assets Tri Net IV | Partic pants | MassMut | Plan Sponsor | Total | $PP |
|------|------|------|------|------|------|------|
| 2014 | $534,174,572 | 8417 | $1,687,957 | $1,087,147 | $2,775,104 | $329.70 |
| 2015 | $625,121,243 | 9876 | $2,073,704 | $903,005 | $2,976,709 | $301.41 |
| 2016 | $781,325,188 | 11585 | $2,211,284 | $292,592 | $2,503,876 | $216.13 |
| 2017 | $1,001,575,831 | 11877 | $2,511,424 | $584,693 | $3,096,117 | $260.68 |

---

[15] Available at https://www.nepc.com/insights/2019-dc-plan-and-fee-survey.

| Year | Assets Tri Net IV | Partic pants | MassMut | Plan Sponsor | Total | $PP |
|------|-------------------|--------------|---------|--------------|-------|-----|
| 2018 | $1,102,018,284 | 14420 | $1,862,288 | $90,358 | $2,122,646 | $147.20 |

114.    Defendants have wholly failed to prudently manage and control the Plans' recordkeeping and administrative costs by failing to try to obtain lower recordkeeping costs than what the recordkeeper was charging.

115.    By way of comparison, we can look at what other plans are paying for recordkeeping and administrative costs.

116.    The Plans had tens of thousands of participants making it eligible for some of the lowest fees on the market.  Recently, Fidelity – a recordkeeper for hundreds of plans -  stipulated in a lawsuit that a Plan with over 58,000 participants and over a billion in assets could command recordkeeping fees as low as $14-21.  *See Moitoso v. FMR LLC*, 2020 WL 1495938, at * 15 (D. Mass. Mar. 27, 2020).

117.    NEPC, a consulting group, recently conducted its 14th Annual Survey titled the NEPC 2019 Defined Contribution Progress Report (referenced above) which took a survey of various defined contribution plan fees.  The sample size and respondents included 121 Defined Contribution Plans broken up as follows: 71% Corporate; 20% Healthcare, and 9% Public, Not-for-Profit and other.  The average plan had $1.1 billion in assets and 12,437 participants.  The median plan had $512 million in assets and 5,440 participants.  *See* Report at 1.

118.    NEPC's survey found that plans with over 15,000 participants paid on average $40 or less in per participant recordkeeping, trust and custody fees.  Report at 10.

119.    Another data source, the *401k Averages Book* (20th ed. 2020)[16] studies plan fees for smaller plans, those under $200 million in assets.  Although it studies slightly smaller plans than the Plans, it is nonetheless a useful resource because we can extrapolate from the data what a slightly bigger plan like the Plans should be paying for recordkeeping.  That is because recordkeeping and administrative fees should ***decrease*** as a plan increases in size.  For example, a plan with 200 participants and $20 million in assets has an average recordkeeping and administration cost (through direct compensation) of $12 per participant.  *401k Averages Book* at p. 95.  A plan with 2,000 participants and $200 million in assets has an average recordkeeping and administration cost (through direct compensation) of $5 per participant.  *Id.*, at p. 108.  Thus, the Plans, with over $3.8 billion dollars in assets in 2018 and over 103,000 participants in 2018, should have had direct recordkeeping costs below the $5 average, which it clearly did not.

120.    The Plans' total recordkeeping costs are clearly unreasonable as some authorities have recognized that reasonable rates for large plans typically average around $35 per participant, with costs coming down every day.[17]

121.    Given the size of the Plans' assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plans could have obtained recordkeeping services that were

---

[16] "Published since 1995, the *401k Averages Book* is the oldest, most recognized source for non-biased, comparative 401(k) average cost information."  *401k Averages Book* at p. 2.

[17] Case law is in accord that large plans can bargain for low recordkeeping fees.  *See, e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d at 798 (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

comparable to or superior to the typical services provided by the Plans' recordkeeper at a lower cost.

122.    A prudent fiduciary would have observed the excessive fees being paid to the recordkeeper and taken corrective action. Defendants' failures to monitor and control recordkeeping compensation cost the Plans millions of dollars per year and constituted separate and independent breaches of the duties of loyalty and prudence.

**FIRST CLAIM FOR RELIEF**
**Breaches of Fiduciary Duties of Loyalty and Prudence**
**(Asserted against the Committee)**

123.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

124.    At all relevant times, the Committee Defendants and its members ("Prudence/Loyalty Defendants") were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans' assets.

125.    As fiduciaries of the Plans, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plans for the sole and exclusive benefit of the Plans' participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

126.    The Prudence/Loyalty Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plans' investment lineup based solely on the merits of each investment and what was in the best

interest of the Plans' participants.   Instead, the Prudence/Loyalty Defendants selected and retained investment options in the Plans despite the high cost of the funds in relation to other comparable investments. The Prudence/Loyalty Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plans.

127.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had Defendants complied with their fiduciary obligations, the Plans would not have suffered these losses, and the Plans' participants would have had more money available to them for their retirement.

128.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence/Loyalty Defendants are liable to restore to the Plans all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

129.    The Prudence/Loyalty Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.   Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against TriNet and the Board)**

130.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

131.    TriNet and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plans.

132.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plans in the event that the Committee Defendants were not fulfilling those duties.

133.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plans' investments; and reported regularly to the Monitoring Defendants.

134.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)     Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plans suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

(b)     failing to monitor the processes by which the Plans' investments were evaluated and their failure to investigate the availability of lower-cost share classes; and

(c)      failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plans, and caused the Plans to pay excessive recordkeeping fees, all to the detriment of the Plans and the retirement savings of the Plans' participants.

135.   As a consequence of the foregoing breaches of the duty to monitor, the Plans suffered millions of dollars of losses.  Had Monitoring Defendants complied with their fiduciary obligations, the Plans would not have suffered these losses, and participants of the Plans would have had more money available to them for their retirement.

136.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plans all losses caused by their failure to adequately monitor the Committee Defendants.   In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including

losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plans, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plans and removal of Plans' fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Date: September 29, 2020

/s/ Joseph M. Sternberg          .
Joseph M. Sternberg, ESQ.
Florida Bar No.: 122447
joseph@landersandsternberg.com
(407) 495-1893
Fax: (407) 362-6325
722 W. Smith Street
Orlando, FL 32804

**CAPOZZI ADLER, P.C.**

/s/ Donald R. Reavey          .
Donald R. Reavey, Esquire
(*Admission Pro Hac Vice to be Requested*)
PA Attorney ID #82498
2933 North Front Street
Harrisburg, PA 17110
donr@capozziadler.com
(717) 233-4101
Fax (717) 233-4103

/s/ Mark K. Gyandoh          .
Mark K. Gyandoh, Esquire
(*Admission Pro Hac Vice to be Requested*)
PA Attorney ID # 88587
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com
(610) 890-0200
Fax (717) 233-4103

Counsel for Plaintiffs and the Putative Class