# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

SHIQIONG HUANG, *et al.*,

                Plaintiffs,

v.

TRINET HR III, INC., *et al.*,

                Defendants.

CASE NO. 8:20-CV-02293
DISPOSITIVE MOTION

**DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

Defendants TriNet HR III, Inc., TriNet HR IV, Inc., the Board of Directors of TriNet HR III, Inc., the Board of Directors of TriNet HR IV, Inc., and the Retirement Committee of TriNet Group, Inc. (collectively, "TriNet"), hereby move the Court pursuant to LR 3.01 and Fed. R. Civ. P. 12(b)(6) for entry of an Order dismissing the First Amended Complaint ("FAC").

This lawsuit is just the latest in a wave of over 50 copycat complaints filed in the last year by this particular plaintiffs' firm[1] against 401(k) plan sponsors.  As the U.S. Chamber of Commerce has observed, these complaints "follow a familiar playbook, often with cookie-cutter complaints that cut and paste pages and pages of identical assertions about the nature of fiduciary obligations, recycling them verbatim

---

[1] According to one study, there were a total of 90 such lawsuits brought by *all* plaintiffs' firms in 2020.  Euclid Specialty Managers LLC, *Exposing Excessive Fee Litigation Against America's DC Plans*, available at https://www.euclidspecialty.com/new-euclid-specialty-whitepaper-exposing-excessive-fee-litigation-against-americas-defined-contribution-plans/ (last visited Sept. 6, 2021).

from prior pleadings."[2]  Without any particularized allegations about the fiduciaries' actual process, plaintiffs try to create an inference of imprudence by comparing the returns of the plans' funds to those of other funds that plaintiffs have selected with the benefit of hindsight.  Numerous courts have dismissed these complaints and rejected the cherry-picked comparisons on which these lawsuits rest because "it is always possible . . . to use the benefit of hindsight to identify . . . a better-performing or less expensive investment option."  *Id.*

This iteration of plaintiffs' well-worn suit brings claims against TriNet, which provides benefits to the employees of thousands of small and medium-sized employers.  Plaintiffs allege breaches of fiduciary duty related to defendants' administration of two 401(k) defined contribution "multiple employer plans" ("MEPs"), the TriNet 401(k) Plan and the TriNet Select 401(k) Plan (collectively, the "Plans").[3]  Plaintiffs want the Court to infer a defective fiduciary process simply from the fiduciaries' choices of recordkeeping providers and investment options— which, throughout the relevant period, included a mix of actively- and passively-managed funds.  But plaintiffs were properly required to exhaust their remedies with a claims administrator ("Administrator"), and in the course of finding plaintiffs' claims wanting, the Administrator compiled records detailing the Plans' investment and recordkeeping expenses, and the competitive request for proposal ("RFP") and

---

[2] Brief of *Amicus Curiae* Chamber of Commerce of the United States of America in Support of Defendants' Motion to Dismiss, *In Re Am. Nat'l Red Cross ERISA Litig.*, 21-cv-00541 (EGS) (D.D.C. Aug. 23, 2021), ECF No. 24–1 at 2.

[3] The Plans are also identified as the TriNet III Plan and TriNet IV Plan, respectively.

request for information ("RFI") processes used to price the Plans' recordkeeping services. These materials, now incorporated in plaintiffs' pleading through the FAC, establish that, contrary to plaintiffs' allegations, the Plans' fiduciaries adhered to a rigorous process that resulted in continual adjustments and assessments of the Plans' investment selections and recordkeeping arrangements, and resulting costs.

Against this record, plaintiffs improbably urge the Court to infer a broken fiduciary process based on three misguided theories. *First*, plaintiffs allege that a handful of the Plans' investment options were imprudent selections because they charged fees that were allegedly above the median and more expensive than certain inexpensive Vanguard index funds. This theory suffers from a number of fatal flaws, including most glaringly that the FAC relies on erroneous expense ratios for all but one of the challenged investments in the TriNet 401(k) Plan. More importantly, plaintiffs miss the forest for the trees. Materials incorporated in the FAC establish that, viewing the Plans' menus as a whole, 51 of the Plans' 57 investment options charged fees *below* the median fee levels plaintiffs refer to, and the Plans included many of the very same Vanguard index funds that plaintiffs allege were absent. The TriNet Select 401(k) Plan, for example, offered participants a choice of 32 options that included approximately 21 different passive index funds or target date funds with extremely low fees. Plaintiffs' charge thus amounts to nothing more than the legally groundless critique that they were afforded a choice between inexpensive index funds and actively-managed options (just three of which in each Plan had slightly higher than median fees). As the Seventh Circuit has explained, the fiduciary

"left [the] choice to the people who have the most interest in the outcome, and it cannot be faulted for doing this."[4]

*Second*, plaintiffs allege in two conclusory sentences that the Court can infer an imprudent process because a handful of the Plans' investments allegedly underperformed for a short period versus certain Vanguard funds that plaintiffs have picked in hindsight. But the claim is contradicted by incorporated documents showing that the Plans' investments, in fact, *outperformed* many of these comparators. And it is legally immaterial in any event, as courts have long recognized that ERISA[5] "requires prudence, not prescience."[6] Court after court has recognized that conclusory allegations that certain investment options, in hindsight, underperformed cherry-picked alternatives with *different* investment strategies says nothing about whether the fiduciary's selections were reasonable at the time they were made.

*Third,* plaintiffs now acknowledge, based on the administrative record, that the Plans' fiduciaries conducted not one but two competitive searches in the last five years to ensure that the Plans' recordkeeping fees were reasonable for the services provided. While plaintiffs concede that this is a "Best Practice" and have alleged this is the hallmark of a prudent process, they nevertheless pursue the desperate claim that the market must be overpricing recordkeeping services to MEPs because

---

[4] *Loomis v. Exelon Corp.*, 658 F.3d 667, 673–74 (7th Cir. 2011).

[5] Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.*

[6] *DeBruyne v. Equitable Life Assurance Soc'y*, 920 F.2d 457, 465 (7th Cir. 1990) (quotation omitted).

(according to plaintiffs) the fees the Plans pay exceed the median recordkeeping fees for single-employer plans.  That contention ignores the obvious differences in costs associated with recordkeeping an MEP, and it is significant that plaintiffs do not point to *any* MEP that pays less for recordkeeping services than the Plans.[7]  Plaintiffs' focus on the *results* of the periodic competitions for the Plans' recordkeeping services is also misplaced: the fiduciaries' duties were to pursue an appropriate *process* for acquiring recordkeeping services.  Plaintiffs concede that the fiduciaries used competitive searches to do so, and their criticism that the fiduciaries did not seek proposals from providers without MEP experience falls flat.

