# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

| | |
|---|---|
| SHIQIONG HUANG, CHRIS R. STOKOWSKI, EVERETT UHL, MARK J. HEARON and MARY T. PATTERSON, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TRINET HR III, INC., TRINET HR IV, INC., THE BOARD OF DIRECTORS OF TRINET HR III, INC., THE BOARD OF DIRECTORS OF TRINET HR IV, INC., THE INVESTMENT COMMITTEE OF TRINET GROUP, INC., and JOHN DOES 1-30,<br><br>Defendants. | Case No. 8:20-cv-02293-T-33TGW<br><br><br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT** |

Plaintiffs in the above-captioned action, by and through their undersigned counsel, respectfully submit this opposition to Defendants'[1] Motion to Dismiss.[2]

## I.    INTRODUCTION

---

[1] "Defendants" refers to TriNet HR III, Inc. ("TriNet III"), TriNet HR IV, Inc. ("TriNet IV") (collectively, "TriNet"), The Board of Directors of TriNet HR III, Inc. (the "Board III"), The Board of Directors of TriNet HR IV, Inc. (the "Board IV") (collectively, the "Board"), The Investment Committee of TriNet Group, Inc. (the "Committee"), and John Does 1-30.

[2] Defendants' Motion To Dismiss The Amended Complaint (ECF No. 29) is referred to herein as "Defs. Mem."  All references to "¶" or "Complaint" are to the First Amended Complaint (ECF No. 23).

Defendants' suggestion that the allegations in this case are somehow infirm because of the large number of cases filed by Plaintiffs' counsel is not well taken. Defendants not surprisingly fail to acknowledge the avalanche of decisions – no less than **twenty-two** to date that have upheld the identical type of claims in cases filed by the undersigned counsel.[3]   As one of these courts aptly remarked in reference to Capozzi Adler, "the Court rejects Defendants' argument that because Plaintiffs have retained counsel that have filed factually similar cases, their allegations are so generic that they cannot survive a motion to dismiss. There is no rule against hiring counsel that specialize in one cause of action or type of lawsuit, and the Court declines to

---

[3] *See, e.g., Dearing, et al. v. IQIVIA, Inc., et al.*, No 1:20-cv-00574-WO-JEP (ECF No. 30) (M.D.N.C. Sept. 21, 2021) (upholding allegations that plan fiduciaries selected higher-cost investment options when lower cost options were available and overpaid for recordkeeping) (attached to Gyandoh Decl. as Exhibit 1); *Garcia v. Alticor, Inc.*, No. 1:20-cv-01078-PLM-PJG (ECF No. 22), at *6 (W.D. Mich. Aug. 9, 2021) (same) (Gyandoh Decl. as Exhibit2); *In re Omnicom ERISA Litig.*, 2021 WL 3292487 (S.D.N.Y. Aug. 2, 2021) (same); *In re Biogen ERISA Litig.*, 2021 WL 3116331 (D. Mass. July 22, 2021) (same); *In re Prime Healthcare ERISA Litig.*, 2021 WL 3076649 (C.D. Cal. July 16, 2021) (same); *McNeilly v. Spectrum Health Sys.*, No. 1:20-cv-00870-PLM-PJG (ECF No. 21) slip op. (W.D. Mich. July 16, 2021) (same) (attached to Gyandoh Decl. as Exhibit 3); *Khan v. PTC, Inc.*, No. 1:20-cv-11710-WGY (ECF No. 34) (D. Mass. April 6, 2021) (same); *Bilello v. Estee Lauder, Inc., et al.*, No. 1:20-cv-04770-JMF (ECF No. 67) (S.D.N.Y., June 7, 2021) (same) (attached to Gyandoh Decl. as Exhibit 4); *Nunez v. B. Braun Medical, Inc.*, No. 5:20-cv-04195-EGS (ECF 49) slip op. (E.D. Pa. June 4, 2021) (same) (attached to Gyandoh Decl. as Exhibit 5); *In re Quest Diagnostics Inc. ERISA Litig.*, 2021 WL 1783274 (D.N.J. May 4, 2021) (same); *Blackmon v. Zachary Holdings, Inc.*, 2021 WL 2190907 (W.D. Tex. April 22, 2021) (same); *Peterson, et al. v. Insurance Offices, Inc., et al.*, 2021 WL 1382168 (D.N.J. April 13, 2021) (same); *McGowan v. Barnabas Health, Inc.*, 2021 WL 1399870 (D.N.J. April 13, 2021) (same); *Kendall et al v. Pharmaceutical Product Development, LLC*, 2021 WL 1231415, at * 8, 10 (E.D.Pa. Mar. 31, 2020) (same); *Davis v. Magna Int'l of America, Inc.*, 2021 WL 1212579 (E.D. Mich. March 31, 2021) (same); *Jones v. Coca-Cola Consolidated, Inc.*, 2021 WL 1226551 (W.D.N.C. March 31, 2021) (same); *McCool v. AHS Management Company, Inc.*, 2021 WL 826756 (M.D. Tenn. March 4, 2021) (same); *Parmer, et al. v. Land O'Lakes, Inc., et al.*, 2021 WL 464382 (D. Minn. Feb 9, 2021) (same); *In re Medstar ERISA Litig.*, 2021 WL 391701 (D. Md. Feb. 4, 2021) (same); *Silva v. Evonik Corp.*, 2020 U.S. Dist. LEXIS 250206 (D.N.J. Dec. 30, 2020) (same); *Pinnell, et al. v. Teva Pharmaceuticals USA, Inc., et al.*, 2020 WL 1531870 (E.D.Pa. Mar. 31, 2020) (same); *Boley v. Universal Health Serv., Inc.*, 498 F.Supp.4d 715 (E.D. Pa. 2020) (same).

dismiss the complaint on this ground alone." *Alticor*, No. 1:20-cv-01078-PLM-PJG (ECF No. 22), at *6.

To be sure, there is one common thread in the Complaint here and others filed by Plaintiffs' counsel. That is, the defendant-fiduciaries in these cases selected a slate of investment options for their retirement plan participants that were imprudent due to their high fees where identical or nearly identical alternative funds were available in the marketplace, and the defendant-fiduciaries in these cases also saddled plan participants with unreasonably high prices for plan recordkeeping services. Specifically here, Defendants, *inter alia* (1) caused the Plans[4] and participants to pay for recordkeeping and administration costs far in excess of reasonable rates for a large asset value plan when looking at other comparably-sized plans and fee surveys, and (2) failed to switch to identical lower-cost share classes of funds already in the Plan.

