UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| SHIQIONG HUANG, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> TRINET HR III, INC., *et al.*, <br><br> Defendants. | 8:20-CV-02293-VMC-TGW <br> DISPOSITIVE MOTION <br><br> **REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Plaintiffs' opposition simplifies the Court's task under Fed. R. Civ. P. 56. The opposition confirms that plaintiffs have abandoned their investment-related theories by conceding they suffered no losses. ECF No. 98 ("Opp.") at 20. And on the other pleaded theory that defendants used a defective process to monitor the Plan's recordkeeping fees, plaintiffs conspicuously fail to cite a *single* document or piece of testimony from the underlying factual record in support, instead relying entirely on conclusions drawn from their expert's Rule 26 disclosure. But in his deposition, that expert conceded that many of the assumptions underlying his opinions had no factual support. Eleventh Circuit decisions require summary judgment in circumstances such as these, where the respondent does nothing more than rehash the complaint's allegations and parrot conclusions from an expert report that have either been abandoned by the purported expert, foreclosed by the record, or both.[1]

---

[1] *See Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[A] party may not avoid summary judgment solely on the basis of an expert's opinion that fails to provide specific facts from the record to support its conclusory allegations."); *Egwuatu v. Burlington Coat Factory Warehouse Corp.*, 2011 WL 2413833, at *2 (M.D. Fla. June 10, 2011) (Covington, J.) ("If the non-movant's response consists of nothing 'more than a repetition of his conclusional allegations,' summary judgment is not

## I. Plaintiffs' Distortions of the Record and Unsupported Expert Conclusions Do Not Create a Genuine Dispute of Material Fact

Plaintiffs strangely suggest that, as the non-movant, they are not obligated to identify support for their claims, even for those elements for which they bear the burden of proof. Opp. 15–16. To the contrary, to avoid summary judgment, plaintiffs must "designate *specific facts* showing that there is a genuine issue for trial,"[2] and an expert's conclusory assertions cannot satisfy this burden.[3] Plaintiffs flout this precedent by relying entirely on fact-barren conclusions included in the report of their purported expert, Vitagliano, to counter defendants' statements of fact ("SOF"). *E.g.*, RSF[4] ¶¶ 16–20. And where they advert to the actual factual record at all (including Vitagliano's own testimony), they mischaracterize it. For example:

- Plaintiffs repeatedly state that Vitagliano concluded that the 2018 RFI and 2021 RFP were "flawed." RSF ¶¶ 16–18, 23, 32, 39. But at his deposition, Vitagliano confirmed that he looked only at the ***2015 RFP***—insisting that he was "not offering an opinion as to the adequacy of the 2018 RFI or 2021 RFP." FV Tr. 252:7–10; *see* SOF ¶ 32.

- Plaintiffs purport to dispute what they term the "findings" of Sheryl Southwick regarding the RC's monitoring of the Plan's recordkeeping costs. RSF ¶¶ 17–18. But Southwick is simply a fact witness who has sworn to certain historical events. SOF ¶¶ 17–18; *see* Southwick Decl. (DX-1).

---

only proper, but required." (quoting *Morris v. Ross*, 663 F.2d 1032, 1034 (11th Cir. 1981)); *Gordon v. Terry*, 684 F.2d 736, 744 (11th Cir. 1982) ("Conclusory allegations . . . have no probative value.").

[2] *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995) (emphasis added); *see, e.g.*, *Egwuatu*, 2011 WL 2413833, at *2; *United States v. Gardner*, 2017 WL 3438316, at *2 (M.D. Fla. Aug. 10, 2017) (Covington, J.); *see also* Order on Motions for Summary Judgment, at 2–3 (ECF No. 42).

[3] *Evers*, 770 F.2d at 986; *see, e.g.*, *Tompkins-Holmes v. Gualtieri*, 2018 WL 4568868, at *9 n.1 (M.D. Fla. Mar. 16, 2018) (Covington, J.) ("[C]onclusory expert opinions or those based on speculation are insufficient to defeat summary judgment.").

