EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/23/2022

IN RE OMNICOM GROUP INC. ERISA

LITIGATION

No. 1:20-cv-4141 (CM) (SLC)

**DECISION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' *DAUBERT* MOTIONS; AND GRANTING IN PART AND DENYING IN
PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

McMahon, J.:

In this class action, named plaintiffs Carol Maisonette, Shane Tepper, Surfina Adams,

Michael Mensack, and Daniel Dise ("Plaintiffs") brings this lawsuit for breach of fiduciary

duties under the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et.*

*seq.*, on behalf of themselves and two sub-classes of similarly situated participants and

beneficiaries of the Omnicom Group Retirement Savings Plan ("Plan"). Plaintiffs accuse

Defendants – Omnicom Group, Inc. ("Omnicom"), the Board of Directors of Omnicom Group,

Inc. ("Board"), the Administrative Committee of the Omnicom Group Retirement Savings Plan

("Administrative Committee" or "Committee"), and Does No. 1-20, who are members of the

Board and Administrative Committee (collectively, "Defendants") – of failing to appropriately

1

monitor the Plan's investments, failing to replace risky and expensive Plan investment funds, and failing to obtain lower recordkeeping fees for Plan participants.

Presently before the Court is a motion for summary judgment (Dkt. No. 130) and three *Daubert* motions to exclude the opinions and proposed testimony of multiple experts (Dkt. Nos. 131–33) filed by the Defendants.

The motions to exclude are granted in part and denied in part.

The motion for summary judgment is granted in part and denied in part.

## I. BACKGROUND

The Court assumes the parties' familiarity with the facts. An extensive discussion about the background of this case is available in the Court's August 11, 2022, Decision and Order Granting Defendants' Motion for Partial Summary Judgment, Denying Plaintiffs' Motion to Strike, and Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification and for the Appointment of Class Representatives and Class Counsel. (Partial Summary Judgment Order, Dkt. No. 124).

## II. PROCEDURAL HISTORY

After initially filing separate complaints on May 29, 2020, and July 31, 2020, Plaintiffs joined together and filed the first consolidated complaint on September 25, 2020. (Compl., Dkt. No. 1; Compl., *Maisonette v. Omnicom Grp. Inc.*, 1:20-cv-06007 (July 31, 2020), Dkt. No. 1; Consolidated Class Action Compl. ("CAC"), Dkt. No. 17). The CAC alleged three breach of fiduciary duty claims, and dependent liability claims for failure to monitor, co-fiduciary liability, and knowing breach of trust. (Dkt. No. 17).

Defendants moved to dismiss the CAC for lack of Article III standing and on the merits, and this Court granted that motion in part and denied it in part on August 2, 2021. (Dkt. No. 52).

2

The Court dismissed for lack of standing those claims relating to the alleged underperformance and greater expense of two investment options in which Plaintiffs had not invested. The Court denied the remainder of Defendants' motion to dismiss, allowing Plaintiffs' other claims to move forward with discovery.

Plaintiffs subsequently filed their Second Amended Complaint ("SAC") on August 27, 2021, removing the dismissed claims. (SAC, Dkt. No. 54). Plaintiffs did not add any new substantive allegations—nor did they move to add parties by February 18, 2022, the deadline set forth in the Court's November 29, 2021, stipulated scheduling order ("Scheduling Order"). (Dkt. No. 65).

On February 18, 2022, Plaintiffs moved to certify a class on all claims. (Dkt. No. 69). Defendants moved for partial summary judgment based on Plaintiffs' lack of standing to maintain their "non-TDF Claim," and opposed Plaintiffs' motion to certify their proposed class. (Dkt. No. 100). The Court granted summary judgment dismissing the "non-TDF Claim," declined to adopt Plaintiffs' proposed class definition, and certified two subclasses for the remaining TDF and Recordkeeping Fee claims: (1) all participants and beneficiaries of the Plan who invested in the Active Suite during the Class Period, and (2) all participants and beneficiaries of the Plan who paid the $34 per-participant annual recordkeeping fee and/or the $12 per-participant administrative fee, during the relevant portion of the Class Period. (Partial SMJ at 24).

On October 24, 2022, Defendants moved for summary judgment on the TDF and Recordkeeping fee claims. (Dkt. No. 130). Defendants also moved to exclude the opinions and proposed testimony of Defendants' experts. (Dkt. Nos. 131–33). Plaintiffs oppose all motions.

3

## III.    LEGAL STANDARD

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant[s] [are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. At summary judgment, the movants bear the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004).

Once the movants meet that burden, the non-movants may defeat summary judgment only by producing evidence of specific facts that raise a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 248; *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). To survive summary judgment, the non-movants must present concrete evidence and rely on more than conclusory or speculative claims. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980). In assessing the record to determine whether genuine issues of material fact are in dispute, a court must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Parkinson v. Cozzolino*, 238 F.3d 145, 150 (2d Cir.2001).

## IV.    *DAUBERT* MOTIONS

I will decide the *Daubert* motions before addressing the merits. Because "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment . . . . it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997). "The resolution of evidentiary questions on summary judgment conserves the resources of the parties, the court, and the jury." *Ibid.*

4

Defendants move to exclude the opinions and proposed testimony of three experts proffered by plaintiffs: (1) W. Scott Simon (Dkt. No. 131); (2) Dr. Gerald Buetow (Dkt. No. 132); and (3) Michael Geist (Dkt. No. 133).

The motion to exclude Simon's opinion is denied; the motion to exclude Dr. Buetow's opinion is denied in significant part but granted as to one aspect of his proposed testimony; the motion to exclude Geist's opinion is granted in part and denied in part.

## Daubert Standard

Under the standard set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and Rule 702 of the Federal Rules of Evidence, the district court serves a "gatekeeping" function in determining whether an "expert" witness really qualifies as one. Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

"The Second Circuit has 'distilled Rule 702's requirements into three broad criteria: (1) qualifications, (2) reliability, and (3) relevance and assistance to the trier of fact.'" *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 27 (S.D.N.Y. 2020) (quoting *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 466 (S.D.N.Y. 2018)). The party proffering the expert's opinions "has the burden to establish the [Rule 702] admissibility requirements, with the district court acting as a 'gatekeeper' to ensure that the 'expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *In re Pfizer Inc. Secs. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2017)). The court need not "admit opinion evidence that is connected to

the existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). In its evaluation, "the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).

Ultimately, the *Daubert* standard is a "flexible one," *Daubert*, 509 U.S. at 594, "and will necessarily vary from case to case," *Amorgianos*, 303 F.3d at 266. District courts have "broad discretion in the matter of the admission or exclusion of expert evidence." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (quoting *Salem v. United States Lines Co.*, 370 U.S. 31, 35 (1962)). Even if an expert is qualified, the court must still consider whether the probative value of the testimony is "substantially outweighed by a danger of . . . unfair prejudice" or likelihood of confusing or misleading the jury. Fed. R. Evid. 403; *see also United States v. Dukagjini*, 326 F.3d 45, 55 (2d Cir. 2002).

## A. Defendants' Motion to exclude the opinions of W. Scott Simon is denied

Defendants seek to exclude certain testimony contained in the report of Plaintiffs' expert, W. Scott Simon.