Accordingly, the Court can and should dismiss the FAC on *de novo* review because plaintiffs' claims are meritless as a matter of law.  But the FAC is also subject to dismissal because plaintiffs were already denied relief on their theories through an exhaustive administrative process that was required by the plan documents, and plaintiffs can avoid that decision only by establishing that it lacks a reasonable basis.  Plaintiffs have pleaded no basis to conclude that the Administrator's decision should be overturned under a *de novo* standard of review,

---

[7] Plaintiffs' counsel are well-aware from other lawsuits they have filed that an apples-to-apples comparison to other MEPs confirms that the Plans' recordkeeping costs are reasonable and in line with or below the costs of other MEPs.  Compl. ¶ 87, *See Khan v. Bd. of Dirs. of Pentegra Defined Contribution Plan*, 20-cv-07561 (S.D.N.Y. Sept. 15, 2020), ECF No. 1 (alleging recordkeeper fees for MEP of $388 per participant); Compl., *Loomis v. Nextep, Inc.*, 21-cv-199 (W.D. Okla. Mar. 10, 2021), ECF No. 1 (alleging recordkeeper fees for MEP of $175 per participant); *see also* Expert Report of James Scheinberg ¶ 80, *Pledger v. Reliance Tr. Co.*, 15-cv-04444 (N.D. Ga. June 8, 2018), ECF No. 131–2 (describing higher fees for an MEP and noting the TriNet Plans' fees as less than competitors).

much less under an arbitrary and capricious standard.  *See Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1354 (11th Cir. 2011).  The case must be dismissed.

## BACKGROUND

### A.    THE TRINET MULTIPLE-EMPLOYER PLANS

TriNet is a professional employer organization ("PEO") and leading provider of human resources expertise, payroll services, and employee benefits to small and medium-sized businesses.  FAC ¶ 24.  TriNet also offers its client-employers the opportunity to participate in two TriNet-sponsored defined contribution 401(k) plans: the TriNet 401(k) Plan and the TriNet Select 401(k) Plan.  *Id.* ¶ 41.  The Plans are MEPs[8] with over 7,975 adopting employers and 250,000 participants, as of 2019.  *See* Declaration of William Pollak ("Pollak Decl."), Ex. 3–K–11 at 49–75; Ex. 3–K–12 at 78; Ex. 3–L–11 at 107, 123–220.  The Retirement Committee of TriNet Group (the "Committee") is responsible for selecting investments for the Plans.  FAC ¶ 25.  The Committee, with the assistance of an independent professional investment advisor, DiMeo Schneider & Associates, LLC (now named Fiducient Advisors[9]), selected a range of 27 to 32 different options for each of the Plans' investment menus that reflect a broad range of asset classes, risk profiles, expense ratios, and strategies, including both actively- and passively- managed strategies.  *See, e.g.*, Ex. 3–K–12 at

---

[8] An MEP is a retirement plan that is adopted by two or more employers that are unrelated for income tax purposes.  FAC ¶ 39.  IRS 7.11.7.1(2) (May 30, 2017).

[9] Fiducient Advisors is a well-known investment ERISA § 3(21) advisor with more than $225 billion in client assets under management.  *See DiMeo Schneider to Rebrand as Fiducient Advisors*, https://www.planadviser.com/dimeo-schneider-rebrand-fiducient-advisors/.

83–104; Ex. 3–L–11 at 112–22; Ex. 3–TT–11 at 400–06; Ex. 3–UU–4 at 438–40; FAC ¶ 47.  The Plans are serviced by two recordkeepers who were retained following a competitive RFP process in 2015 and RFI process in 2018, each of which was led by third-party consultants with expertise in such searches.  FAC ¶¶ 97, 113 n.20.

## B.    The Unique Nature of Multiple Employer Plans

TriNet offers its benefit plans to thousands of client-employers, and each client-employer is afforded the opportunity to elect its own plan terms and conditions from among a menu of plan design options that include different options for eligibility, vesting, matching, automatic enrollment, and the treatment of highly compensated individuals.  Ex. 3–E–1 at 22–25, 31.  As a result of this differentiation, the Plans' recordkeepers must provide customized services and documents for each of the thousands of client-employers.  In addition, since the IRS's Revenue Ruling 2002–21, PEO-sponsored plans like the Plans have been subject to a very detailed and complex set of regulations and qualification requirements.[10]  For example, under the Internal Revenue Code, each of the thousands of client employers within the Plans are treated as separate employers and subject to a series of complex annual mathematical tests to demonstrate minimum coverage and nondiscrimination.[11]

## C.    Procedural Background

Plaintiffs filed their original complaint on September 29, 2020.  ECF No. 1. On December 11, 2020, the Court stayed the action pending plaintiffs' exhaustion of

---

[10] *See* IRS Revenue Ruling 2002–21 at 2, 26 C.F.R. § 601.201 (May 13, 2002).

[11] *See* 26 U.S.C. §§ 401(k)(3), 401(m)(2), 410(b); 26 C.F.R. § 1.401(a)(4)-2(c).

administrative remedies.  ECF No. 17.  Plaintiffs submitted their administrative

claims on December 21, 2020, and the Administrator denied those claims on March

19, 2021.  ECF No. 21 at 2.  Plaintiffs appealed the denial of their administrative

claims and, on July 16, 2021, a separate appeals administrator denied plaintiffs'

appeal.  *See id.*  On August 20, 2021, plaintiffs filed the FAC.  ECF No. 23.

## LEGAL STANDARD

The Eleventh Circuit has established a six-step process for reviewing

administrative decisions under ERISA.  *Blankenship*, 644 F.3d at 1355.  As an initial

step, the court first conducts a *de novo* review of the administrative record to

determine whether the plan administrator's decision is wrong.  *Id.*  If it is not—that

is, if it does not "contain sufficient factual matter . . . to state a claim" that the

administrator's decision was *de novo* wrong "that is plausible on its face," *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted)—the court must dismiss the

action.  If the administrator's decision is "*de novo* wrong" but the administrator was

vested with discretion, then the court reviews the decision "under the more

deferential 'arbitrary and capricious' standard" to determine whether litigation can

proceed.  *Blankenship*, 644 F.3d at 1355.