As addressed below, each of Defendants' specific arguments for dismissal lack merit. As an initial matter, contrary to Defendants' argument, Plaintiffs do not need to allege facts about Defendants' actual process but can plead facts, as they have done here, upon which a court may infer an imprudent process. "If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 598 (8th Cir. 2009).

---

[4] Plans refers to the TriNet 401(k) Plan ("TriNet III Plan") and the TriNet Select 401(k) Plan ("TriNet IV Plan") (collectively, "Plans").

Additionally, due to its size, the Plan had substantial bargaining power to negotiate for lower recordkeeping fees.  Defendants attempt to utilize Requests for Proposals ("RFP") conducted by Defendants in 2015 and 2018 to rebut Plaintiffs' allegations of an imprudent process, while ignoring Plaintiffs' other allegations that, when taken together, demonstrate the Defendants breached their fiduciary duties to the Plans and their participants.  As alleged in the Complaint, the RFPs conducted by Defendants were clearly insufficient as they did not result in reduction of recordkeeping fees to a reasonable rate.  Just as Plaintiffs cannot allege imprudence by only suggesting Defendants failed to conduct an RFP, a prudent process cannot be presumed – as Defendants attempt to suggest – based only on the fact that Defendants conducted an RFP. *See Sacerdote et al. v. NYU*, 2021 WL 3610355, at *9 (2d Cir. 2021) ("In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever.") (citation omitted).

The remainder of Defendants' arguments are equally meritless.  In short, Plaintiffs have alleged sufficient facts to permit the matter to proceed into discovery and Defendants' motion to dismiss should be denied.[5]

---

[5] Defendants' argument that Plaintiffs do not allege they invested in the subject investment options is demonstrably false because Plaintiffs allege they invested in the Plans' investments which are the subject of this lawsuit.  ¶¶ 17-21.  Defendants fail to show that any more specificity is needed than that to confer Article III constitutional standing.  *Khan*, 2021 WL 1550929, at *2 (finding plaintiffs' allegations that "they invested in Plan investments which are the subject of this lawsuit" established Article

## II.   STANDARD OF REVIEW IN BREACH OF FIDUCIARY ACTIONS

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "When evaluating a Rule 12(b)(6) motion, the court must take the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff." *Martinex Claros v. Taylor Lee & Asso., LLC*, 2018 WL 7079995, at *2 (N.D. Ga. Sept. 18, 2018) (citing *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321-22 (11th Cir. 2012)).

Courts recognize that in cases alleging imprudent fiduciary process, "a claim for a breach of fiduciary duty under ERISA may survive a motion to dismiss—even absent any well-pleaded factual allegations relating directly to the methods employed by the ERISA fiduciary—if the complaint alleges facts that, if proved, would show that an adequate investigation would have revealed to a reasonable fiduciary that the

---

III standing and adequately pled "injury and redressability stemming from PTC's alleged mismanagement of the specific funds in which they invested."). Further, a suit under 29 U.S.C. §1132(a)(2) is "brought in a representative capacity on behalf of the plan as a whole," and remedies under §1109 "protect the entire plan." *Braden*, 588 F.3d at 593. Thus, plaintiffs may seek recovery on behalf of the *entire plan*, even if they did not personally invest in every one of the funds that caused injury. *See Parmer*, 2021 WL 464382, at *3 ("The court finds that *Braden* is squarely on point and is therefore dispositive, whereas defendants' authority is inapposite."); *Larson v. Allina Health Sys.*, 350 F.Supp.3d 780, 792 (D. Minn. 2018) (finding plaintiffs to have established standing even though they were not invested in all the funds that were the subject of the lawsuit). The overwhelming majority of courts agree.

investment at issue was improvident." *Henderson v. Emory Univ.*, 252 F.Supp.3d 1344, 1325-6 (N.D. Ga. 2017) (quoting *Pension Ben Guar. Corp. ex rel. St. Vincent Catholic Medical Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt., Inc.*, 712 F.3d 705, 718 (2d Cir. 2013)); *see also Main v. Am. Airlines, Inc.*, 248 F.Supp.3d 786, 792 (N.D. Tex. 2017) (quoting *Braden*, 588 F.3d at 596) (acknowledging same).

## III.   STATEMENT OF FACTS[6]

### A. Overview of the Plan

From 2014 to 2017 the Plans' assets under management ranged from more than $960 million dollars to more than $2.7 billion dollars.   ¶ 48.   The assets under management in the TriNet III Plan for all funds as of the end of 2018 was $2,913,109,232 while the assets under management for the TriNet IV Plan at the end of 2018 was $1,127,332,817.  *Id.*

### B. Defendants' Imprudence Cost the Plans Millions of Dollars in Excessive Fees.

Measured by several different benchmarks, during the Class Period Defendants breached the duties they owed to the Plans.

#### 1. Defendants Breached Their Fiduciary Duties in Failing to Investigate and Select Lower Cost Alternative Funds.

---

[6] Defendants ask this Court to take judicial notice of close to 1,000 pages of documents.  A court may only take notice of certain facts without formal proof when the fact is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  FED. R. EVID. 201(b).  The Eleventh Circuit recognizes judicial notice as "a highly limited process" that requires caution because "the taking of judicial notice bypasses the safeguards which are involved with the usual process of proving facts by competent evidence in district court." *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997).

One indication of Defendants' failure to prudently monitor the Plans' funds is that several funds during the Class Period were more expensive than comparable funds found in similarly sized plans (plans having over 1 billion dollars in assets in the case of the TriNet III Plan and $500 million and $1 billion in the case of the TriNet IV Plan). *Id.* at ¶ 62. In 2018, for example, many of funds in the Plans had expense ratios well above the median expense ratios for similarly sized plans. *Id.* at ¶ 63. The expense ratios for funds in the TriNet III Plan were in some cases *320%* above the ICI Median (in the case of Transamerica Invesco International Growth Ret Acct PX) and *297%* above the ICI Median (in the case of Henderson Triton Ret Acct) in the same category. *Id.* at ¶ 64 (listing nine funds). The expense ratios for funds in the TriNet IV Plan were in some cases *112%* above the ICI Median (in the case of JPMorgan Small Cap Growth) and *79%* above the ICI Median (in the case of Cohen & Steers Realty Shares) in the same category. *Id.* at ¶ 65.