[4] "RSF" refers to plaintiffs' Response to Defendant's Statement of Facts and Counter Statement of Facts (*see* Opp. 3–12). This Reply brief otherwise adopts the same definitions used in Defendants' Motion for Summary Judgment (ECF No. 92) ("Motion").

>   Plaintiffs cannot change her factual averments by citing their expert's conclusory opinion.
>
> - Plaintiffs purport to dispute that the 2015 RFP resulted in reduced recordkeeping fees for the Plan, citing Vitagliano's critique of *TriNet III's* agreement with TransAmerica.  RSF ¶ 33.  But the Court has already dismissed plaintiffs' claims regarding the distinct TriNet III plan.  *See* ECF No. 85.  Regardless, Vitagliano is not on board with plaintiffs' "dispute"—he conceded at his deposition that the 2015 RFP "definitely result[ed] in reduced recordkeeping fees" for both plans.  FV Tr. 257:1–5; *see* SOF ¶ 33.
>
> In short, the actual evidence shows that the material facts are undisputed.[5]

The unsupported conclusions in Vitagliano's report cannot change that, and for the most part he has since conceded the operative, preclusive facts in his deposition.

## II. Uncontradicted Evidence Establishes the Prudence of the RC's Process for Monitoring the Plan's Recordkeeping Costs

In their Motion, defendants marshaled a mountain of evidence showing the RC's diligence in monitoring the Plan's recordkeeping costs, including three competitive searches over six years and regular consultant-driven benchmarking exercises.  SOF ¶¶ 13–18.  Plaintiffs and their expert concede that an RFP is a "***best practice***" and do not dispute the underlying facts evidencing the thoroughness of the RC's two extensive RFP processes.  RSF ¶¶ 13–18, 32; *see* FV Tr. 250:8–19; FAC ¶ 103.  Nor could they—the 2015 and 2021 RFPs were unimpeachable, involving in-depth reviews of each recordkeeper's capabilities and experience, interviews, site visits, and price negotiations that *reduced* participant fees.  SOF ¶¶ 13–18, 32–33.  The 2018 RFI and other periodic benchmarking exercises likewise confirmed the

---

[5] In addition, because plaintiffs fail to "specifically controvert" several of defendants' statements of fact (*e.g.*, SOF & RSF ¶¶ 24–25, 29, 34), those facts must be deemed admitted.  ECF No. 42 at 3.

3

Plan's fees were below market for the services provided.  SOF ¶¶ 16, 18.

Plaintiffs nevertheless insist that they have properly placed the adequacy of the 2015 RFP in dispute, citing Vitagliano's reports.  Opp. 14.  Plaintiffs' principal critique of the 2015 RFP is their contention that TriNet did not include "unbundled" non-insurance company recordkeepers in the competition.  RSF ¶¶ 19, 39, 41; *see* FAC ¶¶ 113–14.  Vitagliano has testified that this contention is *inaccurate*, agreeing that the RFP was sent to "at least one" non-insurance company recordkeeper.  SOF ¶ 33 (citing FV Tr. 268:2–13); *see* Southwick ¶ 22 (Fidelity and Vanguard were also invited to bid).  For good measure, Vitagliano added that it was "very reasonable and rational" to focus the RFP on vendors with MEP recordkeeping experience, that defendants were "not at all" at fault for vendors declining to bid, and that he could not identify a *single* alternative recordkeeper with the requisite experience that should have received the 2015 RFP.  SOF ¶ 33.[6]  There is no triable dispute here.