Mr. Simon is an independent expert in the standard of care for ERISA plan management and the associated fiduciary duties involved in the administration, operation, and management of defined contribution plans. (Simon Rpt., Dkt. 142–19 ¶ 11). He served as a principal at Prudent Investor Advisors, LLC ("Prudent"), a registered investment advisory firm, for 15 years. (*Id.*) In that capacity, he advised Plan sponsors on the performance of investment options and their

fiduciary duties. (*Id.* ¶ 12). He also advised hundreds of plan participants on how to use a fiduciary investment framework for their retirement investing. (*Id.*).

Over the course of 17 years, Mr. Simon has authored 186 articles for Morningstar, a financial investment management company, on a number of fiduciary investment matters, primarily related to ERISA and 401(k) plans. (*Id.* ¶ 15). He is an Accredited Investment Fiduciary Analyst, a professional designation awarded by the Center for Fiduciary Studies in association with the Center for Executive Education, Joseph M. Katz School of Business, University of Pittsburgh. (*Id.* ¶ 19). The designation qualifies him to conduct independent fiduciary assessments to determine whether fiduciaries and investment professionals are in compliance with the standards of modern prudent fiduciary investing. (*Id.*). Simon has also been retained and testified as an expert witness in approximately 25 cases over the last 15 years. (*Id.* ¶ 18).

Plaintiffs want Simon to testify about whether, "the conduct [of the defendant Committee] was consistent with the minimum standard of care applicable to fiduciaries of ERISA-governed retirement plans with respect to [the Committee's] (a) process for selecting, monitoring, and replacing Plan investment options, which resulted in the retention of the Fidelity Freedom funds for a substantial portion of the proposed Class Period; (b) a lack of formal fiduciary training for members of the Committee for a substantial portion of the Class Period; (c) unreasonable reliance on a professional investment advisor for a substantial portion of the Class Period; (d) deficient fiduciary training . . . . " (*Id.* ¶ 6).

Based on his review of the available evidence, Simon opines as follows:

(1) "[T]he process employed by Defendants to select, monitor, and replace Plan investment options fell below applicable minimum fiduciary standards, such that Defendants would have been unable to identify imprudent investment options and timely replace them with more suitable alternatives. It was this deficient process that

caused the Defendants to imprudently retain the high-cost, high-risk, underperforming Freedom Funds."[1]

(2) "Defendants also failed to meet the applicable minimum fiduciary standards of care by: (a) failing to recognize and remedy fundamental deficiencies in the Plan's investment policy statement; (b) over-relying on the advice and recommendations of Mercer without sufficient basis for such reliance; (c) inappropriately permitting a single Committee member to filter the information provided to the Committee; and (d) failing to provide sufficient fiduciary training for members of the Committee.

(*Id.* ¶ 33).

Defendants argue that his opinions must be excluded because he failed to review key evidence about the Committee's Process for monitoring and ultimately replacing the Active Suit. (Dkt. No. 152 at 9). Specifically, Defendants claim that Simon failed to review: (i) quarterly reports and other materials provided to the Committee by its independent investment advisor, Mercer; (ii) materials from Mercer and Plan legal counsel provided to the Committee regarding its decision to replace the Active Suite; (iii) the entire Committee meeting minutes; and (iv) the testimony of a Committee member. *Id.* at 8. As a result, they argue his opinions about the Committee process are untethered from the evidence because they do not consider certain evidence showing information what the Committee was presented with, discussed, and considered in making its decisions. *Id.* at 10. Moreover, they believe his opinions are unreliable because he failed to review records that that they claim contradict his critique of the Committee process. *Id.* at 13.

"Courts have long recognized that the existence of alternative factual scenarios that an expert has not considered in rendering an opinion goes only to the weight and credibility of the

---

[1] Simon noted, however, that the four critiques mentioned in subsection (2), provide the basis for his opinion that the process was deficient, as identified at subsection (1). Ex. 83 (Simon Dep. Tr.) at 106:15–108:6.

expert's testimony, not its admissibility." *Media Glow Digital, LLC v. Panasonic Corp. of N. Am.*, No. 16 CIV. 7907 (HBP), 2019 WL 1055527, at *5 (S.D.N.Y. Mar. 6, 2019). Simon reviewed a substantial portion of the evidentiary record developed in this litigation, including the Investment Policy Statement, many sets of meeting minutes (though not all), and the deposition testimony of a majority of the committee members to form his opinions. (Dkt. No. 168 at 8). Mr. Simon is unquestionably qualified to offer opinions about the minimum standard of care for ERISA plan fiduciaries when deciding on plan investment options. He may reasonably opine on whether the Committee's formal and informal processes for making those decisions were consistent with the minimum standard of care for a prudent ERISA fiduciary. That Defendants reach different conclusions on the basis of items of evidence or information that Simon allegedly did not review may serve to rebut Simon's opinions but does not merit their exclusion. To the extent that Defendants believe Simon overlooked critical evidence in developing his opinions, that can be addressed on cross-examination and does not go to his ability to offer his testimony. *Daubert*, 509 U.S. at 596 (citations and quotations omitted).

The motion to exclude is denied.

**B. Defendants' Motion to exclude the opinion of Dr. Gerald Buetow is denied in significant part but granted as to one aspect of his proposed testimony**

Defendants seek to exclude opinions contained in the report of Plaintiffs' expert, Dr. Gerald Buetow.

Dr. Buetow is an independent expert on investment management, portfolio management, defined contribution and pension fund management, investment selection and review, investment monitoring, and due diligence of investments, including those in defined contribution and pension plans. (Dkt. No. 142-20 ¶ 9). For two years he served as the Chief Investment Officer (CIO) for XTF Global Asset Management in New York City and for eight years served as CIO

and Founder of Innealta Capital in Charlottesville, Virginia. (*Id.* ¶¶ 10, 12). In these roles, he was responsible for all product creation, trading, portfolio management, and research for active ETF based tactical, sector, and country portfolios. (*Id.*) Separately, as a consultant during this period, he performed due diligence on the portfolio performance of asset managers for defined benefit plans and defined contribution plans. (*Id.* ¶ 14).

Plaintiffs want Dr. Buetow to testify about the losses sustained by the Plan as a result of Defendants' selection and retention of the "Active Suite" as a Plan investment option, as well as on certain related fiduciary principles. Plaintiffs asked Dr. Buetow to apply a common loss calculation methodology to calculate the estimated losses suffered by the Plan and its participants as a result of Defendants' decision to retain the Active Suite in the Plan and not replace it with suitable alternative fund. (Dkt. No. 142-20 ¶¶ 3–4). Plaintiffs asked Dr. Buetow conduct his analysis on the basis that the Active Suite was replaced with a "suitable alternative" at the start of the subclass period. Dr. Buetow concluded that the Defendants' decision to retain the Active Suite, and not to replace it with American Funds TDF (which he identified as a suitable alternative) as of May 31, 2014, resulted in losses of $32,447,394 to Plan participants. (*Id.* at 24).