In ERISA cases, motions to dismiss are "important mechanism[s] for weeding

out meritless claims."  *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).

To state a claim for breach of the duty of prudence under ERISA, the complaint

must allege that the fiduciary did not act "with the care, skill, prudence, and

diligence under the circumstances then prevailing that a prudent man acting in a like

8

capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B).

Fiduciaries who "act reasonably—i.e., who appropriately investigate the merits of an

investment decision prior to acting—easily clear this bar." *Tatum v. RJR Pension Inv.*

*Comm.*, 761 F.3d 346, 358 (4th Cir. 2014). If a complaint raises no more than "the

mere possibility of misconduct," it must be dismissed. *Pension Benefit Guar. Corp. ex*

*rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d

705, 718 (2d Cir. 2013).

## RECORD ON DEFENDANTS' MOTION TO DISMISS

It is well-established that, when considering a motion to dismiss, a court may

consider matters of which it may take judicial notice and "documents incorporated

into the complaint by reference."[12] The incorporation-by-reference doctrine extends

to "situations in which a claim depends on the contents of a document," even if the

complaint does not expressly attach the document or allege its contents.[13]

On a motion to dismiss on appeal of an administrative decision to the district

court, "the function of the court is to determine whether there was a reasonable basis

for the [claims] decision, based upon the facts as known to the administrator at the

time the decision was made." *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241,

1246 (11th Cir. 2008) (quotation omitted). To do so, a court must consider "the

material available to the administrator at the time it made its decision" to determine,

---

[12] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see Hi-Tech Pharmaceuticals, Inc.*
*v. HBS Int'l Corp.*, 910 F.3d 1186, 1189 (11th Cir. 2018).

[13] *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005); *see Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th
Cir. 2002).

*de novo*, whether the decision is wrong; if it is not, the court must affirm the decision. *Blankenship*, 644 F.3d at 1354.  In ruling on defendants' motion, the Court may thus consider the excerpts from the administrative record that are attached as Exhibit 3 to the Pollak Declaration.[14]  In addition, because the FAC expressly relies on documents in the administrative record—including, for example, materials related to the recordkeeper RFP and RFI—the excerpts attached as Exhibit 3 are also properly considered as incorporated documents.[15]  It is also appropriate for the Court to consider Exhibits 4–6, which the FAC expressly incorporates, and Exhibits 7–9, which are publicly filed Forms 5500 that are subject to judicial notice.[16]

## ARGUMENT

## I.   THE FAC FAILS TO STATE A CLAIM OF IMPRUDENCE

### A.   Plaintiffs' Inaccurate and Inapt Fee Comparisons Do Not Permit an Inference of Imprudence

The FAC is utterly devoid of the factual allegations necessary to state a claim

---

[14] *See, e.g.*, *Ellison v. Brennan*, 2020 WL 2523287, at *3 (M.D. Fla. May 18, 2020) (taking judicial notice of the administrative record); *Curran v. Kemper Nat'l Servs., Inc.*, 2005 WL 894840, at *7 (11th Cir. Mar. 16, 2005).  Defendants would be happy to submit the full administrative record to the Court upon request.

[15] *See, e.g.,* FAC ¶ 64 n.9; id. ¶ 103 n.16; id. ¶ 113 n.20; *see Saini v. Cigna Life Ins. Co. of N.Y.*, 2018 WL 1959551, at *1 (E.D.N.Y. Apr. 24, 2018) ("The Court may therefore consider the Administrative Record because the Amended Complaint either incorporates its contents by reference, or relies on its terms and effects.").

[16] *See* FAC ¶¶ 64–67, 115, n.8 (relying on Ex. 4, BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018 ("ICI Study")); ¶¶ 110–11, n. 18 (relying on Ex. 6, *401k Averages Book*), ¶¶ 103, 108–09, n.17 (relying on Ex. 5, NEPC 2019 Defined Contribution Progress Report ("NEPC Report")); *see also Tellabs*, 551 U.S. at 322 (court may consider "documents incorporated into the complaint by reference"); *Horsley*, 304 F.3d at 1134  (recognizing Eleventh Circuit's adoption of incorporation-by-reference doctrine); *Lorenz v Safeway, Inc.*, 241 F. Supp. 3d 1005, 1012 (N.D. Cal. 2017), *abrogated on other grounds by Rollins v. Dignity Health*, 338 F. Supp. 3d 1025 (N.D. Cal. 2018) ("Courts routinely take judicial notice of ERISA plan documents," including Form 5500 filings).

for breach of the duty of prudence because plaintiffs do not allege a single deficiency in defendants' investigative and decision-making processes.  Plaintiffs instead ask the Court to *infer* a defective process solely because the Plans' investments were supposedly more expensive than (i) the median expense ratios listed in the ICI Study ("ICI Median"), (ii) certain cherry-picked index funds, and (iii) other share classes of the same mutual funds.[17]  FAC ¶¶ 57–96.  Each of these theories is ill-conceived, and plaintiffs' pleading forecloses any inference of imprudence.

1.  *Plaintiffs Cannot Sustain a Claim of Imprudence Based on the Allegation that 3 out of 32 Plan Investments Had Expense Ratios Slightly Above the ICI Median*

Plaintiffs' claim that the expense ratios of the Plans' investment options exceeded the ICI Median is plagued by errors—indeed, the administrative record establishes that plaintiffs allege erroneous expense ratios for ***all but one*** of the challenged investments in the TriNet 401(k) Plan.  *Compare* Ex. 3–RR–4 at 384–85, *with* FAC ¶ 64.  Plaintiffs concede that their "manually calculated" expense ratios for the TriNet 401(k) Plan are contradicted by documents incorporated into the FAC, including Transamerica's ERISA § 408(b)(2) disclosures to the Plan.  FAC ¶ 64 n.9.  Plaintiffs nevertheless urge the Court to ignore those legally-required disclosures because they "appear[] to simply list the underlying mutual fund associated with the pooled separate account in the Plan."  *Id.*  Plaintiffs plainly misread the documents.  As required by regulation, Transamerica's disclosures clearly describe, for each

---

[17] All that plaintiffs allege is that cheaper options were available; they do not allege that there was anything wrong with the chosen options other than price.