### 2. Defendants Failed to Utilize Identical Lower Fee Share Classes

Yet another fiduciary breach caused by Defendants' flawed investment monitoring process resulted in the failure to identify available lower-cost share classes of many of the funds in the Plans during the Class Period. *Id.* at ¶ 72. The lower cost funds were identical in all ways except price and cost anywhere from *7%* (in the case of the American Funds New World when compared to the American Funds New World R6) to *482%* (in the case of the Transamerica State Street Emerging Markets Index Ret Acct when compared with the State Street Emerging Markets Eq Idx K) less

than the funds selected and maintained in the Plans by Defendants. *Id.* at ¶¶ 73-74 (listing 10 funds). Defendants' failure to select these cheaper identical funds caused the Plans to pay millions of dollars per year in unnecessary fees. *Id.* at ¶ 84.

### 3. Defendants Failed to Utilize Lower Cost Passively and Actively Managed Funds.

Another indication of Defendants' imprudent process was Defendants' failure to consider materially similar but cheaper, better performing alternatives to the Plans' investment options. *Id.* at ¶ 88. The lower cost alternatives in the TriNet III Plan cost anywhere from *65%* (in the case of the Transamerica American Funds New Perspective Ret Acct compared to the T. Rowe Price Global Stock) and *2,083%* (in the case of the Transamerica Janus Henderson Triton Ret Acct compared to the Vanguard Small Cap Growth Index I). *Id.* at ¶ 90 (listing nine funds).

### 4. Defendants Failed to Monitor or Control the Plans' Recordkeeping Expenses.

Recordkeeping and administrative services is a term used to describe a suite of administrative services that include ""claims processing, trustee services, participant education, managed account services, participant loan processing," and a whole host of other services. ¶ 98 "Nearly all recordkeepers in the marketplace offer this range of services." *Id.* "Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee…[b]ecause recordkeeping expenses are driven by the number of participants in a plan." ¶ 99.

The Plans' recordkeeper during the Class Period was Transamerica and MassMutual. *Id.* at ¶ 97. Another indication of Defendants' breach of their fiduciary duties is that as the number of Plan participants and assets increased, the per participant fee for recordkeeping and administration costs also went up instead of going down as should have been the case. *Id.* at ¶ 110.[7] The Plans' per participant administrative and recordkeeping fees were astronomical during the Class Period as follows:

| Year | Assets TriNet III | Participants | Direct TransAm | Direct TriNet | Total | $PP |
|------|------|------|------|------|------|------|
| 2014 | $956,107,454 | 31,840 | $3,000,768 | $154,084 | $3,154,852 | $99.08 |
| 2015 | $1,339,890,441 | 44,317 | $4,184,645 | $152,514 | $4,337,159 | $97.87 |
| 2016 | $1,874,038,569 | 57,110 | $4,180,721 | $299,635 | $4,480,356 | $78.45 |
| 2017 | $2,759,960,791 | 74,107 | $6,366,992 | $452,584 | $6,819,576 | $92.02 |
| 2018 | $2,886,542,111 | 88,647 | $8,466,241 | $415,575 | $8,881,816 | $100.19 |
| 2019 | $4,048,963,050 | 94,295 | $9,790,802 | $362,449 | $10,153,251 | $107.68 |

| Year | Assets Tri Net IV | Participants | MassMut | Plan Sponsor | Total | $PP |
|------|------|------|------|------|------|------|
| 2014 | $534,174,572 | 8,417 | $1,687,957 | $1,087,147 | $2,775,104 | $329.70 |
| 2015 | $625,121,243 | 9,876 | $2,073,704 | $903,005 | $2,976,709 | $301.41 |
| 2016 | $781,325,188 | 11,585 | $2,211,284 | $292,592 | $2,503,876 | $216.13 |

---

[7] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan." There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets." Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/

| Year | Assets Tri Net IV | Partic pants | MassMut | Plan Sponsor | Total | $PP |
|------|------------------|--------------|---------|--------------|-------|-----|
| 2017 | $1,001,575,831 | 11,877 | $2,511,424 | $584,693 | $3,096,117 | $260.68 |
| 2018 | $1,102,018,284 | 14,420 | $1,862,288 | $90,358 | $2,122,646 | $147.20 |
| 2019 | $1,457,582,629 | 16,167 | $2,749,329 | $101,912 | $2,851,241 | $176.36 |

*Id.* at ¶ 104.

According to the NEPC 2019 Defined Contribution Progress Report, which assessed 121 Defined Contribution Plans, plans with over 15,000 participants paid on average $40 or less per participant in recordkeeping, trust, and custody fees. *Id.* at ¶¶ 108-109. The average plan paid no more than $40 in recordkeeping and administrative fees. *Id.* at ¶ 109. Some authorities have recognized that reasonable rates for large plans typically average around $35 dollars per participant. *Id.* at ¶ 111.

## IV.   ARGUMENT

### A. Numerous Courts Have Upheld Allegations Analogous to Those Pled in the Complaint.

Even though Plaintiffs went through the administrative remedies exhaustion process they came no closer to obtaining Investment Committee[8] meeting minutes (which Trinet refused to produce) and other information that would provide direct evidence of Defendants' deliberations regarding their decisions for the Plans. Even if Trinet had produced meeting minutes this would only tell half the story. *See Sacerdote et al.*, 2021 WL 3610355, at *8 ("The fact that one document purports to

---

[8] "Investment Committee" refers to the Investment Committee of TriNet Group, Inc., and its members.

memorialize a discussion about whether or not to offer retail shares does not establish the prudence of that discussion or its results as a matter of law."). The Second Circuit recognized the importance of "testimony" among other things that should accompany documents. *Id.* Accordingly, Plaintiffs plead circumstantial facts that many courts have found to state a prudence claim.