Plaintiffs' separate critique that defendants "never even attempted to negotiate a per participant fee agreement" (Opp. 16) likewise finds no support in the actual record.  The underlying RFP materials—which plaintiffs do not cite, and Vitagliano did not review—demonstrate that TriNet considered both asset-based *and* per-participant price quotes.  *See, e.g.*, DX-40 at 3252, DX-41 at 3228–29; *see also* DX-45 at 3294, 3297–99 & DX-49 at 11477 (per-participant quotes in 2018 and 2021).  None of these were so-called "bundled" quotes.  *Id.*  Tellingly, all plaintiffs can do is cite

---

[6] Vitagliano's review of the 2015 RFP process was abbreviated; his report shows that he considered a grand total of *one* pertinent document.  FV Rpt. at 19 (materials relied upon); *see* ECF No. 93 n.50.

purported counter-statements of fact that simply do not exist. *Compare* Opp. 14, 16 (citing RSF ¶¶ 46–50), *with* Opp. 9–12 (enumerating only RSF ¶¶ 35–41).[7]

Unchallenged facts thus establish a prudent process in this case.[8] Crucially, no decision in the country holds that a fiduciary who purchased plan services using regular RFPs/RFIs breached the duty of prudence in doing so. *See* Mot. nn.26–27. There is not even a decision denying summary judgment in such circumstances. Plaintiffs certainly cite none, and essentially confirm the point by placing their stock in cases declining to grant summary judgment where the fiduciaries *failed* to conduct regular RFPs/RFIs.[9] For this reason alone, summary judgment is proper.

### III. Plaintiffs Cannot Show That the Plan's Recordkeeping Fees Were Excessive Relative to the Multiple-Employer Plan Services Rendered

Independently, plaintiffs cannot meet their burden on the causation element of their claims—*i.e.*, by offering "specific facts" that the Plan's recordkeeping costs were "excessive relative to the services rendered."[10] Plaintiffs predictably tout a passage from Vitagliano's deposition in which he gives a "yes" answer to a question

---

[7] Plaintiffs now claim that NFP was unqualified to advise on the RFP because its own "internal plan" purportedly paid lower recordkeeping fees than the Plan. RSF ¶ 40. Even if that left-field assertion was supported by evidence (it is not) or made sense (it does not), Vitagliano expressly disclaimed any opinion on NFP's qualifications to conduct the 2015 RFP. FV Tr. 253:13–255:10.

[8] Indeed, the fiduciaries' regular fee-benchmarking exercises with their consultant alone establish a prudent process. *See, e.g.*, *Alas v. AT&T Servs.*, 2021 WL 4893372, at *8 (C.D. Cal. Sept. 28, 2021), *appeal filed*, *Bugielski v. AT&T Servs.* (9th Cir. Oct. 27, 2021) (monitoring "both through periodic reviews and through the hiring of outside experts, suffices to show" a prudent process.).

[9] Opp. 2 (citing *Vellali v. Yale Univ.*, 2022 WL 13684612, at *9 (D. Conn. Oct. 21, 2022) (defendant "imprudently failed to obtain competitive bids for recordkeeping services."); *Garthwait v. Eversource Energy Co.*, 2022 WL 3019633, at *4 (D. Conn. July 29, 2022) (defendants failed to "initiate[] a competitive bidding process to invite competition for the [p]lan's recordkeeping services.")).

[10] *Young v. Gen. Motors Inv. Mgmgt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009); Mot. 22–25, nn.29–34.

5

inquiring whether he held the opinion that MassMutual's services to the Plan did not justify the fees. RSF ¶ 31 (citing FV Tr. 105:5–10).[11] But Vitagliano later conceded, explicitly, that he did *not* analyze MassMutual's specific services or costs, taking his unsupported conclusion off the table. SOF & RSF ¶ 31.[12]

Needless to say, the mere possibility that differently situated plans paid less for a different package of recordkeeping services does not justify a trial, as many cases hold. Mot. 23 nn.32–33. Plaintiffs strain to distinguish these authorities by claiming they "offered expert testimony as to why the comparator plans are comparable" to the Plan. Opp. 19. But plaintiffs cite no evidence for that assertion and none exists. To the contrary, Vitagliano admitted at deposition that not a single one of his cherry-picked comparators was an MEP or otherwise comparable to the Plan. SOF & RSF ¶¶ 28–30; *see* Mot. 23–25.[13] And plaintiffs do not dispute that the Plan paid some of the lowest recordkeeping fees of any MEP in the market. SOF & RSF ¶ 25.[14]

---

[11] Plaintiffs now suggest that onboarding fees should be paid by some unidentified "asset manager." RSF ¶¶ 24, 30, 31. This assertion makes no sense—there is no dispute that the recordkeeper provides the services associated with onboarding new participating employers to the Plan and is, accordingly, compensated by the Plan for those services. SOF ¶¶ 24, 31; *see* Southwick ¶ 37.