Defendants argue that Dr. Buetow's opinions should be excluded for two reasons.[2]

---

[2] In their Background of the motion to exclude Buetow's opinion testimony, Defendants recount multiple occasions where Buetow's opinions has been excluded by other federal courts and the grounds for those exclusion. (Dkt. No. 154 at 8). However, nowhere in their motion do they argue that Buetow's testimony should be excluded because he is not qualified, because his methodology is improper, or because of some reason why his opinions were excluded in other cases. As a result, the fact that Buetow's testimony has been excluded in other cases for other reasons is not a reason to exclude it here. However, Dr. Buetow's history of having his opinions excluded is certainly relevant to his credibility as an expert and will undoubtedly be the subject of considerable cross examination.

First, they argue that his loss calculation must be excluded because it is not tethered to the liability claim set forth by Plaintiffs in their Second Amended Complaint. (Dkt. No. 154 at 8). Defendants claim that the Plaintiffs' theory is that Defendants breached their fiduciary duties of prudence by failing to switch from the Active Suite to the Index Suite as the Plan's TDF investment option. *Id.* However, Dr. Buetow's analysis compares the returns on the Plan from the retention of the Active Suite to the returns if the Active Suite had been replaced with the "American Funds TDF." *Id.* As a result, they argue that his opinion on losses is irrelevant and should be excluded entirely. *Id.*

Losses sustained as a result of an ERISA fiduciary's imprudent selection and retention of certain funds, "are measured by the difference between the plan's actual performance and how the plan would have performed if the funds had been invested 'like other funds being invested during the same period in proper transactions.'" *Trustees of Upstate New York Engineers Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 567 (2d Cir. 2016) (quoting *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985)). "Where several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these." *Id.* (quoting *Donovan*, 754 F.2d at 1056); see also *Sacerdote v. New York Univ.*, 9 F.4th 95, 113 n.68 (2d Cir. 2021).

While Plaintiffs bear the burden of proving losses caused by an imprudent investment, they need not prove that their proposed alternative was the only plausible or prudent investment. *Sacerdote v. New York Univ.*, 9 F.4th at 113. The fiduciaries found to be in breach of their duty bear the burden of proving that the funds would have earned less than the amount Plaintiffs calculate they would have earned had they been used for the proposed alternative investment. *Donovan*, 754 F.2d at 1056.

11

As a predicate matter, Defendants misconstrue Plaintiffs' TDF claim. Defendants cite multiple allegations in Plaintiffs' Second Amended Complaint which state that the Index Suite was a more appropriate choice for the Plan than the Active Suite and argue that Defendants should have replaced the Active Suite with the Index Suite. (SAC ¶¶ 34–35, 44, 47–49). Defendants claim this shows the Plaintiffs' liability theory is that Defendants breached their fiduciary duties by failing to replace the Active Suite with the Index Suite.

Plaintiffs counter that their TDF Claim instead alleges that, "it was imprudent for Defendants to retain the Active Suite *instead of the various suitable alternative investments readily available on the market.*" (Opp. at 19–21) (emphasis added). They also cite to numerous parts of their Second Amended Complaint, in which they identify Defendants' fiduciary breach as the retention of high-cost investments instead of offering *prudent alternatives.* (SAC ¶¶ 6, 34, 42) (emphasis added).[3] Both sides quote language from prior Orders of this court that they claim supports their respective interpretations. (Motion to Dismiss Order at 5, Dkt. No. 52; Partial Summary Judgment Order at 8).

The controlling document is the SAC, and that is quite clear. In it, Plaintiffs allege that Omnicom breached its duty by retaining the Active Suite as the Plan's TDF option. The SAC identifies the Index Suite as an example of a known alternative investment that should have caused Defendants to be aware that the Active Suite was an imprudent investment. The SAC does not plead that the Index Suite was the only suitable alternative, or even the preferred alternative, to the Active Suite. Plaintiffs plainly summarize their allegation in the introduction of their Second Amended Complaint:

---

[3] Plaintiffs cite to Paragraph Three of their Second Amended Complaint. However, the quoted text is actually found at Paragraph Six of the complaint.

"Defendants have breached their fiduciary duties to the Plan and, as detailed below, have . . . selected, retained, and/or otherwise ratified high-cost and poorly-performing investments, instead of offering more prudent alternative investments when such prudent investments were readily available at the time that they were chosen for inclusion within the Plan and throughout the Class Period (defined below).

(SAC ¶ 6).

Plaintiffs do not need to show that Plan participants suffered losses because Defendants did not replace the Active Suite with the Index Suite. Plaintiffs may show that Plan participants suffered losses because Defendants did not replace the Active Suite with some more suitable alternative.

In order to prove losses for Plaintiffs, Dr. Buetow was asked to select the most favorable replacement fund among suitable alternatives. (Dkt. 142-20 ¶ 29). He analyzed potential replacement funds drawn from the same Morningstar category as the Active Suite and available during the Class Period through a composite score of standard investment industry metrics. (*Id.* ¶¶ 29–36). Dr. Buetow then determined the "best-in-class funds" from the subset of seventeen possible suitable replacements, assessing them using qualitative criteria commonly used by fiduciaries, such as operational capability, skilled investment managers, and manager experience. (*Id.* ¶ 37). At the end of this exercise, Dr. Buetow determined the American Funds Target Date Funds were the most favorable of suitable alternatives. (*Id.* 29, 37).

The fact that Dr. Buetow selected a fund other than the Index Fund to use as the basis for his damages calculations does not mean that his opinion on damages can or should be excluded. At the time the Plaintiffs filed their complaint I doubt they had the benefit of Dr. Buetow's analysis. He did not think the Index Fund was the most suitable alternative and he explained why. Plaintiffs are not require to plead the contents of expert opinions at the outset of a case. Dr.

Buetow's analysis is perfectly consistent with the law in this Circuit law. Buetow's losses

calculation is highly relevant to Plaintiffs' TDF claim, and he is perfectly competent to offer it.

Second, Defendants seek to exclude three statements that Dr. Buetow makes about

aspects of the Active Suite that, in his view, should have raised concerns for a reasonable

fiduciary:

(1) "[N]o fiduciary would have been able to evaluate the funds' performance and execution," because some of the underlying funds lacked five years of performance history as of the Class Period's start;

(2) [T]hat the poor performance of all but two of the Active Suite's underlying funds would "raise concerns" for any "knowledgeable fiduciary;"

(3) That the Active Suite's "chaotic" glide path would raise concerns for any responsible fiduciary.

Defendants argue that these comments should be excluded as irrelevant because they fall

outside the scope of his proffered losses opinion. (Dkt. 154 at 12) They also claim that Dr.

Buetow's comments are *ipse dixit* and are not grounded in the facts in the record. (*Id.*).

Specifically, they argue that because he failed to consider or request any documents showing

whether the Defendants considered his concerns, he failed to apply his commentary to the Plan

fiduciaries' actual monitoring of the Active Suite. (*Id.* ¶¶ 25–28).

Dr. Buetow draws his first and second assertions from his analysis of publicly available

data on the performance of the Active Suite's underlying funds, from the same data source used

for his loss calculations. (*Id.* ¶¶ 25, 27). He rests his third assertion on a publication published in

2011, three years before the start of the Class period (*Id.* ¶ 28). He did not perform any additional

analysis to determine whether the facts described in 2011 were unchanged at the commencement

of the class period. (Dkt. 183 at 10).