investment option, the "expenses charged by the underlying mutual fund," any additional fees received in connection with the separate account, and "the total expense ratio [] ultimately paid by participants." *See* Ex. 3–RR–4 at 384–86; Ex. 1 at 6 (relying on the "total expense ratio" column). Moreover, numerous additional documents in the administrative record confirm the accuracy of the expense ratios in the Transamerica disclosures. *See, e.g.*, Exs. 3–UU–4 (participant fee disclosure); Exs. 3–NN & 3–MM–7 (fund fact sheets). Plaintiffs cannot travel on speculative allegations that are clearly contradicted by materials properly considered in evaluating this motion to dismiss.[18]

When the correct expense ratios are used, it is readily apparent that almost all of the challenged funds charged fees well below the ICI Median. For example, plaintiffs allege that the 2020 expense ratios for the State Street International Index and State Street Emerging Markets Index funds were 0.95% and 0.99%, respectively. FAC ¶ 64. Those funds, however, were available in the TriNet 401(k) Plan at expense ratios of 0.05% and 0.10%—well below the alleged ICI Median expense ratio of 0.50% for international equity funds. Ex. 1 at 6; Ex. 3–UU–4 at 439. More generally, 90% (51 out of 57) of both Plans' investment options had expense ratios

---

[18] *See Crenshaw v. Lister,* 556 F.3d 1283, 1292 (11th Cir. 2009) (if the allegations of the complaint conflict with the content of an exhibit, the exhibit controls); *Badadjanian v. Deutsche Bank Nat'l Tr. Co.*, 2011 WL 13214300, at *13 n.81 (C.D. Cal. Mar. 29, 2011) ("When documents incorporated in the complaint or subject to judicial notice contradict the allegations of the complaint, the exhibits govern" (citing *Griffin Indus., Inc. v. Irvin,* 496 F.3d 1189, 1206 (11th Cir. 2007), and collecting cases)); *A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC,* 2018 WL 1273343, at *8 n.4 (S.D.N.Y. Mar. 5, 2018); *cf. Found. Resol. Corp. v. Aon Hewitt Inv. Consulting, Inc.*, 2019 WL 1937255, at *3 (M.D. Fla. Mar. 1, 2019) (court can disregard allegations if incorporated documents show they are incorrect).

below their respective ICI Medians.  *Compare* Exs. 3–RR–4 & 3–OO (listing expense

ratios for the Plans' investment options), *with* FAC ¶¶ 64–65.

Even if plaintiffs' assertions as to the funds' expense ratios were consistent

with the information incorporated in the FAC and included in the administrative

record (they are not), the mere fact that some funds' expenses exceeded the pertinent

ICI Median is not a basis to condemn the funds as imprudent.  As another district

court recently found in rejecting a nearly identical claim brought by this same

plaintiffs' firm, "the ICI Median Fee reflects the fees of both passively and actively

managed funds." *Davis v. Salesforce.com, Inc.*, 2021 WL 1428259, at *3–5 (N.D. Cal.

Apr. 15, 2021).  This has the effect of significantly lowering the median expense ratio

for funds within a particular category, and renders any comparison to the ICI

Median inapt because "passively managed funds are not meaningful benchmarks for

actively managed funds given their essential differences." *Id.*[19]  Using a median fee

as a benchmark for prudence is irrational in any event because it renders half of the

funds in the market imprudent, and also fails to account for other important metrics

---

[19] *See also Dupree v. Prudential Ins. Co. of Am.*, 2007 WL 2263892 at *20 (S.D. Fla. Aug. 7, 2007) (recognizing variance in fees charged by "competing strategies"); *Amron v. Morgan Stanley Inv. Advisors Inc.,* 464 F.3d 338, 345–46 (2d Cir. 2006) ("That a mutual fund has an expense ratio higher than Vanguard, a firm known for its emphasis on keeping costs low, raises little suspicion."); *Wehner v. Genentech, Inc.,* 2021 WL 507599, at *10 (N.D. Cal. Feb. 9, 2021) (rejecting the "'apples-to-oranges' comparisons of an actively-managed fund's fees to a passively-managed index fund's fees due to the differences in the way the funds are managed"); *Patterson v. Morgan Stanley*, 2019 WL 4934834, at *11–12 (S.D.N.Y. Oct. 7, 2019) (a passive index fund's fees "cannot be meaningfully compared" to an actively-managed fund's fees).

like the range of fees[20] within a particular investment category.  ERISA's duty of prudence allows for a wide range of acceptable outcomes—not a single median expense ratio beyond which a decision is automatically imprudent.[21]  And the actual expense ratios for the challenged funds—which ranged from 0.10% to 0.79%—fall well below the range that courts have found to be reasonable as a matter of law.[22]

2. *The Plans' Fiduciaries Did Not Act Imprudently by Offering Actively-Managed Funds to Complement the Plans' Broad Array of Passively-Managed Funds*

Plaintiffs' comparison of certain of the Plans' investments to a handful of cherry-picked Vanguard index funds suffers from the same infirmities.  The Vanguard funds that plaintiffs tout are designed to track an index and, thus, pursue fundamentally different investment strategies from the actively-managed funds that plaintiffs selectively criticize.  *See* FAC ¶¶ 90–91.  Courts have easily rejected attempts to condemn actively-managed choices merely because their expenses exceed those of passively-managed alternatives; "[c]omparing apples and oranges is not a way to show that one is better or worse than the other." *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 485 (8th Cir. 2020); *see* n.19, *supra*.  Plaintiffs' criticisms ring especially hollow given that the Plans have always offered the option of investing in a broad selection of low-priced State Street and Vanguard index funds, Exs. 3–TT–

---

[20] The ICI Study confirms that the expense ratios of the challenged funds fall in the middle of the range of expense ratios in the domestic equity category.  *See* Ex. 4 (ICI Study) at 65–67.

[21] *See Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009).

[22] *See, e.g., White v. Chevron Corp.*, 2016 WL 4502808, at *11 (N.D. Cal. Aug. 29, 2016) ("*Chevron I*") (concluding that expense ratio of 1.24% was reasonable); *Loomis*, 658 F.3d at 669–72 (similar, 0.96%); *Renfro v. Unisys Corp.*, 671 F.3d 314, 319, 326–28 (3d Cir. 2011) (similar, 1.21%).