In *Silva*, the Court reasoned based on plaintiffs' citations to "news articles, academic scholarship and specific examples of cheaper investment funds," plaintiffs adequately claimed defendants breached their duty of prudence. *Silva,* 2020 U.S. Dist. LEXIS 250206, at *12. As in *Silva*, Plaintiffs' Complaint here alleges near analogous facts, comparisons to specific examples of lower cost funds and alternatives, and citations to various articles, academic scholarship, and the median and average fees.[9] *See* Complt., ¶¶ 59-67, 72-84, 86-116. *Pinnell* involved almost a near analogous fact pattern. *Pinnell*, 2020 WL 1531870 at *1 (alleging failure to select lower-cost share classes of T.Rowe Price target date funds); *see also McNeilly*, No. 1:20-cv-00870-PLM-PJG (ECF No. 21) at *9 ("The amended Complaint alleges that Defendants breached their duty of prudence by some combination of the following facts:…that the Committee could and should have selected identical but lower-cost share classes…; that the recordkeeping and administrative costs of the Plan were excessive; and that the Plan could have leveraged its large size to negotiate with and reduce recordkeeping

---

[9] *See also Bouvy v. Analog Devices, Inc.*, 2020 WL 3448385, at *2 (S.D. Cal. June 24, 2020) (upholding allegations that "the Plan's investment expenses were higher than industry averages: at least 18 of the 20 mutual funds offered in 2016 had above-average expenses.").

and administrative costs but failed to even attempt to do so.  Plaintiffs support each of these arguments with tables and charts comparing various investment options…"); *Peterson*, 2021 WL 1382168, at * 5 (same); *Nunez*, No. 5:20-cv-04195-EGS (ECF 49) slip op., at n.1 ("First, the plaintiffs point out that half of the funds in the Plan had expense ratios that exceeded the median expense ratios for funds in the same category."); *Kendall,* 2021 WL 1231415, at *8, 11 (upholding allegations plan fiduciaries selected higher-priced identical share classes and overpaid for recordkeeping); *Magna,* 2021 WL 1212579, at *8, 11 (same); *McCool*, 2021 WL 826756, at *5 (same); *Parmer,* 2021 WL 464382, at *6-7, 9 (same); *see also MedStar*, 2021 WL 391701, at *5-6 (upholding claims defendants breached their fiduciary duty in failing to switch from the Fidelity Freedom K target date funds to the passively managed funds); *Coca-Cola*, 2021 WL 1226551, at *4-5 (same); *Alticor,* No. 1:20-cv-01078-PLM-PJG, at *9-14 (same).

Courts across the nation, in addition to those cases cited above and in fn 3 *supra*, have upheld nearly identical claims as those pled in this action.[10]

---

[10] *See Sacerdote v. New York Univ.*, 2021 WL 3610355 (2d Cir. 2021) (upholding *inter alia* excessive recordkeeping fee claim); *Tracey et al. v. MIT*, 2017 WL 4478239, * 2 (D.Mass. Oct. 4, 2017) (upholding excessive fee claim); *Falberg v. Goldman Sachs Group, Inc.,* 2020 WL 3893285, at * 11 (S.D.N.Y. July 9, 2020) (same); *Feinberg v. T.Rowe Price Group, Inc., et al.*, 2018 WL 3970470, at * 7 (D. Md. Aug. 20, 2018) (same); *Disselkamp, et al. v. Norton Healthcare, Inc. et al.*, 2019 WL 3536038 (W.D. Ky. Aug. 2, 2019) (same); *Cassell v. Vanderbilt*, 285 F.Supp.3d 1056, 1061 (M.D. Tenn. 2018) (same); *Bell v. Pension Committee of ATH Holding Company, LLC*, 2017 WL 1091248, at * 4 (S.D. Ind. Mar. 23, 2017) (same); *Schultz et al. v. Edward Jones*, 2018 WL 1508906, a * 3 (E.D.Mo. Mar. 27, 2018) (same); *Johnson v. Providence Health & Servs. et al.*, 2018 WL 1427421, at * 6 (W.D. Wash. Mar. 22, 2018) (same); *Troudt v. Oracle Corp.*, 2017 WL 1100876, at * 3 (D. Col. Mar. 22, 2017) (same); *Henderson v. Emory Univ.*, 252 F.Supp.3d 1344, 1349 (N.D. Ga. May 10, 2017) (same).

### B. Defendants Breached Their Duty of Prudence By Implementing A Flawed Process for Selecting the Plan's Investment Options

#### 1. Defendants Breached Their Fiduciary Duty By Maintaining Higher Cost Funds When Identical Lower Cost Shares Were Available.

Defendants give short shrift to Plaintiffs' claim that Defendants failed to offer available identical lower-cost alternatives to some of the Plan's investments.  Defs. Mem. at 15-17.  That is because the law is not on their side.  Courts within the Eleventh Circuit have held, "plaintiffs have properly stated a claim that choosing retail-class shares over institutional-class shares is imprudent." *Henderson*, 252 F.Supp.3d at 1350-51 ("the plaintiffs allege that the defendants did not use their bargaining power to obtain the lower cost fees and that the lower cost options are the exact same as the higher cost shares except for the actual fees charged. The plaintiffs assert that no reasonable fiduciary would choose or be complacent with being provided retail-class shares over institutional-class shares."); *Pledger v. Reliance Trust Co.*, 240 F.Supp.3d 1314, 1331-32 (N.D. Ga. 2017) (same).

In *Davis et al. v. Washington U.*, 960 F.3d 478, 484 (8th Cir. 2020), the Eighth Circuit found that failure to gain access to cheaper identical funds is a "failure of effort [or] competence" and "is enough to state a claim for breach of the duty of prudence."