[12] Plaintiffs concede that Vitagliano did not analyze the costs of processing individual terminations by participating employers, but futilely attempt to justify that omission by claiming he was "not aware" of the relevant information in the record. RSF ¶ 31. Alas, this is only because plaintiffs did not provide it to him. *See, e.g.*, DX-47 at 119042; DX-53 at 7725.

[13] Plaintiffs also ignore this testimony in opposing defendants' *Daubert* motion (ECF No. 93) and assert that Vitagliano's methodology was to select "plans of similar sizes." ECF No. 100 at 12. Vitagliano's report, however, reveals that his comparators were not in fact comparable in size to the Plan. *Compare, e.g.*, FV Rpt. at 12 (the Plan had 11,585 participants in 2016), *with id.* at 13–15 (the Thrift Savings Plan had 5 million participants and $495 billion in assets, the Amalgamated Plan had 17,000 participants, and the Mallinckrodt plan had 5,362 participants).

[14] Plaintiffs try to muddle the record by conflating a *multi*-employer plan (like the Amalgamated plan) with a *multiple*-employer plan or "MEP" (like the Plan). As Vitagliano himself explained,

6

In the end, plaintiffs' bid for a trial rests on their contention that Vitagliano opined that MEP recordkeeping costs should be "equal to *or less than*" those of single-employer plans. RSF ¶ 30. But his testimony was just the opposite:

> Q: And you would also expect a multiple employer plan with a certain number of participating employers to have higher recordkeeping and administrative fees than a single employer plan; is that correct?
>
> A: Single employer plan of the same number of participants, yes.

SOF ¶ 30 (citing FV Tr. 192:14–20); *see* FV Tr. 243:15–21 (agreeing there are "significant differences" in single-employer plan and MEP costs).[15] This concession both explains why a handful of single-employer plans and other non-MEP comparators may have paid lower fees than the Plan for their far-less extensive recordkeeping services and, given the absence of any other evidence, forecloses any claim that the Plan's costs were excessive "relative to the services rendered." Mot. 22–25. For this independent reason, there is no genuine dispute requiring a trial.

Dated:  December 23, 2022

Sacha Dyson
GRAY ROBINSON, P.A.
401 East Jackson Street
Tampa, FL 33602
(813) 273–5000
sacha.dyson@gray-robinson.com

O'MELVENY & MYERS LLP

*/s/ Catalina Vergara*
Catalina Vergara (*pro hac vice*)
Brian Boyle (*pro hac vice*)
1625 Eye Street, N.W.
Washington, D.C. 20006
(202) 383–5300
cvergara@omm.com

---

multi-employer plans are union plans subject to less burdensome regulations than MEPs and, thus, he "would expect the cost of recordkeeping and administration for [the Plan] to be greater than the [cost] of the Amalgamated [plan]." FV Tr. 14:14–15:23, 235:12–237:4, 241:14–18; *see* SOF ¶ 29.

[15] Vitagliano testified that he assumed many of the additional costs associated with administering an MEP are paid by TriNet, not the Plan's recordkeeper. But he conceded that he did "not know that to be true" and he does not "know all the details." FV Tr. 206:10–25. As this opinion was based on pure speculation and is contrary to evidence in the record, it cannot salvage plaintiffs' claims. *See, e.g.*, Southwick ¶¶ 36–40; DX-40 at 3245, 3246, 3250; *see generally* DX-53–DX-60.