Expert opinion should be excluded where the expert fails to rely upon reliable sources. *See, e.g., In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 455 (S.D.N.Y. 2016). While the Active Suite may have had a "chaotic" glide path in 2011, Dr. Buetow cites no evidence that it was chaotic in 2014 and thereafter. As a result, this aspect of his report is unreliable and he will not be allowed to give this testimony.

The rest of his testimony will, however, be admitted. His other two challenged opinions are relevant and are not simply ipse *dixit*.

As Dr. Buetow's Report indicates, he was not retained as an expert to opine on the prudence of selecting or retaining the Active Suite. (Dkt. No. 142-20 ¶ 3). However, Dr. Buetow has significant experience providing due diligence on investments for asset managers and retirement. He certainly has the expertise to comment on the characteristics of a fund that might raise concerns for a responsible fiduciary. It is appropriate for him to opine whether certain publicly available data about a fund might raise concerns in a reasonable fiduciary. To the extent that Defendants believe the data on which Dr. Buetow relies is unreliable, that can be addressed on cross-examination. *Daubert*, 509 U.S. at 596 (citations and quotations omitted).

Finally, Defendants argue that Dr. Buetow did not try to learn whether the Committee and Mercer were aware of the concerns he raises, which makes his opinion that they either were not aware of or ignored such concerns "speculative". Again, this is an issue best addressed by cross examination, not exclusion.

## C. Defendants' Motion to exclude the opinion of Michael Geist is granted in part and denied in part

Defendants seeks to exclude in their entirety the opinions contained in the report of Plaintiffs' expert, Michael Geist.

Geist is an independent retirement plan consultant and founder of ClearSage Advisory Group, a consulting group that provides services to the retirement plan and recordkeeping industries. (Dkt. No. 142-21 ¶ 7; Ex. 2 at 77). In that capacity, he solicits bids from recordkeepers and other retirement plan services providers for retirement plan recordkeeping services on behalf of retirement plan fiduciaries and evaluates proposals for retirement plan services. (*Id.* ¶ 7). Before starting his consulting practice, he spent over ten years in the Retirement Plan Services division of T. Rowe Price, departing as a Senior Vice President in the Product Development and Management department. (*Id.* at ¶¶ 9–10). At T. Rowe Price, he was responsible for delivering, creating, and/or governing over 20,000 pricing proposals for over 10,000 retirement plans, including proposals for recordkeeping and administrative services. (*Id.*).

Plaintiffs asked Mr. Geist to review case documents, deposition testimony, and publicly available information and to opine whether Defendants discharged their duties related to the engagement and compensation of recordkeepers with the "standard of care, skill, prudence, and diligence for fiduciaries." (Dkt. No. 142-21 ¶ 2). Plaintiffs also asked Geist to opine about the reasonable retirement plan services fees that prudent fiduciaries would have agreed to pay had they followed the fiduciary standard of care, skill, prudence, and diligence. (*Id.* ¶ 3). In formulating his opinions, Geist analyzed Defendants' conduct for the period immediately preceding May 29, 2014, through the present. (*Id.* ¶¶ 2–3). He opines that Defendants' conduct demonstrated, "no actual process related to the effective review and monitoring of retirement plan services fees." (*Id.* ¶ 11). Specifically, Geist avers that Defendants could not reliably ensure that the administrative fees being charged were reasonable because Defendants failed to execute a competitive RFP for the Plan's recordkeeping services. (Id. ¶ 274–76). He concludes that Defendants did not, "observe the standard practices and level of care necessary to ensure Plan

16

Participants paid only reasonable fees . . . [and their conduct was] . . . characterized by a persistent failure to act in the exclusive best interest of Plan Participants." (*Id.* ¶ 10).

Based on his analysis of the 2019 RFP bids, public market data, and his experiences at T. Rowe Price putting together bid proposals, he opines that an appropriate fee for Fidelity's recordkeeping services would be $25 per-participant. (*Id.* ¶¶ 308–09).

Defendants make four arguments for excluding Geist's opinions.[4]

First, Defendants argue that Geist cannot opine that Fidelity would have provided a lower bid had it been required to provide a proprietary discount because the record shows Defendants did ask Fidelity to lower its bid and Fidelity declined. (Dkt. 150 at 16). Email records and Committee member Leslie Chiocco's deposition indicate that the Committee and Mercer asked Fidelity whether they could provide a better per-participant fee than $34 and Fidelity declined to offer one. (*Id.*; Defs.' 56.1 ¶¶ 30–34). At his deposition, Geist indicated that he was aware of the record evidence that the Committee had asked for a discount and Fidelity refused. (Dkt. 150 at 17). Defendants claim that this refutes Geist's claim that Defendants could have negotiated a bid lower than $34, so his assertion to the contrary must be excluded.

Among other points, Plaintiffs argue that this request for a discount does not contradict Geist's opinion because Defendants made their request *after they surrendered the negotiating*

---

[4] Apparently Mr. Geist's opinion testimony has also been excluded by a number of federal courts for various reasons, including questions about his credentials and his methodology. (Dkt. No. 150 at 9-10). However, Defendants do not argue that Geist's credentials are insufficient, or that his methodology is improper; neither do they seek to exclude his testimony on any other basis on which it was excluded in some other case. Once again, the fact that multiple courts have chosen not to listen to Mr. Geist is grist for the mill of cross examination and for an argument that he is not worthy of belief. But since Defendants do not themselves argue that Geist is not qualified, or that his calculation methodology is flawed, there is no reason for me to exclude his testimony simply because some other judge in some other case did so. We will learn which weight the court give to his – and Dr. Buetow's -- testimony after they are cross-examined.

*leverage with Fidelity.* (Dkt. No. 170 at 18). As Geist puts it, "the structure and execution of the

2019 RFP process 'poisoned the well' . . . [because language in the Request for Proposal]

document soliciting proposals specifically signaled to the competing Recordkeepers that there

was little chance to obtain proprietary assets." (Dkt. 142-21 ¶¶ 225–26).[5] Plaintiffs argue that this

failure to create a competitive environment for recordkeeping fees eliminated any pressure on

Fidelity to provide a more competitive bid, both at the initial bidding stage *and* when the

Committee made its further request for a discount. (Dkt. No. 170 at 18).

     Put another way, Plaintiffs argue Defendants went to the car dealership, agreed to pay

above retail, and, just before they signed on the dotted line, they asked the car salesman if he

could do any better. For Plaintiffs, Defendants were lucky to have gotten away without paying

for the undercoat. They claim the refusal of a final request asking whether Fidelity "could do any

better," (Dkt. No. 150 at 17), does not foreclose a claim that the Committee could have

negotiated a better price if it had conducted a proper RFP and required Fidelity to submit a

proprietary discount bid.