11, 3–TT–40, 3–UU–4, 3–UU–5 (participant disclosures).  Some of those index

options are the ***very same*** alternatives that plaintiffs allege the fiduciaries failed to

consider,[23] and others offered even lower fees than the choices plaintiffs champion.[24]

In any event, even if plaintiffs' inapt comparators were meaningful fee benchmarks

(and they are not), courts have consistently recognized that "nothing in ERISA

requires every fiduciary to scour the market to find and offer the cheapest possible

fund (which might, of course, be plagued by other problems)."[25]

       3.    *The FAC's Share Class Allegations Fail to State a Claim*

      There is no merit to plaintiffs' claim that defendants failed to invest in the

lowest-cost share classes.  FAC ¶¶ 68–84.[26]  In 2020, the Plans invested in the lowest-

cost share class for six of the nine[27] challenged investments.  Ex. 1 at 6; *see* FAC

---

[23] *Compare* FAC ¶ 91 (alleging Vanguard Intermediate Term Bond Index fund as low-cost alternative for TriNet Select Plan), *with* Exs. 3– TT–11 & 3–TT–40 (showing TriNet Select Plan's investment in Vanguard Intermediate Term Bond Index fund throughout the relevant period).

[24] *Compare, e.g.*, FAC ¶ 90 (alleging TriNet 401(k) Plan should have invested in Vanguard Small Cap Value (0.06%), Total International Stock (0.08%), and Emerging Markets Stock indexes (0.10%)), *with* Ex. 3–UU–4 at 438–40 (showing TriNet 401(k)'s investments in State Street Russell Small Cap (0.04%), International (0.05%), and Emerging Markets (0.10%) stock indexes).

[25] *Hecker*, 556 F.3d at 586; *see Divane v. Northwestern Univ.*, 953 F.3d 980, 989 (7th Cir. 2020) ("That plaintiffs prefer low-cost index funds . . . does not make its inclusion in the plans a fiduciary breach."); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 n.7 (8th Cir. 2009) (Plaintiffs cannot state a claim with the "bare allegation that cheaper alternative investments exist in the marketplace."); *Martin v. CareerBuilder, LLC*, 2020 WL 3578022, at *6 (N.D. Ill. July 1, 2020) ("Defendants' failure to offer every index fund under the sun is not, in and of itself, imprudent"); *White v. Chevron Corp.*, 2017 WL 2352137, at *14 (N.D. Cal. May 31, 2017) (same).

[26] Plaintiffs conveniently omit that the Plans invested in institutional share classes for the overwhelming majority of options.  *See* Ex. 3–TT–11 at 402–06 (showing Vanguard institutional TDFs and BlackRock iShares Institutional Index Fund); Ex. 3–UU–4 at 438–40.  The Forms 5500 also demonstrate that the Plans made a number of changes to their investment options over time, including to lower share classes, undercutting any suggestion that the fiduciaries failed to monitor the Plans' investments.  *See generally* Exs. 3–TT–11, 3–TT–40, 3–UU–4, 3–UU–5.

[27] In 2020, the TriNet 401(k) Plan did not invest in Invesco International Growth fund.  Ex. 1 at 6.

¶¶ 73–74.  And the difference in cost for the other three investments was entirely attributable to a "revenue sharing" credit that the "higher-cost" share classes made available to defray recordkeeping costs—such that the ***net cost*** to the Plans of those three investments was ***equal to or less than*** the purportedly "lower-cost" share classes. *See* Ex. 1 at 6; Exs. 3–OO & 3–RR–4 (2020 408(b)(2) disclosures).

Plaintiffs concede that the decision to invest in funds that engage in revenue sharing is not *per se* imprudent, FAC ¶ 80, and for good reason: Courts have repeatedly recognized that revenue sharing is a "common and acceptable" method for compensating plan recordkeepers.[28]  Indeed, another district court recently rejected a virtually identical claim brought by the same plaintiffs' law firm, where revenue sharing provided an "obvious alternative explanation" for the plan's use of higher-cost share classes.  *Salesforce.com*, 2021 WL 1428259, at *3–5.  While plaintiffs ominously warn of the "devastating" harm that could hypothetically result from revenue sharing if "unchecked" and used to "milk" plan assets, FAC ¶ 80, they do not allege that any such conduct occurred here.[29]  Nor could they, as the Plans' recordkeeping agreements (incorporated in the FAC) required the recordkeepers to return to the Plans any excess revenue above and beyond their stated recordkeeping

---

[28] *See, e.g., Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014); *Hecker*, 556 F.3d at 585 (revenue sharing "violates no statute or regulation"); *Chevron I*, 2016 WL 4502808, at *14 (same).

[29] *See Iqbal*, 556 U.S. at 679 (A complaint does not state a claim if it alleges no more than "mere possibility of misconduct.").

16

fees.[30]  Plaintiffs' claim that defendants failed to select lower-cost investments fails at every level and must be dismissed.[31]

### B. Plaintiffs' Hindsight Performance Allegation Does Not Permit an Inference of Imprudence

Plaintiffs' cursory allegation that certain cherry-picked "alternative funds had better performance" in hindsight fails to state a claim.  FAC ¶ 92.[32]  First, it is well-established that "the ultimate outcome of an investment is not proof of imprudence." *DeBruyne*, 920 F.2d at 465.  Indeed, courts have consistently rejected this type of hindsight comparison because it says nothing about the fiduciary's process for selecting funds.[33]  Here, plaintiffs do not identify any reason that a prudent fiduciary would have avoided the challenged investment options *ex ante*.  Second, many of plaintiffs' comparators employed fundamentally different investment strategies from the challenged funds.  *Supra* at 13–14.[34]  As numerous courts have recognized, "[t]he

---

[30] *See* Ex. 3–Z (TransAmerica Services Agreement (8/1/17)), at 307–08; Ex. 3–W (MassMutual Plan Administrative Services Agreement (9/25/2017)), at 282.

[31] Plaintiffs have not alleged that they were invested in any of the challenged investment options, and defendants submit (based on the Plans' records) that they cannot allege having maintained balances in all of them.  The FAC thus also fails to establish that plaintiffs have Article III standing to complain about the fees or performance of the challenged options.  *See, e.g.*, *Santiago v. Univ. of Miami*, 2021 WL 1173164, at *7–8 (S.D. Fla. Mar. 1, 2021).

[32] In fact, as the Administrator concluded, many of the challenged investments **outperformed** the alternatives that plaintiffs have cherry-picked in hindsight.  Ex. 1 at 8.