---

960 F.3d at 483.  Many courts recognize that: "[i]f defendants did, in fact, include higher fee options when identical lower fee options were available, they failed to act with the 'care, skill and prudence' required by ERISA."  *Tracey*, 2017 WL 4478239, * 2 (upholding excessive fee claim); *McCool*, 2021 WL 826756, at * 5 (same).  Virtually every court to consider a plan's retention of a more expensive share class when a cheaper share class was available, including *Braden*, *Davis*, *Sweda*, and now the Second Circuit in *Sacerdote, see supra* fn. 10, has held it gives rise to a plausible claim for breach of fiduciary duty.[11]

Defendants' excuses fall short.  First, Defendants concede that in 2020 three of nine funds were not in the lowest share class but remain silent with regard to the years 2014 to 2019.  Defs. Mem. at 15. Moreover, Defendants' statement that "the Plans invested in institutional share classes for the overwhelming majority of options,"  Defs. Mem. at 15, n.26, is an indictment on their fiduciary process.  "First, it appears that the changes Defendants made may not have been in funds referenced in this case, so the changes do not appear relevant.  And second, the fact that Defendants made some changes raises a question of fact – why didn't Defendants move more or all of the higher-cost share classes to a lower-cost group?"  *McNeilly*, No. 1:20-cv-00870-PLM-PJG (ECF No. 21) at 14.

---

[11] *See also Parmer*, 2021 WL 464382, at * 7; *Disselkamp*, 2019 WL 3536038, at * 4 (recognizing "Courts examining this issue have concluded that investment in a retail class fund where an identical institutional class fund with lower fees is available can violate the duty of prudence."); *Johnson et al. v. Fujitsu Tech. and Bus. of Am., Inc.*, 250 F.Supp. 3d 460, 466-67 (N.D. Cal. Apr. 11, 2017) (holding plaintiffs' allegations regarding share classes supported a claim for breach of fiduciary duty); *Krueger v. Ameriprise Financial, Inc.*, 2012 WL 5873825, at *10-11 (D. Minn. Nov. 20, 2021) (same).

Second, to the extent Defendants suggest the higher-cost share class was justified because "revenue sharing is a 'common and acceptable' method for compensating plan recordkeepers," Defs. Mem. at 16, Defendants are conceding the Plans' participants were overcharged via revenue sharing.  *See McNeilly*, No. 1:20-cv-00870-PLM-PJG (ECF No. 21) at 17 ("Defendants acknowledge that they were in higher-cost share classes when lower share classes were available" by not disputing that revenue sharing was utilized).

In *Cassell*, the court said "the appropriate inquiry on these claims involves issues of fact, which cannot be determined on a motion to dismiss."  *Cassell*, 285 F.Supp.3d at 1067.  And in *Disselkamp*, "[d]efendants argue[d] this claim must be dismissed because Defendants applied the higher fees collected from the retail class funds to pay administrative fees through revenue-sharing." 2019 WL 3536038, at *5.  The court rejected this argument because it was "not suited for a decision on a motion to dismiss."  *Id.*  It also noted that "while the revenue-sharing argument may eventually mitigate liability and damages, it still remains to be seen whether Defendants prudently investigated the higher share class investments before subjecting Plan participants to those higher fees."  *Id.*  The defendants in *Parmer* made a similar argument which the court rejected.  *Parmer*, 2021 WL 464382, at * 7.

Lastly, the Court in *McNeilly v. Spectrum Health Sys.* astutely recognized that "the fact that Defendants retained higher-cost shares to provide more basis for revenue

sharing supports the inference that funds were not selected on their merits." *Id.* at 18.

This court should reach the same conclusion.[12]

### 2. The Other Alleged Indicia of Imprudence Considered Together Leads to An Inference that the Plan Fiduciaries Engaged In An Imprudent Fund Monitoring Process.

### 1. The ICI Chart is a Useful Measurement.

The parties dispute the accuracy of certain of the funds expense ratios. *See* ¶ 64, n. 9.[13] Nevertheless, Defendants question the usefulness of the Complaint's utilization of median and average fee comparisons even if Plaintiffs' assessment of expense ratios were correct. Defs. Mem. at 11-14.[14] Notwithstanding Defendants' criticism of the

---

[12] Defendants' reliance on Seventh Circuit authority, such as *Hecker v. Deere & Co.,* 556 F.3d 575 (7th Cir. 2009), *Loomis v. Exelon Corp.*, 658 F.3d 670 (7th Cir. 2011), and *Divane v. Northwestern Univ.*, 953 F.3d 980 (7th Cir. 2020) on this point is unhelpful. *Divane* is up on appeal before the Supreme Court. *See Hughes et al. v. Northwestern Univ.*, 2021 WL 2742780, at *1 (2021); *see also* Br. for the United States as Amicus Curiae at 1, 8, *Hughes v. Northwestern Univ.*, No. 19-1401 (May 25, 2021) (Solicitor General argued if petitioners (plaintiffs) succeed in proving respondents maintained high-cost retail-class mutual funds in the plan when identical lower-cost share classes were available, "then respondents breached ERISA's duty of prudence by offering higher-cost investments to the Plans' participants when respondents could have offered the same investment opportunities at a lower cost."). The Seventh Circuit diverges from the Third and Eighth Circuits regarding allegations a plaintiff needs to plead in order to survive a motion to dismiss claims of excessive fees.

[13] Plaintiffs' allegations are based on actual fund prospectuses. For example, Plaintiffs allege the Transamerica Janus Henderson Triton Ret. Acct. charged an expense ratio of 1.31.%. ¶ 73. The Transamerica prospectus for this fund confirms as much. *See* Exhibit 6 Gyandoh Decl. Defendants' challenge of the various expense ratios alleged in the Complaint raises a question of fact.

[14] The cases Defendants cite are not dispositive because they involve challenges to specific funds as opposed to the process utilized by defendants that resulted in selection of several imprudent funds, including ones invested in by plaintiffs. *See Patterson v. Morgan Stanley*, 2019 WL 4934834, at *2 (S.D.N.Y. Oct. 7, 2019) ("Plaintiffs focus on thirteen investment options."). Relying on precedent set forth by district courts across California, the court in *Wehner v. Genentech, Inc.*, rejected the plaintiffs' comparisons of actively and passively managed funds. *Wehner v. Genentech, Inc.*, 2021 WL 507599, at *10 (N.D. Cal. Feb. 9, 2021). As addressed *infra*, most courts have held that the adequacy of Plaintiffs' benchmarks raises issues of facts not suitable for resolution at the motion to dismiss. *Amron v. Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338, 340 (2d Cir. 2006) involved claims brought under section 36(b) of the Investment Company Act of 1940, not ERISA. *Dupree v. Prudential Ins. Co. of Am.* is also not instructive to the present motion to dismiss because Defendants cite to the