     "Where an expert ignores evidence that is highly relevant to his conclusion, [but]

contrary to his own stated methodology, exclusion of the expert's testimony is warranted*." In re*

*Mirena Ius Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 242

(S.D.N.Y. 2018), aff'd, 982 F.3d 113 (2d Cir. 2020). However, "[a] contention that an expert did

---

[5] The language stated, "Approximately 70% of the assets are currently held in the recordkeeper's proprietary funds. While changes in the investment line-up are not anticipated, the impact of proprietary investments on the pricing of administration is requested in the fee section." (Dkt. 142-21 ¶ 226). Geist opines that, "[i]t is well known among retirement plan services salespeople and prudent fiduciaries that the inclusion of such language is a clear signal that it is very unlikely that plan fiduciaries will choose a new Recordkeeper under any circumstances . . . [and] that the entire RFP process is most likely a "check the box" exercise with a preordained outcome (retaining the incumbent Recordkeeper)." (*Id.* ¶¶ 226–27).

18

not weigh a certain piece of evidence adequately does not take an expert opinion into the realm of "'speculative or conjectural.'" *Cooper Crouse-Hinds, LLC v. City of Syracuse, New York*, 568 F. Supp. 3d 205, 221 (N.D.N.Y. 2021) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)). "Rather, the method to contest the factual underpinning of expert opinion is vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Id.*

There is arguable merit to Defendants' argument that Geist's failure to address the final discount negotiation contradicts his ultimate conclusion, principally because Geist was clearly aware of the negotiation and chose not to address it in his report. However, it is not apparent to me that the mere fact Defendants asked for a discount at the end of an allegedly flawed negotiation contradicts Geist's contention that a properly executed RFP and the requirement of a proprietary discount bid from Fidelity would have produced a lower fee. Moreover, if the 2019 RFP was as deeply flawed as Geist claims, Defendants allegedly lacked any sense for what a reasonable rate would be for Fidelity's services, and so would have no way to know whether the final $34 per-participant fee was truly the best that could be negotiated. The fact that Defendants did seek a lower fee and were refused certainly goes to the credibility and weight that one might accord Geist's opinion that a discount was possible; it is an issue on which Geist must be vigorously cross-examined. But it does not merit exclusion.

Second, Defendants claim that Geist cannot speculate that Fidelity would have provided a lower bid had the 2019 RFP not disincentivized them from offering one. As a result, Geist's calculations about the reasonable recordkeeping fees that the Plan should have been able to obtain must also be excluded as impermissible speculation.

19

Geist makes three statements that Defendants argue is impermissible speculation on Fidelity's state of mind. First, he states that Fidelity was "disincentivized" by certain language in the RFP to provide a bid lower than $34. (*Id.* ¶ 225). Second, he states that, based on the Defendants' conduct during the RFP, "Fidelity determined that it had virtually no risk of losing the vast majority of revenues . . ." (*Id.* ¶ 238). Third, Geist states, "[h]ad the Omnicom Plan Fiduciaries properly required Fidelity to comply with the terms of the RFP and obtained a proprietary discount bid from Fidelity based on its management of 74% of the Plan's assets, Fidelity would have provided a bid significantly lower than its initial open architecture bid of $34." (Dkt. No. 142-21 ¶ 242).

Geist also opines that prudent Plan fiduciaries exercising the appropriate standard of care for a competitive RFP could have negotiated a $25 per participant fee from Fidelity. (Id. ¶¶ 290–94). He calculated this number by evaluating the "discount rate proposed by each Recordkeeper to Omnicom under various proprietary scenarios," to forecast the discount that would have been from each recordkeeper. (Id. ¶¶ 281–94). Mr. Geist corroborated these estimates by surveying the publicly available fee data and information of similarly sized plans. *Id.* ¶¶ 296–304. This revealed that Fidelity had at least four other similarly sized clients paying less than the Plan during the same period. *Id.* ¶¶ 296–304. Geist also opined that the $25 fee was consistent with the rates he encountered while employed by T. Rowe Price. *Id.* ¶ 309.

"[T]he opinions of [] witnesses on the intent, motives or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise." *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004). "Questions about the parties' knowledge and intentions are classic questions of fact for the jury." *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 470 (S.D.N.Y. 2005). Experts may not testify as

to what another actor would or would not have done. See *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 466 (S.D.N.Y. 2016). Geist speculates that Fidelity did not lower its prices because the RFP was flawed and that it would have lowered them if the RFP was properly developed and executed. Thus questions that call for Geist to opine about what Fidelity "thought," and what Fidelity would or would not have done, are improper speculation and must be excluded.

However, it is ultimately a question of wording Geist's opinion properly. Geist's ultimate point is that – based on his review of the available evidence and his experience creating and advising on RFPs – the Defendants' 2019 RFP suffered from such significant flaws that it could not have provided an accurate understanding of the fair market rate for the Plan's recordkeeping services. Considering his significant expertise in the area, Geist may offer his opinion about issues with the 2019 RFP, whether the Committee adhered to the terms of the RFP and to the prudent standard of care for the monitoring of recordkeeping fees (the opinion for which he was engaged, by his own account), and what changes to the terms and process of the 2019 RFP would have gotten a reasonable recordkeeper in Fidelity's position to lower its recordkeeping fee bid.

Plaintiffs also engaged Geist to opine as to the reasonable retirement plan services fees that *prudent fiduciaries would have agreed to pay.* (Dkt. No. 142-21 ¶ 3). It is perfectly appropriate for Geist to opine that, based on his analysis, a prudent fiduciary would conclude that the reasonable fee for Fidelity's recordkeeping services was $25 per participant and would not have accepted a higher fee for Plan beneficiaries. And he may do so based on evidence about what similarly situated customers of Fidelity were paying to Fidelity, as well as what competitors like T. Rowe Price were charging their customers.

Third, Defendants argue that Geist's opinions relating to purportedly "excessive" recordkeeping fees paid by the Plan prior to April 1, 2019, should be excluded because they are irrelevant to conduct during the subclass period.

Based on his review of the available evidence and his experience working in the retirement industry, Geist opines that the Defendants failed to monitor and negotiate the Plan's recordkeeping and administrative fees in a manner consistent with the minimum standards applicable to fiduciaries of large retirement plans. (Dkt. No. 142-21 ¶ 10–16). Specifically, he identifies seven process lapses that support his conclusion:

> 1. There is no evidence that the Omnicom Plan Fiduciaries solicited any competitive bids from multiple recordkeepers from at least July 2009 through October 2019.
>
> 2. The Omnicom Plan Fiduciaries failed to require Fidelity to provide both an open architecture bid and a proprietary discount bid at any time during the Class Period.
>
> 3. The Omnicom Plan Fiduciaries' 2019 RFP was structurally flawed, ineffectively and improperly executed, and insufficient to enable the Omnicom Plan Fiduciaries to determine the fair and reasonable Bundled RK&A fee rate for Fidelity's services.
>
> 4. The Omnicom Plan Fiduciaries did not take seriously their duty to act for the exclusive benefit of Plan Participants and ensure the Plan paid only reasonable fees for RK&A services.
>
> 5. The Plan Fiduciaries never engaged the Plan's advisor, Mercer Investments LLC ("Mercer"), to provide any services related to the monitoring of the Plan's RK&A fees until 2019.
>
> 6. The Plan Fiduciaries failed to include Plan Fees or Plan Administration as a regular topic in meeting minutes until November 2017.
>
> 7. The Omnicom Plan Fiduciaries improperly failed to return millions of dollars in unreasonable and excess fees paid by Plan Participants in a timely manner.