[33] *See, e.g., Barchock v. CVS Health Corp.*, 886 F.3d 43, 44–45 (1st Cir. 2018) (the fiduciary duty of prudence is "one of conduct, and not a test of the results of performance of the investment." (quotation omitted)); *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 424 (4th Cir. 2007) ("[W]hether a fiduciary's actions are prudent cannot be measured in hindsight"); *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917–18 (8th Cir. 1994) ("[T]he prudent person standard is not concerned with results").

[34] Plaintiffs' parlor trick is to compare the Plans' investments in diversified funds to pure **growth** funds, which have excelled during the unprecedented bull market over the last five years.  *See* FAC ¶¶ 90–91 (comparing the Oakmark Int'l fund with the Vanguard Int'l **Growth** Fund); Ex. 3–JJ–4 at 331 (the Oakmark Int'l "Fund invests primarily in a diversified portfolio").  "There is no authority to

fact that one fund *with a different investment strategy* ultimately performed better does not establish anything about whether the [subject funds] were an imprudent choice at the outset." *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018) (emphasis added). The FAC is fatally devoid of any basis for inferring that the fiduciaries' choices of funds (and underlying strategies) were unreasonable when made.[35]

### C. Plaintiffs Do Not Plausibly Allege that the Plans' Fiduciaries Failed to Monitor the Plans' Recordkeeping Fees

Plaintiffs cannot sustain a breach of fiduciary duty claim based on the Plans' recordkeeping fees either, because the FAC (and the documents it incorporates by reference) conclusively demonstrate that the Plans' recordkeeping fees were the result of a prudent and thorough process. Indeed, plaintiffs concede that defendants sought competitive bids for the Plans' recordkeeper services *twice* during the class period—an RFP in 2015, and an RFI in 2018. FAC ¶ 113 n.20. Independent retirement consultants NFP and DiMeo Schneider, who have expertise in recordkeeper searches, assisted the Plans during these competitions. *See* Ex. 1 at 3–4; Ex. 3–P. During the 2015 RFP, the Plans solicited detailed submissions from six highly-

---

support the proposition that the 'growth' or 'value' styles of portfolio management are preferable to one another, or . . . [selection of one] would constitute a breach of fiduciary duty." *In Re Disney ERISA Litig.,* 2017 WL 1505129, at *5 (C.D. Cal. Apr. 21, 2017).

[35] Even if plaintiffs had adequately alleged that some of the Plans' funds underperformed meaningful benchmarks over 3- and 5-year periods, courts routinely find such periods "not sufficiently long-term to state a plausible claim of imprudence." *Salesforce.com*, 2021 WL 1428259, at *6; *see Wehner*, 2021 WL 507599, at *9 ("There is nothing presumptively imprudent about a retirement plan retaining investments through periods of underperformance…" (quotation omitted)); *Patterson*, 2019 WL 4934834, at *11 (dismissing claims, as "the duty of prudence does not compel ERISA fiduciaries to reflexively jettison investment options in favor of the prior year's top performers.").

respected recordkeepers, narrowed the candidate pool to three finalists, and thoroughly analyzed the finalists' services and pricing (including through site visits and a "quantitative product assessment" across numerous different metrics).  *See, e.g.*, Ex. 3–R.  The Plans' fiduciaries ultimately selected two recordkeepers— Transamerica for the TriNet 401(k) Plan and MassMutual for the TriNet Select 401(k) Plan—who had extensive "experience with [MEPs]" and submitted price quotes that were among the lowest of the candidates.  Ex. 3–R at 231–32; Ex. 3–T at 266.  While "[n]othing in ERISA compels periodic competitive bidding" for plan services,[36] courts have consistently dismissed claims of unreasonable recordkeeping fees, like those here, when the fees resulted from an RFP process.[37]  Indeed, plaintiffs acknowledge that the "*[b]est [p]ractice* is to compare fees and services through a record keeping vendor search Request for Proposal process."  FAC ¶ 103.[38]  Moreover, the Plans' fiduciaries were able to reduce the recordkeeping fees over time

---

[36] *Chevron I*, 2016 WL 4502808, at *14; *see also Del Castillo v. Cmty. Child Care Council of Santa Clara Cty., Inc.*, 2019 WL 6841222, at *5 (N.D. Cal. Dec. 16, 2019).

[37] *See, e.g., Sacerdote v. New York Univ.*, 328 F. Supp. 3d 273, 293 (S.D.N.Y. 2018) (dismissing claims because there had been two RFP processes); *see also Marshall v. Northrop Grumman Corp.*, 2019 WL 4058583, at *11 (C.D. Cal. Aug. 14, 2019) (granting summary judgment in favor of defendants on recordkeeping fee claims because the defendants had a RFP process during the class period that resulted in a new recordkeeper that provided lower fees); *Del Castillo*, 2019 WL 6841222, at *5.

[38] Conspicuously absent from the FAC is plaintiffs' initial allegation that "a prudent fiduciary would have conducted an [RFP] at least every three to five years to assess alternative recordkeepers." Compl. (ECF No. 1) ¶ 112.  Plaintiffs' counsel has, in fact, consistently asserted in other lawsuits that a prudent fiduciary conducts an RFP process in order to select its recordkeeper.  *See, e.g.,* Compl. at ¶ 102, n.11, *Kong v. Trader Joe's Co.*, 2:20-cv-05790 (PA)(JEM) (C.D. Cal. June 29, 2020), ECF No. 1.  That is precisely what Defendants did here.

through competitive bidding, frequent reviews, and consolidation, which courts have also recognized as hallmarks of a prudent process.[39]  *See, e.g.*, Ex. 3–T at 256.

Plaintiffs do not—and cannot—challenge the thoroughness of the fiduciaries' benchmarking processes.  Instead, plaintiffs rely on a comparison of their ***estimate*** of the Plans' recordkeeping fees to two industry-wide surveys of single-employer plans. FAC ¶¶ 108–110[40] (citing NEPC Report and *401k Averages Book*).[41]  This is deeply flawed.  It is axiomatic that recordkeeping costs must be evaluated in light of the specific "services rendered."[42]  As a result, numerous courts have rejected similar attempts to peg even single-employer plan costs to the same benchmarks that plaintiffs use here absent concrete allegations regarding the type of recordkeeping services received by those plans.[43]

---

[39] *See, e.g., Sacerdote*, 328 F. Supp. 3d at 293 ("The evidence supports that during the Class Period, the Committee prudently managed its recordkeepers: it ran prudent RFP processes, was able to obtain lower fees for the [] Plan . . ., and it consolidated recordkeepers for the [] Plan.").