use of the ICI median and averages charts, several courts have upheld claims based in part on the chart.  *See Silva,* 2020 U.S. Dist. LEXIS 250206, at *13.  ("Plaintiffs allege that most of the investment options in the Plan charged higher-than-average fees, with reference to median fees published by the Investment Company Institute and the fees of alleged comparators."); *Pinnell*, 2020 WL 1531870 at * 5 ("[Plaintiffs] included three tables comparing investment options offered by the Plan to similar or identical lower-fee alternatives and comparing expense ratios to median fees in the same category); *Bouvy*, 2020 WL 3448385, at * 2 ("the Plan's investment expenses were higher than industry averages: at least 18 of the 20 mutual funds offered in 2016 had above-average expenses."); *see generally McCool*, 2021 WL 826756 (upholding allegations based on ICI median charts); *Magna*, 2021 WL 1212579, at *7 (court rejected defendants challenges of the ICI study finding "[t]o the extent that Defendants argue the merits of Plaintiffs' comparisons, such arguments are premature in a motion to dismiss").  Moreover, Defendants are attempting to improperly inject their interpretation of the ICI median fee data which is improper at this stage of the litigation.[15]

### 2. Whether Plaintiffs' Alleged Comparators are Meaningful Comparators for the Challenged Plan Funds is Not Suitable for Resolution at the Motion to Dismiss Stage

---

court's post-trial amended findings of fact and conclusions of law.  *Dupree v. Prudential Ins. Co. of Am.*, 2007 WL 2263892, at *20 (S.D. Fla. Aug. 7, 2007).

[15] Defendants argue that the expense ratios of the Plans' funds fall within a presumptively reasonable range.  Defs. Mem. at 14.  No court has endorsed a "reasonable range" rationale.  *See Troudt*, 2017 WL 1100876, at *1 ("[h]eeding [] admonitions of [pertinent case law], the court cannot adopt defendants' proposal to dismiss Count I of the complaint on the theory that the plan's fee structure fell within a presumptively reasonable range of expense ratios."); *Henderson*, 2017 WL 2558565 at *2 (rejecting argument that "the Plans' investment options offer a range of expense ratios from .07% to 1.41%, and that many courts have found this range to be reasonable.").

Defendants ultimately take issue with Plaintiffs' choice of comparators, but the argument raises issues of fact that require assessment on a more developed record.[16] *See Silva,* 2020 U.S. Dist. LEXIS 250206, at *13 (quoting *Nicolas v. Trustees of Princeton Univ.*, No. 17- 3695, 2017 WL 4455897, at *5 (D.N.J. Sept. 25, 2017)) (an inquiry into 'whether the alternative funds Plaintiff[s] suggest[ ] are apt comparisons' is a question of fact unsuitable for resolution on a motion to dismiss.); *McCool*, 2021 WL 826756, at *5 ("the appropriate inquiry on these claims involves issues of fact, which cannot be determined on a motion to dismiss"); *Cassell*, 285 F.Supp.3d at 1067 (same); *Cryer v. Franklin Templeton Resources Inc.*, 2017 WL 818788, at *4 (N.D. Cal. Jan. 17, 2017) (same). [17]

### 3. Plaintiffs' Performance Benchmarks Are Plausibly Alleged

Defendants criticize Plaintiffs' use of 3- and 5-year periods of performance comparisons to illustrate several of the Plan's funds trailed in performance to its peer funds. Among other things, Defendants suggest the 3- and 5-year performance periods

---

[16] Unsurprisingly, Plaintiffs' allegations are easily distinguishable from those in Defendants' authorities. Plaintiffs do not fault Defendants for failing to "pick the best performing fund," as in *Meiners*. *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018). Instead, Plaintiffs question Defendants' monitoring processes because the Plans, *inter alia*, retained high cost mutual funds when a lower cost share class identical in all ways except price was available to the Plan during the Class Period.

[17] Defendants rely on *Davis v. Salesforce.com* to attack Plaintiffs' benchmarks. *See* Defs. Mem. at 13. Relying on Ninth Circuit precedent, the court in *Salesforce* failed to consider the totality of the allegations as set forth in plaintiffs' complaint as a whole and instead, isolated each allegation in its conclusion it was "not persuaded by the reasoning" of "the cases on which plaintiffs rely [that] have held allegations identifying lower-cost share classes are, without more, sufficient to state a claim for imprudence." *Davis v. Salesforce.com, Inc.*, 2020 WL 5893405, at *5 (N.D. Cal. Oct. 5, 2020). *White, et al. v. Chevron Corp.*, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016), which Defendants also rely, is an outlier that similarly relied on precedent outside the Eleventh Circuit.

are hindsight based. Defs. Mem. at 17. These arguments are unfounded. Plaintiffs' allegations are based on detailed benchmarking and information, such as expense ratios, available to fiduciaries *at the time* of the breaches Plaintiffs allege. ¶¶ 89-94.[18] The Supreme Court requires fiduciaries to continually monitor investments from the time the investments are selected to every moment during the Class Period. *See Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828-29 (2015) ("*Tibble IV*"). It does not take hindsight for the Plan fiduciaries to recognize selecting more expensive funds over nearly identical cheaper funds – all things being equal – will result in the more expensive funds underperforming. That is exactly what happened in this case.[19] *See McNeilly*, No. 1:20-cv-00870-PLM-PJG (ECF No. 21) at *13 (court rejected defendants' arguments that plaintiffs' claims were based on hindsight finding "Plaintiffs bring allegations that the Committee failed for *years* to perform sufficient review or investigations into the Plan's performance. Thus, it is plausible that Defendants had access to performance data at various points throughout the relevant period."); *Alticor*, No. 1:20-cv-01078-PLM-PJG, at *13); *Short v. Brown Univ.*, 320 F.Supp.3d 363, 372 (D.R.I. 2018) (rejecting argument allegations are based on hindsight); *Sacerdote v. New York Univ.*, 2017 WL 3701482, at *10 (S.D.N.Y. Aug. 25, 2017) (same); *see also Silva*,

---

[18] Plaintiffs' comparisons demonstrate years of Defendants' failure to continually monitor the investments and take corrective measures when the funds repeatedly underperformed. This is not a mere hindsight or results-based assessment the courts rejected in *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 419, 424 (4th Cir. 2007) or *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917-18 (8th Cir. 1994).