(*Id.* ¶ 14).

In addition, Geist opines on the potential losses to beneficiaries as of May 29, 2014, by comparing the fees beneficiaries actually paid to "reasonable fees" Plan fiduciaries could have

obtained by soliciting vigorous competition for recordkeeping services – specifically, rates of: $33 per participant in 2014–2015, $27 per participant in 2016–2018, and $25 per participant in 2019–2020. (*Id.* ¶ 308). Had the Plan Fiduciaries obtained reasonable fees, and had the excess fees been invested in a timely manner, Geist calculates Plan beneficiaries would have benefitted from an additional $5,523,713 in earned income during the period beginning May 29, 2014 and ending December 31, 2020. (*Id.* ¶ 312). Additionally, Geist calculates Plan beneficiaries lost $1,872,675 due to the Plan fiduciaries' failure to "promptly return" the revenue credit provided to beneficiaries for participation in the revenue-sharing recordkeeping fee structure that preceded the sub-class period. Id. ¶¶ 250, 255, 313.

An expert opinion is only relevant if "it 'fits' the facts of the case." *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 279–80 (S.D.N.Y. 2000) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 597, 591–92 (1993)). Opinions related to claims outside of those that have been certified are irrelevant. *In re Namenda Indirect Purchaser Antitrust Litig.*, 2021 WL 2403727, at *19 (S.D.N.Y. June 11, 2021).

The Court certified one subclass relating to Plaintiffs' recordkeeping fee claim: all participants and beneficiaries of the Plan who "paid the flat $34 per-participant annual recordkeeping fee charged by the Plan's recordkeeper, Fidelity, or the $12 per-participant administrative fee [from] . . . April 1, 2019, through the entry of judgment)." (Dkt. No. 124 at 24). Geist submitted his expert report on May 13, 2022, (Dkt. 142-21 at 2) – prior to the Court's class certification decision – and Plaintiffs do not appear to have asked him to update it to reflect that decision. As a result, it includes significant opinions about Defendants' conduct and alleged losses preceding the start of the subclass period. Defendants seek to exclude that testimony.

23

Plaintiffs argue that Geist's opinions on the Defendants' conduct prior the subclass period is relevant because it provides "crucial context" as to Defendants' activities during the class period. (Dkt. 170 at 14). Specifically, they argue that these activities inform about Defendants' "lackadaisical attitude" towards the recordkeeping fees during the subclass period. *Id.*

Plaintiffs' "context" argument is not without merit – particularly as this is going to be a bench trial, and the court, acting as trier of fact, is perfectly capable of ferreting out any "contextual" testimony offered by Mr. Geist's that might be irrelevant. I recognize that the recordkeeping fee model prior to the start of the subclass period was very different from the model that was used during the subclass period, and that this case is concerned solely with potential breaches of fiduciary duties during the subclass period. But that does not mean that previous practices – and attitudes – are necessarily irrelevant to what went on during the class period, and specifically to whether the Defendants were acting as proper fiduciaries during that period of time. I see no basis to exclude entirely Geist's testimony about any of the seven "red flags" that he identified in this Report.

## V.     THE ADMINISTRATIVE COMMITTEE IS A PROPER DEFENDANT

Defendants have moved for summary judgment dismissing all of Plaintiffs' claims on the ground that Plaintiffs failed to sue the proper parties. The motion is denied on this basis.

In their Second Amended Complaint, Plaintiffs name as defendants, Omnicom, the Administrative Committee, the Board of Directors, and John Does 1-20. John Does 1-10 are identified as members of the Board who were/are fiduciaries of the Plan and John Does 11-20 are identified as the members of the Administrative Committee.

Plaintiffs previously asked this Court for time to amend their Complaint to identify the members of the Committee and the Board and name them in place of the John Does, (SAC ¶¶ 20,

22). They never filed an amended complaint naming either the member of Omnicom's Board or members of its Administrative Committee.

Defendants argue that neither the Administrative Committee nor the Board of Directors is a suable entity; that neither fits within ERISA's statutory definition of a "person; and so that neither the Committee nor the Board is a proper party defendant on a claim for breach of an ERISA fiduciary duty. (Mot. at 18–19). They further argue that Omnicom is not a proper defendant because it is not a functional fiduciary with regard to the Plan. (*Id.* at 21).

That argument does not wash.

ERISA requires that a plan document "provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." 29 U.S.C § 1102(a)(1). A "named fiduciary" is a "fiduciary who is named in the plan instrument." Id. § 1102(a)(2).

ERISA makes liable "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries" by the Act. 29 U.S.C. § 1109(a) (emphasis added).

The Administrative Committee is the "named fiduciary" of the Plan; it is the entity tasked with the majority of responsibilities for controlling and managing its operation. ERISA expressly contemplates that a named fiduciary may be sued. 29 U.S.C. 1109(a). And Congress has longstanding authority to make entities suable by statute. *United Mine Workers of Am. v. Coronado Coal Co.*, 259 U.S. 344, 402, 42 S. Ct. 570, 580, 66 L. Ed. 975 (1922).

As my esteemed late colleague Judge Sand recognized, *In re Beacon Assocs. Litig.*, 818 F. Supp. 2d 697, 706 (S.D.N.Y. 2011), ERISA's fiduciary provisions are to be broadly construed and plan participants are not to be denied relief on technicalities. So I can see no reason why the

Administrative Committee cannot be sued as an entity for breach of fiduciary duty. In fact, it happens all the time. And because the Committee is defined in the Plan documents as "the individuals appointed under Section 8.1 to administer the Plan," (Plan Document § 2.1, OMNICOM-9574; Dkt. No. 136), suing the Committee as an entity is no different than suing the individual members who make up the Committee.

Defendants argue that the Administrative Committee cannot be sued because "the Committee" cannot satisfy a judgment. By all accounts, it has no assets.

However, the Plan Document's indemnification clause specifies that Omnicom will indemnify anyone who serves as a fiduciary with respect to the Plan. (*Id.* § 8.13, OMNICOM-9646). The Plan Document can reasonably be interpreted as having indemnified, not just the Committee members, but the Committee as an entity – since the Committee is nothing more than the sum of its members. And indeed, a clause in the "Investment Policies" section of the Plan Document specifies:

> "The *Administrative Committee* including each member and former member to whom duties and responsibilities have been allocated, *may be indemnified and held harmless by the Employer* with respect to any breach of alleged responsibilities performed or to be performed hereunder."

(*Id.* § 8.12(d)) (emphasis added). The claim in this case is that the Committee made a fiduciarily unwise decision by retaining the Fidelity Freedom Funds and by not obtaining a lesser recordkeeping fee from Fidelity; the Plan Document makes it perfectly clear that Omnicom has agreed to indemnify the Committee and all of its members for such conduct if it proves to constitute a breach of fiduciary duty. So whether viewed as an entity or as an amalgamation of its members, whoever is sued will be able to satisfy any judgment that is rendered against it.