[40] Plaintiffs also cite a discovery stipulation in *Moitoso* to argue that Fidelity is able to provide recordkeeping to its own single-employer plans for $14–$21 per participant.  FAC ¶ 107.  But plaintiffs do "not explain how the services that Fidelity provided to its own plans are equivalent in value to the services Fidelity provided to the Plan at issue," *Wehner*, 2021 WL 507599, at *6—a particularly forbidding problem in this case given that the Plans at issue are highly complex MEPs.

[41] *Wehner*, 2021 WL 507599, at *6 (holding allegations "do not make clear why the market comparator from the 401(k) Average Book provides an accurate comparison to the fees charged by the Plan at issue in this case" and "whether that calculation includes services that go beyond the regular amount of recordkeeping and administrative services reflected in the 401(k) Average Book").

[42] *Young v. General Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009) (Sotomayor, J.) (requiring a plaintiff to allege that fees were "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining" (quoting *Gartenberg v. Merrill Lynch Asset Mgmt.*, 694 F.2d 923, 928 (2d Cir. 1982))).

[43] *See, e.g., Divane*, 953 F.3d at 990–91 ("Northwestern was not required to search for a recordkeeper willing to take $35 per year per participant as plaintiffs would have liked. . . . And plaintiffs have failed to explain how a hypothetical lower-cost recordkeeper would perform at the level necessary to serve the best interests of the plans' participants."); *Albert v. Oshkosh Corp.*, No. 20-C-901, 2021 WL 3932029, at *5 (E.D. Wis. Sept. 2, 2021) ("The mere existence of purportedly lower fees paid by

These surveys are of even less utility in evaluating the fees of MEPs like the Plans, which require a unique and complex set of recordkeeping services relative to single-employer plans.[44]  For example, each of the Plans' thousands of client-employers may select its own plan terms and conditions, which adds a layer of complexity to the Plans' recordkeeping services given the need to customize plan-related documents and participant notices for each client-employer.  Moreover, the IRS treats the Plans as thousands of *separate* plans in assessing (i) compliance with the IRS's non-discrimination tests, (ii) whether the Plan is "top-heavy," and (iii) whether employees are "highly compensated."  *See* 26 U.S.C. §§ 401(k)(3), 416, 414(q).  Complying with discrete regulatory requirements for each of thousands of separate client-employers within the framework of a single plan is a complicated and time-intensive endeavor; plaintiffs' inapt comparison to single-employer plans does not plausibly support an inference that the associated costs were excessive.

Even assuming *arguendo* that the surveys were appropriate benchmarks for the Plans' recordkeeping costs, the comparisons suffer from fatal defects.  First, instead of relying on the Plans' recordkeeping agreements (Exs. 3–W, 3–Y–2, 3–Y–3, 3–Y–4, 3–Z, 3–BB), plaintiffs attempt to reverse-engineer an estimate of the Plans' recordkeeping fees from the Plans' Forms 5500.  FAC ¶ 104.  But plaintiffs

---

other plans says nothing about the reasonableness of [the Plans'] fee"); *Wilcox v. Georgetown Univ.*, 2019 WL 132281, at *13 (D.D.C. Jan. 8, 2019) (same).

[44] There is no indication in either survey that the collected data relates to MEPs.  Indeed, the NEPC Report acknowledges that "[a]ll plans are not created equal" and "recordkeeping fees are a direct function of plan size, complexity, and the package of services delivered by the recordkeeper."  *See* Ex. 5 at 10.

inexplicably treat all compensation paid to TransAmerica and MassMutual as "recordkeeper fee[s]," even though the Forms 5500 are clear that such compensation also reflects non-recordkeeper services.[45]   The Court should not credit plaintiffs' speculative metric as a well-pleaded factual assertion when it is contradicted by the very source from which they purport to draw it, as well as the recordkeeper agreements themselves (which show significantly lower fees).[46]   Exs. 3–W, 3–Z; *see Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

Second, the FAC misconstrues the surveys that it relies on.   Plaintiffs allege that the *401k Averages Book* shows that average annual recordkeeping fees are only $5 per participant "***through direct compensation***."   FAC ¶ 119 (emphasis added).   As the study explains, however, that $5 cost covers only "hard dollar charges for recordkeeping and administration services," and excludes any revenue sharing that may also be used to reduce direct recordkeeping costs.   Ex. 6 at 6–7 (Q.11 and Q.14).

---

[45] Plaintiffs' calculations are flawed because the "Service Codes" listed in the Forms 5500 indicate that Mass Mutual and TransAmerica were compensated for a range of services beyond just recordkeeping, including participant loan processing (Code 37), investment management (Code 52), sub-transfer agency fees (Code 60), float revenue (Code 62), and securities brokerage services (Code 71).   *See* Ex. 3–K–12 at 81; Ex. 3–L–11 at 110; Dep't of Treasury, IRS Form 5500 2020 Annual Return/Report of Employee Benefit Plan at p. 27, https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2020-instructions.pdf.   Plaintiffs lump all of these fees together along with administrative payments *to TriNet* and label them "recordkeeper fees," FAC ¶ 104, even though most have nothing to do with recordkeeping and some of these fees were not even received by the Plans' recordkeepers.

[46] The Plan's agreement with TransAmerica provides for a $■ per-participant fee plus asset based fees ranging from ■■■■%.   Ex. 3–Z at 307–08.   Based on the TriNet Plan's assets and participants as of the end of the year, this translates to a per-participant fee of approx. $■■■.   Likewise, the MassMutual Recordkeeping agreement provides that MassMutual earns a fee of ■■% on Plan assets.   Ex. 3–W at 282.