[19] In *Barchock v. CVS Health Corp.*, 2017 WL 1382517, at * 5 (D.R.I. April 18, 2017), the court reasoned "the newly asserted facts in the Complaint focus primarily on the extent and duration of the Fund's investment in cash or cash-equivalent assets." *Id.* These facts are inapposite to the facts in this case where Plaintiffs are alleging they were saddled with unreasonable fees.

2020 U.S. Dist. LEXIS 250206, at *14 ("the relevant inquiry is whether the Investment Committee prudently investigated cheaper alternative investments, regardless of the degree of savings.").

The appropriate benchmarking period is a factual dispute that cannot be resolved at this stage. *See, e.g.*, *Sacerdote*, 2017 WL 3701482, at *10; *Austin v. Union Bank & Tr. Co.*, 2016 WL 8732420, at *10 (D. Or. Feb. 19, 2016) (opposing experts' "conflicting opinions [on the appropriate benchmark duration] cannot be resolved on summary judgment."). Longer-term benchmarking can be appropriate if it is the result of a conscious decision. *See Jenkins v. Yager*, 444 F.3d 916, 925 (7th Cir. 2006) (evidence on *summary judgment* showed defendants intentionally pursued "a long-term plan.").

### 4. Defendants Breached Their Fiduciary Duties in Failing to Monitor the Plans' Recordkeeping Fees.

"Many allegations concerning fiduciary conduct, such as reasonableness of 'compensation for services' are 'inherently factual question[s]' for which neither ERISA nor the Department of Labor give specific guidance." *Sweda*, 923 F.3d 320, 329 (3d Cir. 2019); *see also Magna*, 2021 WL 1212579, at *11 (upholding allegations plan fiduciaries overpaid for recordkeeping); *McCool*, 2021 WL 826756, at *5 (same); *Parmer,* 2021 WL 464382, at *9 (same); *Miller*, 2020 WL 6479564, at * 10 ("the Court recognizes the need to conduct discovery on this [recordkeeping] issue…"). When considering Plaintiffs' allegations of excessive recordkeeping fees, the Court should

apply "a fair reading of the entire Complaint." *Rohan v. Saint Luke's Health System, Inc.*, 2020 WL 8410451, at *6 (W.D. Mo. June 22, 2020).

Defendants ask this Court to presume prudence based on the fact that they conducted RFPs for recordkeeping services twice during the Class Period. Defs. Mem. at 18. Plaintiffs do not dispute Defendants RFP initiatives, but rather allege "the process they used was clearly deficient" because the process resulted in consideration of "proposals from only three recordkeepers owned by insurance companies" when "[i]t's well known in the industry that insurance based recordkeepers are not marketed towards institutional investors such as the Plans but are instead aimed at offering a higher cost product for retail investors or smaller plans lacking the bargaining power of the Plans, which combined had over $5 billion dollars in assets under management, in 2019." ¶ 113.[20]

Defendants' argument that Plaintiffs have failed to plead facts concerning the specific services offered to the Plan, Defs. Mem. at 20, has been consistently rejected by courts.[21] *See, e.g., Kruger*, 131 F. Supp. 3d at 479 ("While Defendants claim that

---

[20] Defendants here misrepresent the court's conclusions in *Sacerdote v. New York Univ.* In *Sacerdote*, after an eight-day trial, which involved testimony by over twenty witnesses including expert witnesses and over six hundred documents admitted into evidence, the court concluded defendants' RFP frequency and decision-making process "was considered, careful, and prudent under the particular circumstances." *Sacerdote v. New York Univ.*, 328 F.Supp.3d, 273, 300 (S.D.N.Y. 2018). *Marshall v. Northrop Grumman Corp.*, 2017 WL 2930839 (C.D. Cal. Jan. 30, 2017) was a decision on a motion for summary judgment.

[21] *Young v. GM Inv. Mgmt. Grp.*, 325 F. App'x 31, 33 (2d Cir. 2009) does not counsel otherwise. The court noted plaintiffs did not allege "specific services," but unlike here, plaintiffs in that action alleged "no facts concerning other factors relevant to determining whether a fee is excessive under the circumstances." Similarly, to the extent *Wilcox v. Georgetown Univ.*, 2019 WL 132281, at * 10 (D.D.C. Jan. 8, 2019) supports Defendants' position, it is an outlier.

Plaintiff have not alleged facts regarding … the services provided, or how the fees charged to the Plan were excessive in light of those services, this court finds that those are the types of facts warranting discovery, and, therefore, dismissal at this stage is not appropriate"); *Krueger*, 2012 WL 5873825, at *20 (same); *Peterson,* 2021 WL 1382168, at * 7 ("Upon consideration, the Court finds that, at this stage, Plaintiffs need not allege why the fees were not justified by the services provided when considering the Plan as a whole."); *Davis*, 2021 WL 1212579, at * 10 ("With respect to Defendants' second argument, at this stage Plaintiffs need not allege why the fees were not justified by the services provided when considering the plan as a whole."); *Parmer*, 518 F.Supp.3d at 1307 ("Plaintiffs allege that the Plan has a large pool of participants and assets, that the recordkeeping market is highly competitive, and that defendants paid higher than reasonable recordkeeping fees despite their market strength.").

Another fact supporting Plaintiffs' allegations is that even though the Plans' number of participants increased by massive numbers year over year, the Plans' fiduciaries failed to take advantage of the economies of scale by negotiating lesser per participant recordkeeping and administrative fee amounts.  In fact, the opposite was true as the per participant amounts increased year after year.  Further, it strains credulity to assume that Defendants obtained recordkeeping and administrative services for the Plan that were so far and above what its peers obtained that its off-the

charts recordkeeping and administrative fees were justified.  This is yet another reason why discovery on these issues is needed instead of crediting Defendants' bald statements.