Because Defendants have raised the Committee's capacity to be sued as an issue, Plaintiffs may wish to eliminate it as a possible ground for appeal by amending their complaint

26

to name the individuals who make up the Committee in addition to the Committee. I express no opinion one way or another, but if Plaintiffs wish to name the John Does, they must do so by December 28, 2022. I also express no opinion about whether there would be a statute of limitations issue with doing so might depend on whether the claims against the individuals (as opposed to the Committee) "relate back" to the claims against the Committee (which is nothing more than the sum of its individual members). The opinion I do express is that the Administrative Committee is a suable entity.

The above discussion does not address whether the "Board of Directors of Omnicom" is an entity that can be sued. Unlike the Committee, the Board is not a named fiduciary under the Plan. Plaintiffs' argument is that the Board is a functional fiduciary and while I have no doubt that the individual members of the Board are indemnified under the articles of incorporation and bylaws of Omnicom (an obligation likely secured by a directors and officers ("D&O") policy), I am not familiar with the terms of any of those documents and so cannot say whether they apply to the Board as an entity in the same way that the Plan documents apply to the Committee as an entity. Ordinarily, for example, corporations agree to indemnify directors, not the Board, and D&O policies cover individuals, not an entity (such as a Board). And while I have presided over many cases in which a named fiduciary under a plan was indemnified while its individual members were not, in the ordinary course someone suing the directors of a corporation names the corporation.

For these and other reasons, Defendants' arguments for why the individual directors, not the "Board of Directors of Omnicom," are the proper defendants are more appealing. But the parties have not briefed this issue in a way that recognizes the differences between the Committee (a named fiduciary under the plan) and the Board (which is not) nor discussed how

27

that might impact the analysis here. Nor have they discussed the law of whatever state is the state of incorporation of Omnicom. So I am not prepared to rule on Defendants' motion insofar as it seeks dismissal of the claims against the entity "the Board of Directors of Omnicom." Because I promised the parties that they would know before Christmas whether or not they were going to trial, I am releasing this opinion while leaving that issue open.

## VI. THE MOTION FOR SUMMARY JUDGMENT DISMISSING THE $12 ADMINISTRATIVE FEE CLAIM IS GRANTED

This Court certified a subclass of Plan participants who, "paid the $34 per participant annual recordkeeping fee *and/or* the $12 per-participant administrative fee, during the relevant portion of the Class Period." (Partial SMJ Order at 24) (emphasis added). Defendants argue in their motion for summary judgment that, "Plaintiffs have not adduced any evidence—fact or expert opinion—that the $12 annual per-participant administrative fee is substantively unreasonable, or caused a loss to the Plan." (Mot. at 29).

In their reply to Plaintiffs opposition motion, they aver Plaintiffs, "concede they are not challenging the $12 administrative fee." (Reply at 14; Dkt. No. 177). As a result, this claim is dismissed. *Id.*

End of story. Defendants' motion for summary judgment dismissing the $12 recordkeeping fee claim is GRANTED.

## VII. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE ACTIVE TDF CLAIM AND THE EXCESSIVE RECORDKEEPING FEE CLAIMS IS DENIED

Defendants have moved for summary judgment dismissal of all of Plaintiffs' claims on the basis that Plaintiffs have failed to raise a triable issue of fact as to whether Defendants breached their fiduciary duty of prudence by (1) failing to appropriately monitor plan

28

investments and improperly retaining the Active Suite as an investment and (2) failing to appropriately monitor that recordkeeping fees charged to Plan participants were reasonable.

A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could find in favor of Plaintiffs on evidence provided.

Plaintiffs have raised genuine issues of material fact as to whether Defendants breached their fiduciary duty of prudence by failing to appropriately monitor plan investments and improperly retaining the Active Suite. They have also raised genuine issues of material fact as to whether Defendants breached their fiduciary duty of prudence by failing to appropriately monitor that recordkeeping fees charged to Plan participants were reasonable

Under ERISA, the duties owed by fiduciaries to plan participants and beneficiaries "are those of trustees of an express trust—the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 271–72 n.8 (2d Cir. 1982). The duty of prudence requires a pension plan fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

A fiduciary's prudence "is measured according to the objective prudent person standard developed in the common law of trusts." *Sacerdote v. New York Univ.*, 9 F.4th 95, 107 (2d Cir. 2021), cert. denied, 142 S. Ct. 1112 (2022) (citations omitted). Under this "prudent person" standard, a fiduciary's action must be assessed "based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight." *Id.*

(citations omitted). The analysis centers, therefore, on the "fiduciary's conduct in arriving at an investment decision, not on its results", and the relevant question is "whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment, not merely whether there were any methods whatsoever." *Id. See also Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984), cert. denied, 464 U.S. 1040 (1984); *Ferguson et al. v. Ruane Cunniff & Goldfarb Inc. et al.*, No. 17-CV-06685 (ALC), 2019 WL 4466714, at *5 (S.D.N.Y. Sept. 18, 2019). Fiduciaries' "lack of familiarity with investments is no excuse" for failing to act with the care, skill, prudence and diligence required under the circumstances then prevailing. *Katsaros*, 744 F.2d at 279.

An ERISA fiduciary has an ongoing "duty to monitor trust investments and remove imprudent ones" and must review investments at "regular intervals." *Tibble v. Edison Int'l*, 575 U.S. 523, 135 S. Ct. 1823, 1828 (2015). A fiduciary "cannot assume" that investments that were prudent at one time "will remain so indefinitely." *Id.* at 1828 (quoting A. Hess, G. Bogert & G. Bogert, Law of Trusts and Trustees ("*Bogert*") § 684, pp. 145–46 (3d ed. 2009)). Rather, the fiduciary "must 'systematic[ally] conside[r] all the investments of the trust at regular intervals' to ensure that they are appropriate." Id., 135 S. Ct. at 1828 (quoting Bogert § 684, pp. 147–48) (alterations in *Tibble*).

ERISA's fiduciary duty of prudence also imposes the obligation to "review . . . fees for reasonableness." *Cunningham v. Cornell Univ.*, 2019 WL 4735876, at *5 (S.D.N.Y. Sept. 27, 2019). A fiduciary has the responsibility to ensure that fees paid to recordkeepers are not excessive relative to services rendered. *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 Fed. App'x 31 (2d Cir. 2009). ERISA does not dictate "any particular course of action" with regards to fees, but it does require a "fiduciary ... to exercise care prudently and with diligence under the

30

circumstances then prevailing." *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006) (internal quotation omitted). As with other ERISA claims, Plaintiffs must show that demonstrated imprudence caused a monetary loss. *Silverman v. Mut. Benefit Life Ins. Co.*, 138 F.3d 98, 104 (2d Cir. 1998). However, once Plaintiffs establish loss, "the burden under ERISA shifts to the defendants to disprove any portion of potential damages by showing that the loss was not caused by the breach of fiduciary duty." *Sacerdote v. New York Univ.*, 9 F.4th 95, 113 (2d Cir. 2021), cert. denied, 212 L. Ed. 2d 9, 142 S. Ct. 1112 (2022)

*Active TDF Claim*

The central triable issue for the Active TDF claim is whether the Committee appropriately monitored and evaluated investments within the Plan portfolio.