When revenue sharing is included, the *401k Averages Book* reports an average recordkeeper fee of $165—or 3,200% above plaintiffs' preferred $5 figure.[47]

Finally, plaintiffs allege in conclusory fashion that the Plans' fiduciaries acted imprudently in selecting "recordkeepers owned by insurance companies" because, according to the ICI Study, "only 13% of plans with over $1 billion in assets used insurance based recordkeepers."  FAC ¶¶ 113, 115.  Yet there is no legal support for the allegation that insurance-based recordkeepers are *per se* imprudent, and it cannot be the case that 13% of plans with over $1 billion in assets (and 49.5% of all plans) have breached their fiduciary duties merely by hiring insurance-based recordkeepers. *See* Ex. 4 at 44 (Exhibit 3.1).[48]  Moreover, TriNet was advised by two advisors with expertise in recordkeeper searches such that the candidates they targeted in their searches were ones "known to have experience with MEPs."  *See* Ex. 3–R at 231.[49] The FAC does not identify a single alternative non-insurance-based recordkeeper with the capability or experience to provide recordkeeping services to an MEP.  Nor does plaintiffs' allegation that the Plans' recordkeepers established separate accounts

---

[47] *See Johnson v. PNC Fin. Servs. Grp.*, 2021 WL 3417843, at *4 (W.D. Pa Aug. 3, 2021) ("Plaintiffs' $35 figure accounts for only direct recordkeeping fees; when revenue sharing (i.e., an indirect fees) is included, smaller plans pay much more").  Likewise, the NEPC Report indicates that only half of the surveyed plans paid recordkeeper fees solely through a per-participant fee and, thus, the average per-participant fee is not a reliable metric.  Ex. 5 (NEPC Report) at 9–10.

[48] As the NEPC Report acknowledges, the Plans' recordkeepers are two of the more prominent recordkeepers in the industry.  Ex. 5 (NEPC Report) at 2.

[49] Indeed, publicly filed Forms 5500 demonstrate that the largest MEPs, like TriNet, use insurance-based recordkeepers.  *See, e.g.*, Ex. 7, 2020 Form 5500 for JustWorks (listing Slavic as the recordkeeper); Ex. 8, 2020 Form 5500 for Nextep (listing MassMutual as the recordkeeper); Ex. 9, 2020 Form 5500 for ADP (identifying Voya as the recordkeeper); *see also McCaffree Fin. Corp. v. ADP, Inc.*, 20–cv-05492-ES-MAH (D.N.J. July 31, 2020) (alleging Voya as ADP's recordkeeper).

suggest that their recordkeeping fees were excessive, as this is a standard service provided by recordkeepers of all types.  *See* Ex. 4 at 46 (Exhibit 3.3).  In any event, the providers' 408(b)(2) disclosures indicate that the recordkeepers did not receive any additional fees for this "separate account" service.  Ex. 3–RR–4 at 384–86, 3–RR–10 at 394–95.

## II.   THE ADMINISTRATOR'S DECISION WAS NOT ARBITRARY AND CAPRICIOUS

Even if *de novo* review could sustain plaintiffs' claims (it cannot), the FAC would be due to be dismissed because the Plans' documents indisputably vest the Administrator with discretion in reviewing these claims.[50]  As a result, under the Eleventh Circuit's decision in *Blankenship*, the Court must apply an "arbitrary and capricious" standard of review and dismiss these claims if "reasonable grounds" support the Administrator's decision.[51]  Plaintiffs have alleged no basis to conclude that the Administrator's decision was arbitrary and capricious.  They do not point to any issue or facts that the Administrator overlooked or failed to consider.[52]  Nor do they allege any basis to conclude that the Administrator had a conflict of interest or

---

[50] *See* Ex. 3–B–2 (TriNet Select Basic Plan Document), at 7–8 (§ 11.07); Ex. 3–D–2 (TriNet 401(k) Plan Document), at 14–15 (Art. 18.1).  These exhibits are incorporated by reference.  *See* FAC ¶ 25.

[51] 644 F.3d at 1354; *Glazer*, 524 F.3d at 1246; *Epolito v. Prudential Ins. Co. of Am.*, 737 F.Supp.2d 1364, 1369 (M.D. Fla. 2010).

[52] *Cf. Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (plaintiffs must allege facts that plausibly suggest that the Administrator "entirely fail[ed] to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence."); *Demyan v. Sun Life Assur. Co. of Canada*, 148 F. Supp. 2d 1316, 1320 (S.D. Fla. 2001).

was biased.[53]  Indeed, the FAC does not even once mention the administrative process or the Administrator.[54]

As explained, the FAC cannot survive this Court's *de novo* review.  But even if it could, the lawsuit would still be subject to dismissal because the FAC does not plead facts that would plausibly indicate that the Administrator acted in an arbitrary and capricious manner.[55]

/s/ __**Sacha Dyson**_____

Sacha Dyson
GRAY ROBINSON, P.A.
401 East Jackson Street
Tampa, FL 33602
(813) 273–5000
sacha.dyson@gray-robinson.com

/s/ *Brian Boyle*_____

Brian Boyle (*pro hac vice pending*)
Catalina Vergara (*pro hac vice pending*)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
(202) 383–5300
bboyle@omm.com
cvergara@omm.com

## LOCAL RULE 3.01(g) CERTIFICATION

On September 8, counsel for defendants conferred by telephone with counsel for plaintiffs regarding defendants' motion.  Plaintiffs oppose the motion.

---

[53] *Howard v. Hartford Life & Accident Ins. Co.*, 929 F. Supp. 2d 1264, 1289–91 (M.D. Fla. 2013), *aff'd*, 563 F. App'x 658 (11th Cir. 2014); *see also Vivas v. Hartford Life & Acccident Ins. Co.*, 49 F. Supp. 3d 1124, 1137 (S.D. Fla. 2014).

[54] Plaintiffs have failed to plead exhaustion, which also provides a basis for dismissal.  *See Sanctuary Surgical Ctr., Inc. v. United Healthcare, Inc.*, 2011 WL 2134534, at *8 (S.D. Fla. May 27, 2011).

[55] As plaintiffs have failed to adequately plead that the Plans' fiduciaries breached the duties of loyalty and prudence, their derivative failure to monitor claim (Claim II) also fails.  Plaintiffs "cannot maintain a claim of failure to monitor when those to be monitored were acting prudently." *Lanfear v. Home Depot, Inc.*, 718 F. Supp. 2d 1364, 1382 (N.D. Ga. 2010), *aff'd*, 679 F.3d 1267 (11th Cir. 2012) (*quoting Smith v. Delta Air Lines, Inc.*, 422 F. Supp. 2d 1310, 1333 (N.D. Ga. 2006)). Plaintiffs' monitoring claim also independently fails because there is not a single allegation in the FAC that suggests that the monitoring fiduciaries neglected to reasonably review the performance of their appointees.  *Chevron I*, 2016 WL 4502808, at *18.