Plaintiffs pled numerous examples of market comparisons and reasonable fee benchmarks to support the claims the Plan's recordkeeping fees were excessive.  ¶¶ 107-111, 115.[22]  Plaintiffs cite to the NEPC 2019 Defined Contribution Progress Report, which took a survey of comparably sized plans (the average plan had $1.1 billion in assets and 12,437 participants).  *Id.* at ¶ 108.  Based on the NEPC survey, plans with over 15,000 participants paid on average $40 or less in per participant recordkeeping, trust and custody fees.  ¶ 109.  Here, the Plans' recordkeeping fees ranging from $78.45 to $329.70 per participant during the Class Period, ¶ 104, far exceed the $40 per participant average paid by participants in comparably sized plans.

### C. The Administrator's Denial of Plaintiffs' Claims Was Unreasonable.[23]

---

[22] The court in *Wehner v. Genentech, Inc.* noted, "[f]ederal district courts in California have held that a plaintiff must plead administrative fees that are excessive in relation to the *specific* services the recordkeeper provided to the *specific* plan at issue." *Wehner*, 2021 WL 507599, at *5 (emphasis in original).  This standard would erroneously require ERISA plaintiffs to essentially prove any recordkeeping allegations prior to reaching discovery and would functionally mandate that they undertake the benchmarking required of plan fiduciaries.  Additionally, Defendants here note in *Wehner*, 2021 WL 507599, at *5, the Northern District of California rejected the plaintiffs' claims based on the *401k Averages Book* (*see* Defs. Mem. at 20, n. 41), however other courts have upheld analogous recordkeeping claims based on references to the *401k Averages Book.  See Magna*, 2021 WL 1212579, at *10-11; *Kendall*, 2021 WL 1231415, at *11 ("Plaintiffs allege that a per participant fee of $20 is unreasonable when smaller plans average a per participant fee of $5 according to the 401k Averages Book […] This claim ekes across the plausibility line.").

[23] Defendants half-heartedly argue Plaintiffs failed to plead exhaustion.  Defs. Mem. at 25, n. 54.  This is a disingenuous attack given that Defendants concede in their memorandum that Plaintiffs exhausted their remedies and the parties jointly filed a motion to lift the stay in this matter because Plaintiffs had exhausted administrative remedies.  ECF 21.

Defendants cannot reasonably suggest that the decision to deny Plaintiffs' claims was reasonable. Defendants rely on a several cases, including *Blackenship v. Metropolitan Life Ins. Corp.*, that involved the denial of an individual employee's claim for disability benefits. *See Blackenship v. Metropolitan Life Ins. Corp.*, 644 F.3d 1350, 1352 (11th Cir. 2011).[24]  None of the cases cited by Defendants involved claims advanced on behalf of an entire plan and its participants brought pursuant to §§ 409 and 502 of ERISA, 29 U.S.C. §§ 1109 and 1132.  In fact, the analysis applied by Defendants from *Blackenship* specifically sets forth a test "[f]or a court reviewing a plan administrator's **benefits** decision." *Blackenship*, 644 F.3d at 1355.  Plaintiffs' claims here did not involve a denial of a benefits decision, thus the "arbitrary and capricious" standard of review applied by Defendants is of no consequence.

A suit under 29 U.S.C. §1132(a)(2) seeks remedies under §1109 to "protect the entire plan." *Braden*, 588 F.3d at 593.  Even if this Court were to find the Administrator could deny the Named Plaintiffs' *individual* claims, the Eleventh Circuit's test does not provide for an administrator's denial of claims brought on behalf of a class of plan participants.  As such, the representative claims here require assessment before a federal district court.

Additionally, Defendants suggest Plaintiffs did not "allege any basis to conclude that the Administrator had a conflict of interest or was biased."  Defs. Mem. at 24.

---

[24] *See also Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1243 (11th Cir. 2008) (case involving administrative denial of employee's claim for disability benefits); *Epolito v. Prudential Ins. Co. of Am.*, 737 F.Supp.2d 1364, 1366 (M.D. Fla. 2010) (denial of pension benefits).

The Eleventh Circuit defines "[a] pertinent conflict of interest" as an instance "where the ERISA plan administrator both makes eligibility decisions and pays awarded benefits out of its own funds." *Blackenship*, 644 F.3d at 1355 (citing *Metropolitan Life Ins. Co. v. Glenn*, 128 S.Ct. 2342, 2348 (2008)). While this conflict-of-interest standard does not apply to claims advanced under §§ 1109 and 1132, a clear conflict still exists here as Defendant TriNet denied Plaintiffs claim after *its own* administrator concluded "the Plan records reflect a robust and thorough procedure for the selection and monitoring of recordkeepers and investment options under the Plans." *See* ECF No. 30-1, Exhibit 1 attached to Defendants' Motion to Dismiss at p. 9 of 10. Effectively, TriNet reviewed its own process and concluded its process was prudent. Defendants cannot reasonably argue such a procedure was devoid of conflict of interest or bias. Additionally, it is impossible to reach the Administrator's conclusion without engaging in substantial fact and expert discovery. Absent significant document production and written discovery, deposition testimony from both Parties and related fact witnesses, assessment by experts from both Parties as to the reasonableness of Defendants' process and any resulting damages, it cannot be said that "reasonable grounds" support the Administrator's decision.

## V.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court deny Defendants' motion to dismiss in its entirety, or in the alternative, to grant Plaintiffs leave to amend.

Date: October 21, 2021                          */s/ Joseph M. Sternberg            .*

Joseph M. Sternberg, ESQ.
Florida Bar No.: 122447
joseph@landersandsternberg.com
(407) 495-1893
Fax: (407) 362-6325
722 W. Smith Street
Orlando, FL 32804

**CAPOZZI ADLER, P.C.**

*/s/ Mark K. Gyandoh            .*
Mark K. Gyandoh, Esquire
(*Admitted Pro Hac Vice*)
PA Attorney ID # 88587
Gabrielle P. Kelerchian, Esquire
PA Attorney ID #324248
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com
gabriellek@capozziadler.com
(610) 890-0200
Fax (717) 233-4103

Donald R. Reavey, Esquire
(*Admitted Pro Hac Vice*)
PA Attorney ID #82498
2933 North Front Street
Harrisburg, PA 17110
 donr@capozziadler.com
(717) 233-4101
Fax (717) 233-4103

Counsel for Plaintiffs and the Putative Class

26

**CERTIFICATE OF SERVICE**

I hereby certify that on October 15, 2021 a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.


By:  /s/ *Mark K. Gyandoh*
Mark K. Gyandoh, Esq.