On the first issue, there are disputed questions of material fact concerning at the least the following issues: whether the defendants' monitoring processes for the Plan's portfolio were reasonable; (Mot. 17 n.1; Opp. 18); whether the Active Suite should have been removed; (Mot. 24; Opp. 27); and whether the Plan beneficiaries suffered losses as a result of imprudent monitoring. (Mot. 25; Opp. 28–29).

For the Active TDF claim, several factual questions abound about the Defendants' conduct and involvement in monitoring the funds; the Committee members' knowledge of fiduciary investing concepts; the Committee's process for identifying certain funds as candidates for replacement; the proper comparator and performance metric for the Plan's investments; their reliance on and independent consideration of their investment advisor's fund recommendations; and whether the Active Suite was a prudent investment for retention.

On these points, Plaintiffs identify depositions by certain Committee members in which they stated they did not receive formal ERISA-related fiduciary training when they joined the

Committee or at any time during the Class Period. (Pls.' 56.1 Counter ¶ 80). Plaintiffs point to evidence that the Investment Policy Statement, the Plan's statement of policies and processes for making investment decisions, did not include any specific or standardized guidelines for the removal or replacement of investment funds or the placement of investment funds on a watch list. (Pls.' 56.1 Counter ¶ 82). Plaintiffs offer evidence that the Active Suite was not benchmarked against universal comparators. (Pls.' 56.1 Counter ¶ 83–85). Further, Plaintiffs recount evidence that Defendants never established any process for monitoring their Plan investment advisor Mercer, nor conducted any independent investigations of the recommendations Mercer made for the Plan, nor solicited an RFP from an alternative investment advisor during the Class Period. (Pls.' 56.1 Counter ¶ 90–91). This evidence raises genuine issues about the propriety of the Committee's monitoring and oversight of the Plan.

Plaintiffs' expert, W. Scott Simon, opines that Defendants' processes for monitoring and evaluating the Plan's investments rendered the Committee unable to timely identify and replace imprudent funds. (*See* Simon Report ¶ 33, Dkt. No. 142-21). Plaintiffs' expert, Dr. Gerald Buetow, also opines the Active Suite fell short of basic fiduciary criteria for investments. (*See* Buetow Report ¶¶ 25–27, Dkt. No. 142-20). This testimony has not been excluded, and it raises genuine issues of material fact as well.

In short, construing the evidence most favorably for the Plaintiffs, a jury could find that the Committee's processes for monitoring and judging investments were insufficient to determine whether the Active Suite was an appropriate investment.

Plaintiffs have also raised a genuine dispute of material fact regarding loss causation. Plaintiffs' expert, Dr. Gerald Buetow, opines that Plan beneficiaries suffered losses of $32,447,394 because of the Defendants' decision not to replace the Active Suite with a more

suitable investment. While Defendants contest the relevance of Dr. Buetow's method of calculation, as discussed *supra* Section IV.B., the evidence is not being excluded, so the trier of fact (the court, in this instance) needs to evaluate the witness on the stand during cross examination.

*Recordkeeping Fee Claim*

The central triable issue for the Recordkeeping Fee claim is whether the Committee appropriately monitored recordkeeping services for the Plan.

The parties disagree about: whether the Defendants' processes for monitoring and negotiating the Plan's recordkeeping fees were reasonable, (Mot. at 26 n.13; Opp. 29–32); and whether the Plan's fees were reasonable. (Mot. 27; Opp. 30).

Again, genuine issues of material fact – including but not limited to factual questions abound about the Defendants' conduct and involvement in monitoring the recordkeeping fees; whether the Committee employed an appropriate method for obtaining lower recordkeeping fees; and whether those recordkeeping fees were reasonable – preclude summary judgment and warrant a trial.

On these points, Plaintiffs offered evidence that Defendants did not regularly benchmark recordkeeping services or solicit competitive bids from non-Fidelity service providers prior to the class period. (Pls.' 56.1 Counter ¶ 108). Plaintiffs' expert, Michael Geist, opines that Defendants' 2019 RFP for recordkeeping services was structured in a manner that dissuaded competitive recordkeeping fee bids. (*See* Geist Report ¶¶ 101–105, 229, 161–62, 172; Dkt. No. 142-20). Defendants disagree with Plaintiffs about how this evidence should be interpreted, but that simply points out why this case has to go to trial.

Plaintiffs have also raised a genuine dispute of material fact about whether and how much in losses were suffered because of excessive recordkeeping fees. Plaintiffs' expert, Michael Geist, opines that the reasonable fee for recordkeeping services for the plan in 2019 and 2020 was no more than $25 per participant. (Geist Report ¶ 308; Dkt. No. 142-20). Geist further opines that Plan beneficiaries suffered significant losses because of the Defendants' flawed 2019 RFP.[6] While Defendants contest the basis of Geist's method of calculation, as discussed *supra* Section IV.C, Geist's loss calculation method is appropriate for determining the reasonable fees that a prudent fiduciary would have allowed plan participants to pay. Construing the evidence most favorably for the Plaintiffs, a jury could find that the Plan beneficiaries suffered losses as a result of the Committee's improper monitoring of the recordkeeping fees.

The disposition of the summary judgment motion means that Defendants' motion for summary judgment dismissing Plaintiffs claims for failure to monitor and co-fiduciary liability (Count II), and for knowing participation in a breach of trust (Count III) must also be denied – Defendants are correct that these claims are "entirely dependent" on proof of an underlying fiduciary duty breach, which can only be ascertained after trial.

We will go to trial on February 22, 2023. The parties should submit the written direct testimony of their witnesses per the court's rules for bench trials, as well as proposed findings of fact and conclusions of law (NOT a trial brief, please), by February 3.

## CONCLUSION

---

[6] Geist opines that Plan Participants lost $5,523,713 as a result of excessive and unreasonable fees. However, Geist calculates this number based on the assumption that the class period for losses extends from May 29, 2014, through December 31, 2020. Since the class period was only certified for April 1, 2019, through the entry of judgment, this calculation is not correct. Geist will need to recalculate alleged Plan losses prior to trial. However, construing the evidence most favorable for the Plaintiffs, his calculations are sufficient to allege that Plaintiffs suffered actual losses as a result of the improper monitoring.

This decision will temporarily be filed under seal. In accordance with this court's prior order temporarily sealing certain documents referencing material that the parties deem to be confidential (See Docket No. 67), the parties have until January 11, 2023, to identify any portion of this decision that should remain under seal because they contain the sort of information that is properly filed under seal. Pages and paragraphs in this opinion and in briefs must be identified with specificity, as must exhibits or portions thereof, and each designation must be accompanied by an explanation of why sealing should be permitted in light of the presumption of public access. After I have received any submissions, I will make the necessary rulings and this opinion will be publicly filed, either in its entirety or in appropriately redacted form. The parties should be aware that, as of the present moment, I see no reason to redact anything from this opinion. They should recall that the trial will be a public, open courtroom trial and everything that goes on, and every bit of evidence, will be publicly available.

This constitutes the opinion and order of the court. It is a written opinion.

The Clerk of the Court is respectfully directed to file this opinion under seal and to close the motions at Docket Numbers 130, 131, 132, and 133 and to remove them from the Court's list of open motions.

Dated: December 23, 2022

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

35