UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SHIQIONG HUANG, CHRIS R.
STOKOWSKI, EVERETT UHL, and
MARK J. HEARON,

     Plaintiffs,

v.                                    Case No. 8:20-cv-2293-VMC-TGW

TRINET HR III, INC., et al.,

     Defendants.

_____/

**ORDER**

This matter is before the Court on consideration of the Motion for Summary Judgment (Doc. # 92), filed on November 18, 2022, and the Daubert Motion to exclude the testimony of Plaintiffs' expert (Doc. # 93), filed on November 21, 2022, by Defendants TriNet HR III, Inc., TriNet HR IV, Inc., the Board of Directors of TriNet III, Inc., the Board of Directors of TriNet IV, Inc., the Investment Committee of TriNet Group, Inc., and John Does 1-30. Plaintiffs responded to Defendants' Motions on December 9, 2022, and December 12, 2022, respectively. (Doc. ## 98, 100). Defendants replied on December 23, 2022. (Doc. # 103). For the reasons that follow, both Defendants' Daubert Motion and Motion for Summary Judgment are granted.

1

I.    **Background**

This is a class action brought under the Employee Retirement Security Act of 1974 ("ERISA") by Plaintiffs Shiqiong Huang, Chris R. Stokowski, Everett Uhl, and Mark J. Hearon, participants in the TriNet Select 401(k) Plan ("Plan"). Plaintiffs allege that the authorities responsible for overseeing the Plan breached their fiduciary duties under ERISA in two respects: (1) by selecting high-cost, underperforming investment options and (2) by causing the Plan participants to pay excessive recordkeeping fees. (Doc. # 23 at ¶¶ 117-130). The Court previously certified the following class to pursue these claims:

> All persons, except Defendants and their immediate
> family members, who were participants in or
> beneficiaries of the TriNet IV Plan, at any time
> between September 29, 2014 through the date of
> judgment.

(Doc. # 85 at 30).

A.    **TriNet and the Retirement Committee**

TriNet Group, Inc. ("TriNet") provides human resources services to small and medium-sized businesses and offers its client-employers the opportunity to participate in one of two defined contribution 401(k) plans: the TriNet 401(k) Plan ("TriNet III") and the Plan at issue. (Doc. # 23 at ¶¶ 24,

41). At the beginning of the Class Period, the Plan had 8,417 participants. The number of participants steadily climbed: 11,877 in 2017, 14,420 in 2018, 16,167 in 2019, and 18,200 in 2020. (Doc. # 92-19 at 145). The Plan is a multiple employer plan ("MEP") with more than 1,200 participating employers. (Doc. # 92-2 at ¶ 3).

From September 29, 2014, to the present ("Class Period"), the Retirement Committee ("RC") was delegated authority to administer the Plan, including retaining a recordkeeper and selecting and monitoring the Plan's investment options. (Id. at ¶ 6). The RC comprised between five and seven TriNet employees with expertise in different subject areas, including in finance, human resources, and law. (Id. at ¶ 7).

B.   **Plan Investment Options**

The Plan's Investment Policy Statement established guidelines for the selection, monitoring, and removal of investment options, including identifying qualitative and quantitative factors to consider. (Id. at ¶ 9). The RC was advised during the Class Period by two independent investment advisors with significant investment expertise: NFP Retirement ("NFP") until February 2016, and DiMeo Schneider

3

("DiMeo") from 2016 onward. (Doc. # 92-15 at 107-18). Before each RC meeting, the Plan's investment consultant distributed materials containing detailed information regarding the Plan's investments and potential alternatives. (Id. at 117-18). The consultant's investment reviews contained a scorecard that evaluated the Plan's funds relative to their benchmarks and peer groups across numerous criteria, and identified any funds for the RC to "watch" or "discuss" based on those factors. (Doc. # 92-5 at 17-78; Doc. # 92-6 at 1-291). The scorecards consistently indicated that the Plan's investments had below-average fees relative to peers. (Id.).

Throughout the Class Period, the Plan offered participants a broad range of investment strategies with differing management styles and risk-return characteristics. (Doc. # 92-17 at 13-14).

### C.  **Plan Recordkeeping Costs**

In 2015, NFP assisted the RC in conducting a Request for Proposal ("RFP") for the Plan's recordkeeping services. (Doc. # 92-2 at ¶ 22). The 2015 RFP was issued to six recordkeepers with experience with MEPs, and it consisted of hundreds of questions examining, among other things, each vendor's relevant experience, structure and organization, systems,

capacity for growth, account management plan, technological services, personnel, data security and risk management, participant disclosures, and communications and education. (Id. at ¶¶ 22-23; Doc. # 92-10 at 13-87). In addition to the six to which it issued the 2015 RFP, the RC also approached other large recordkeepers, including Fidelity and Vanguard; however, they were not interested in submitting a response. (Doc. # 92-2 at ¶ 22).

Three recordkeepers (MassMutual, Transamerica, and Voya) responded to the 2015 RFP. (Id. at ¶¶ 23-24). The other three recordkeepers declined because they were either unable to meet the pre-established minimum bid requirements or had capacity concerns. (Id. at ¶ 25). The RC chose MassMutual, which submitted the lowest price quote of the three responding recordkeepers, and negotiated a further price reduction before retaining its services. (Id. at ¶¶ 25-26).

In 2018, DiMeo assisted the RC in issuing a Request for Information ("RFI") for the plan's recordkeeping services to the three prior responding vendors (MassMutual, Transamerica, and Voya). (Id. at ¶ 27). DiMeo and the RC evaluated the responses based on numerous criteria, including pricing. (Id. at ¶ 28). Again, MassMutual provided the lowest price and the

RC concluded that the existing structure with MassMutual as the recordkeeper was "working well." (Id. at ¶ 29).

In 2021, DiMeo once again assisted the RC in issuing an RFP for the Plan's recordkeeping services. (Id. at ¶ 30). DiMeo issued the 2021 RFP to four recordkeepers: Empower (which had acquired MassMutual's recordkeeping business), Transamerica, Voya, and Northwest Plan Services. (Id.). The 2021 RFP solicited information on each recordkeeper's organization, capabilities, services, and fees. (Id. at ¶ 31; Doc. # 92-12 at 53-61). The two finalists, Empower and Transamerica, provide nearly identical price quotes. (Doc. # 92-12 at 82). The results of the 2021 RFP were discussed at the February, August, September, and October 2021 board meetings. (Doc. # 96-2 at 29-31, 36-41).

As a result of the 2021 RFP, the RC consolidated the recordkeeping services for TriNet III and the Plan, securing Empower as the vendor for both. (Id. at 41). The consolidation resulted in a fee reduction for the Plan. (Doc. # 92-2 at ¶¶ 32-33).

In the intervals between the 2015 RFP, 2018 RFI, and 2021 RFP, DiMeo regularly reviewed the Plan's recordkeeping arrangement and presented the RC with information regarding

the recordkeeping costs of other plans. (Id. at ¶ 34; Doc. # 92-13 at 1-39).

D. **Expert Testimony**

1. **Defendants' Experts**

Defendants offer the testimony of three experts: Steven Case, Dr. Jennifer Conrad, and Peter Swisher. Mr. Case is a former investment consultant, who opined that the RC's processes for monitoring the Plan's investment options and recordkeeping expenses were "consistent with best fiduciary practices." (Doc. # 92-16 at 10). Dr. Conrad, a tenured professor of finance at the Kenan-Flagler Business School, University of North Carolina at Chapel Hill, explained that (1) fees of index funds "are not meaningful benchmarks for actively managed funds' fees," and (2) that it is appropriate to include actively-managed options in retirement plans because research indicates that active management produces superior results in certain market conditions. (Doc. # 92-17 at 12-25).

Mr. Swisher, an expert in MEPs with nearly ten years' experience administering and selecting recordkeepers for a large MEP, opined that the RC followed best practices in conducting competitive bidding through the 2015 RFP, 2018

RFI, and 2021 RFP. (Doc. # 92-18 at 11-13). He further noted that recordkeeping fees for single-employer plans are not comparable to those for MEPs. (Id. at 40, 52). Mr. Swisher explained that the Plan includes well over 1,000 distinct participating employers and most recordkeeping services for an MEP must be performed on an employer-by-employer basis. (Id. at 51-53). The process of onboarding new client employers "is a substantial cost for MEP recordkeepers" and the Plan onboards ten to twenty new employers per month. (Id. at 41-42, 51-52; Doc. # 92-13 at 37). He added that IRS regulations governing MEPs require each participating employer to be treated separately for purposes of tests related to non-discrimination, top-heaviness, participation and coverage, and highly compensated employees. (Doc. # 92-18 at 15-17, 45-47). Finally, Mr. Swisher determined that, based on the data utilized by Plaintiffs' expert, the TriNet Plans paid some of the lowest recordkeeping fees of any MEP in the market, and noted that all MEPs paid more than $30 per participant. (Id. at 62-65).

### 2. **Plaintiffs' Expert**

Plaintiffs offer the testimony of Frances Vitagliano as to the reasonableness of the Plan's recordkeeping fees. (Doc.

# 92-19 at 23:3–24:1). Mr. Vitagliano has "35 years of experience in the record keeping and administration business and the related asset management processing." (Id. at 134). In approximately 1980, he established an MEP, the National Pension Group ("NPG") and worked closely with his co-founder "in the design, implementation and pricing of the record keeping system used to record keep and administer the NPG MEP." (Id. at 137). NGP closed at some point in the 1980s. (Id. at 77:15-17). While he has experience responding to RFPs for vendor services from his role as Vice President of State Street Bank and Trust in the late 1980s (Id. at 135), Mr. Vitagliano admitted that he does not have experience issuing RFPs or evaluating responsive bids. (Id. at 51:23–53:2).

In this case, he relied on his experience and considered a (1) 1998 consultant study submitted to the Department of Labor, (2) a survey of eight government plans for the State of North Carolina, and (3) the recordkeeping expenses he calculated for two single-employer plans: Federal Thrift Savings Plan (5 million participants) and the Mallinckrodt Pharmaceuticals Retirement Savings and Investment Plan (5,362 participants), and one multi-employer plan, Amalgamated

Transit Union National 401(k) Pension Plan (17,000 participants). (Id. at 145-148).

Mr. Vitagliano reached the following conclusions:

(1) The Plan's recordkeeping fees were unreasonable because they exceeded $30 per participant (plus $3 to $6 in additional "administrative" fees), which is the reasonable rate for both the TriNet III and TriNet IV Plans.
(2) The RC and its consultants were "imprudent and likely negligent" when they conducted the 2015 RFP for recordkeeping services.

(Id. at 138, 228). Mr. Vitagliano based his reasonable fee conclusion on his review of the aforementioned documents. (Doc. # 92-19 at 145-48). With respect to the 2015 RFP, he concluded that it was imprudent because it did not include any "independent" or "unbundled" recordkeepers. (Id. at 16).

**E.   Procedural History**

Plaintiffs initiated this action on September 29, 2020, (Doc. # 1) and filed an amended complaint on August 20, 2021. (Doc. # 23). Defendants filed their answer to the amended complaint on January 24, 2022. (Doc. # 54).

Now, Defendants seeks final summary judgment in their favor. (Doc. # 92). Additionally, Defendants filed a Daubert motion to exclude the expert report and testimony of Mr. Vitagliano. (Doc. # 93). Plaintiffs responded to both

10

Motions. (Doc. ## 98, 100). Defendants replied. (Doc. # 103).

The Motions are ripe for review.

## II.   <u>Legal Standard</u>

### A.   <u>Daubert Motion</u>

Federal Rule of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Implementing Rule 702, <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), requires district courts to ensure that any and all scientific testimony or evidence admitted is both relevant and reliable. <u>See</u> <u>Id.</u> at 589–90. The <u>Daubert</u> analysis also applies to non-scientific expert testimony. <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 147 (1999). District courts must conduct this gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert

testimony.'" <u>Rink v. Cheminova, Inc.</u>, 400 F.3d 1286, 1291 (11th Cir. 2005). The Eleventh Circuit "requires trial courts acting as gatekeepers to engage in a 'rigorous three-part inquiry.'" <u>Hendrix v. Evenflo Co.</u>, 609 F.3d 1183, 1194 (11th Cir. 2010).

> The district court must assess whether:
>
> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

<u>Id.</u> The proponent of the expert testimony bears the burden of showing, by a preponderance of the evidence, that the testimony satisfies each of these requirements. <u>Id.</u>

### B.   <u>Summary Judgment</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude

a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

III.   **Analysis**

   A.   **Daubert Motion**

Defendants seeks to exclude Mr. Vitagliano's expert testimony on the grounds that it meets neither the qualification nor reliability requirements of Rule 702. (Doc. # 93 at 1-4).

During his deposition, Mr. Vitagliano made several statements that Defendants contend undermined his

14

qualifications, methodology, and final conclusions. First, he admitted that he did not compare the Plan's fees to those of any other MEP. (Id. at 111:14-20). Mr. Vitagliano acknowledged that most of the plans he considered in deriving his reasonable recordkeeping fee were not similar in size or structure to the Plan. See (Doc. # 92-19 at 228:10-230:6, 236:4-237:4, 239:14-243:5, 246:18-248:18) (admitting that the Thrift Savings Plan, Amalgamated plan, and Mallinckrodt plans were not comparable to the Plan). He also stated that he did not consider the size or type of plans when he chose to include in his report the North Carolina plans and that he did not know how many participants each plan had. (Id. at 236:4-237:4, 239:14-243:5).

He further agreed that an MEP would have higher recordkeeping costs than a single-employer plan of the same size, (Id. at 192:14-25), because there are significant differences in the administrative costs incurred by a recordkeeper and plan administrator in administering a single-employer plan, as opposed to a multiple employer plan. (Id. at 243:15-21, 191:24-193:8, 204:9-206:25). He also explained that multiemployer plans, such as the Amalgamated plan, differ from MEPs because multiemployer plans are union

plans subject to less burdensome regulations than MEPs and, thus, he "would expect the cost of recordkeeping and administration for [the Plan] to be greater than the [cost] of the Amalgamated [plan]." (Id. at 235:12–237:4, 241:14–18).

Second, Mr. Vitagliano recognized that he "did not undertake an analysis of the costs incurred by . . . MassMutual in servicing [the Plan]." (Id. at 224:4–10). He acknowledged that an MEP recordkeeper undertakes "quite a bit of work" to onboard and terminate employers, but he did not attempt to calculate MassMutual's onboarding or termination costs. (Id. at 122:20–127:8, 146:25–150:12, 153:2–157:24, 181:2–182:4).

Third, Mr. Vitagliano conceded that, with regard to the 2015 RFP, the Defendants solicited bids from at least one unbundled recordkeeper and acknowledged that TriNet was "not at all" at fault for the "very reasonable and rational" decision of that vendor not to bid. (Id. at 258:4–20, 268:2–13). He further did not identify any other recordkeepers to which the Defendants should have sent the RFP. (Id. at 258:13–20). Indeed, Mr. Vitagliano admitted that he himself was not "up on" the current recordkeeper market and instead would "depend upon the . . . expertise in that area" of a

16

specialized recordkeeping consultant, Siegel company. (<u>Id.</u> at 260:21-261:1). He went on to state the following:

> Q. So you don't know whether there were more than three vendors in the marketplace that could have even responded to the RFP, correct?
> A. That is correct. **I would leave that up to the experts** who spent their entire lives just in the recordkeeping field for multiple and multiemployer plans.
> Q. And that's not within your area of expertise, correct?
> A. I'm on the providing of services rather than surveying other competitors of them.

(<u>Id.</u> at 263:10-264:3) (emphasis added).

### 1.   <u>Qualifications</u>

The first question under <u>Daubert</u> is whether Mr. Vitagliano is qualified to testify competently regarding the matters he intends to address. <u>City of Tuscaloosa v. Harcros Chems., Inc.</u>, 158 F.3d 548, 563 (11th Cir. 1998). An expert may be qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "Determining whether a witness is qualified to testify as an expert 'requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony.'" <u>Clena Invs., Inc. v. XL Specialty Ins. Co.</u>, 280 F.R.D. 653, 661 (S.D. Fla. 2012) (quoting <u>Jack v. Glaxo Wellcome, Inc.</u>, 239 F. Supp. 2d 1308, 1314-16 (N.D. Ga. 2002)).

"This inquiry is not stringent, and so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility." Id. (citations and internal quotation marks omitted). The Court is aware that its "gatekeeper role under Daubert 'is not intended to supplant the adversary system or the role of the jury.'" Maiz v. Virani, 253 F.3d 641, 666 (11th Cir. 2001) (quoting Allison v. McGhan, 184 F.3d 1300, 1311 (11th Cir. 1999)). "Courts must also be mindful that '[e]xpertise in one field does not qualify a witness to testify about others.'" Easterwood v. Husqvarna Pro. Prod., Inc., 576 F. Supp. 3d 950, 958 (M.D. Ala. 2021) (quoting Lebron v. Sec'y of Fla. Dep't of Children & Families, 772 F.3d 1352, 1368 (11th Cir. 2014)).

Defendants contend that Mr. Vitagliano is not qualified to opine on the 2015 RFP process because he does not have the necessary knowledge or experience. (Doc. # 93 at 20-21). Defendants note that Mr. Vitagliano stated during his deposition that he would ask a consultant that was "intimately knowledgeable about multi and multiple employer plans" to determine which recordkeepers should have received the 2015 RFP. (Id. at 21) (quoting Doc. # 92-19 at 258:21-259:12,

260:21–261:1). They also point to his statement that he "would leave that up to the experts" when asked whether there were any other recordkeepers that could have responded to the RFP. (Doc. # 93 at 21) (quoting Doc. # 92-19 at 263:10–264:3).

In response, Plaintiffs argue that Mr. Vitagliano is qualified to opine that NFP, the consultant on which Defendants relied for the 2015 RFP process, was unqualified. (Doc. # 100 at 17) (citing Doc. # 92-19 at 259:2-8). They further contend that Mr. Vitagliano opined that the 2018 RFI and the 2021 RFP were also deficient. (Id. at 7-8). According to Plaintiffs, he also alternatively concluded that the 2015 RFP process was flawed because NFP was an unqualified consultant. (Id. at 17).

First, though Plaintiffs contend otherwise, Mr. Vitagliano stated specifically that he did not offer an opinion as to the 2018 RFI or 2021 RFP. (Doc. # 92-19 at 252:7-10). He also expressly stated during his deposition that he was not offering an opinion on NFP's qualifications:

> Q. So are you expressing an opinion that NFP was not qualified to run this RFP process?
> A. I'm expressing an opinion that NFP's strength lay in investment management, that NFP itself paid significantly less for its own recordkeeping fees, and I didn't find any of their publicly presented individuals and experts having any extensive background in recordkeeping itself.

19

Q. But what's the answer to my question? Are you expressing an opinion that they were unqualified to run this RFP process, yes or no?
A. I'm not in a position to make that final decision on that. I have not interviewed them, I have not gone into them, and before I'd make a statement like that I'd like to go into dramatically more detail with them and meet them individually.

(Id. at 253:13-254:3).

Second, as to the 2015 RFP process, the Court finds that Mr. Vitagliano is not qualified to testify competently. Mr. Vitagliano himself readily admitted that he would have to rely on the expertise of a consultant to determine how the Defendants could have improved the RFP process. He further stated that his experience was in the "providing of services" — not in conducting an RFP process. (Doc. # 92-19 at 263:10-264:3). Plaintiffs' response attempts to evade the underlying issue of his qualifications. Instead they argue that "he has experience with RFPs and he is more than qualified to offer this opinion" on the consultant, NFP. (Doc. # 100 at 17). The Court, however, is not persuaded by this argument, as Mr. Vitagliano expressly disclaimed any opinion on the qualifications of NFP to conduct the RFP process. (Doc. # 92-19 at 253:21-254:13).

The bottom line is that, despite his experience in other areas within this field, Mr. Vitagliano has never conducted

an RFP, has not responded to an RFP in nearly forty years, and acknowledged that he would need to rely on a consultant to determine the best way to conduct the process. See Griffin v. Coffee Cnty., 608 F. Supp. 3d 1363, 1370 (S.D. Ga. 2022) (finding forensic pathologist unqualified to opine on treatment of methamphetamine overdose because expert had not treated emergent patients in forty years and acknowledged he would defer to an emergency room physician regarding the course of treatment); Parc at Duluth, LLC v. Cintas Corp. No. 2, No. 1:10-CV-2752-RWS, 2012 WL 113650, at *3 (N.D. Ga. Jan. 13, 2012) (barring fire-protection engineer from opining on the standards of an annual sprinkler system inspection because expert had not performed such an inspection). Because Mr. Vitagliano's qualifications do not fit with the topic of his opinion, his testimony with respect to the 2015 RFP is barred.

### 2.  **Reliability**

The Court must also assess whether the expert's methodology is reliable. "Exactly how reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at

21

trial." Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004) (citing Fed. R. Evid. 702, Advisory Committee Notes (2000)). There are four recognized, yet non-exhaustive, factors a district court may consider in evaluating reliability:

> (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community.

Seamon v. Remington Arms Co., 813 F.3d 983, 988 (11th Cir. 2016) (citations omitted). A district court can take other relevant factors into account as well. Id. (citations omitted).

"If the [expert] witness is relying solely or primarily on experience, then," in establishing reliability, "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Frazier, 387 F.3d at 1261 (citation and internal quotation marks omitted). "[A] trial court may exclude expert testimony . . . whose factual basis is not adequately explained." Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla., 402 F.3d 1092, 1111 (11th Cir. 2005).

22

Expert opinions must have "a traceable, analytical basis in objective fact." Bragdon v. Abbott, 524 U.S. 624, 653 (1998). "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

Defendants argue that Mr. Vitagliano's opinion as to the reasonableness of the Plan's recordkeeping fees is not based on any methodology or, at the very least, not on a reliable one. (Doc. # 93 at 10-15). Specifically, Defendants contend that he has not articulated his method for how he arrived at his reasonable recordkeeping fee of $30 per participant (with $3-6 in administrative fees). (Id. at 10-11). They also argue that the comparator plans referenced in Mr. Vitagliano's report are not, in fact, comparable to the Plan and that Mr. Vitagliano admitted as much during his deposition. (Id. at 11-13).

Plaintiffs respond that Mr. Vitagliano did articulate his method of generating his reasonable fee: he relied on his

23

experience and considered the comparator plans referenced in his report. (Doc. # 100 at 11-12). Further, they contend that Mr. Vitagliano chose his referenced comparator plans based on the size of those plans and "factor[ed] in the different sizes of these mega plans to calculate how much the Plans' recordkeeping fees would have cost if they also used per-participant fees[.]" (Id. at 12). Plaintiffs contend that size was the most important factor he relied on in determining the reasonable recordkeeping fees for a given plan. See (Id. at 12) ("[I]t's clear from Vitagliano's report that he purposely chose mega sized plans like TriNets' Plans to calculate how plans of similar sizes used per participant fees and economy of scale to negotiate lower fees.").

The Court agrees with Defendants: Mr. Vitagliano has not satisfactorily explained his methodology. Mr. Vitagliano does not detail how his knowledge and experience led him to calculate the fees for the relevant time period, or why those numbers are reasonable in light of any features of the Plan. Without more, this conclusory statement of applied knowledge of the industry's practices is insufficient under Rule 702 because "'general references' to an expert's 'experience' do not provide a reliable basis for his proposed testimony."

Cunningham v. Cornell Univ., No. 16-CV-6525 (PKC), 2019 WL 4735876, at *9 (S.D.N.Y. Sept. 27, 2019); see also, Hughes v. Kia Motors Corp., 766 F.3d 1317, 1329 (11th Cir. 2014) (affirming district court's decision to bar expert's testimony where expert "had based his opinion on experience" but "never explained how his experience or the relevant texts supported his opinion"). "The trial court's gatekeeping function requires more than simply taking the expert's word for it." Fed. R. Evid. 702, advisory committee's note, 2000 amendment (internal quotation marks omitted).

The Court finds persuasive the reasoning articulated in Cunningham. In Cunningham, the court found unreliable an expert witness's method of determining the reasonable recordkeeping fees a pension plan could have secured. Id. The expert testified that he generated the fee estimate by relying on his "experience . . . in the marketplace" working for a firm that generated RFPs and his evaluation of the relevant case documents. Id. The court found that this generalized reference to his experience did not provide a reliable basis for his proposed testimony. Id.

Like the expert in Cunningham, Mr. Vitagliano has not sufficiently explained his methodology beyond general

25

references to his experience and his review of several studies. Mr. Vitagliano's experience alone is insufficient to support his opinion. "[I]f an expert is relying solely on or primarily on his experience, then he must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Frazier, 387 F.3d at 1261. Here, Mr. Vitagliano does not indicate a single plan in his experience with $30 per participant fees for similar services, he does not explain how his experience helped him determine a reasonable fee, and he has very little experience setting recordkeeping prices in the first place. See Ramos v. Banner Health, 461 F. Supp. 3d 1067, 1134 (D. Colo. 2020) ("The Court declines to rely on [plaintiffs' expert]'s testimony as to the reasonable annual ranges of recordkeeping fees because his opinion is based on vague and insufficient references to his experience in the 401(k) plan industry."), aff'd, 1 F.4th 769 (10th Cir. 2021); Sacerdote v. N.Y. Univ., 328 F. Supp. 3d 273, 283 n.19 (S.D.N.Y. 2018) (concluding plaintiffs' expert "lacked the particular expertise necessary to provide useful opinions to the Court"

because he had "virtually no experience with" the type of retirement plans at issue).

Further, the comparator plans included in Mr. Vitagliano's report cannot support his conclusion. As in Cunningham, he offers no rationale in his report for why or how the comparator plans were selected. In fact, he acknowledged that at least one of the plans was not even meant to be a comparator, but instead was intended to show the low end of possible recordkeeping fees. See (Doc. # 92-19 at 228:23-229:1) ("I put the Federal Thrift Savings Plan in purely to show the absolute lower bounds that one would not ever expect a plan to go below for expenses and what have you."). He offers no explanation for how he arrived at his $30 reasonable fee or how he decided to tack on $3-6 in administrative fees, and he makes no attempt to tie these numbers to the fees for the comparator plans listed in his report.

Plaintiffs' post hoc reasoning for Mr. Vitagliano's chosen comparator plans is also unavailing. Plaintiffs state that Mr. Vitagliano chose plans of similar size as comparators and "factor[ed] in the different sizes" between the plans to generate his fee estimate. (Doc. # 100 at 12). The Court is

27

not persuaded that Plaintiffs' explanation indicates a reliable methodology.

First, Mr. Vitagliano did not explain in either his report or deposition why he picked these comparator plans. To the contrary, he acknowledged during his deposition that many of the plans listed in his report are not comparable in size or type to the Plan. See (Doc. # 92-19 at 228:10-230:6, 236:4-237:4, 239:14-243:5, 246:18-248:18) (admitting that the Thrift Savings Plan, Amalgamated plan, and Mallinckrodt plans were not comparable to the Plan); see also (Id. at 236:4-237:4, 239:14-243:5) (acknowledging that he did not consider the size or type of plans when he chose to include in his report the North Carolina plans).

Second, if the Court accepted that Mr. Vitagliano simply "considered" these comparator plans to generate his reasonable fee estimate, this explanation alone is insufficient to constitute a reliable methodology. Other courts in this circuit have excluded experts under similar circumstances to the ones present here. See generally Pledger v. Reliance Tr. Co., No. 1:15-CV-4444-MHC, 2019 WL 4439606, (N.D. Ga. Feb. 25, 2019). In Pledger, the court barred the testimony of the plaintiffs' expert, who opined on the

reasonableness of the recordkeeping fee charged by the retirement plan at issue. Id. at *15. There, the court found that the expert, who had decades of experience in the recordkeeping industry, had not utilized a reliable methodology in determining a reasonable fee for the plan. Id. at *16. The expert did not "use any pricing model from any recordkeepers when performing his analysis" and did not rely on pricing databases or "any objective source of pricing information from a third party." Id. Instead he relied on a fifteen-year-old table noting the fees for plans a fraction of the size of the plan at issue and the data from several Form 5500s with fees that did not support his fee estimate. Id. at 18.

Here, the Court faces a nearly identical scenario. Mr. Vitagliano purports to have "considered" the recordkeeping fees of several plans incomparable in size and structure to the Plan and relied on his experience to determine what a reasonable fee should have been. Such a methodology is insufficient to support his opinion. See Id. ("The Court agrees with Defendants that in short, [the expert] contends that he is a walking benchmark and is able to conjure the

exact dollar figures the Plan allegedly should have paid. . . . This evidence is inadmissible.").

Finally, Mr. Vitagliano did not compare the Plan to any other MEPs, instead relying on single and multiemployer plans as comparators – despite recognizing that such plans are not, in fact, comparable to MEPs. Mr. Vitagliano stated that there are "significant differences in the administrative costs incurred by a recordkeeper and plan administrator in administering a single employer plan, as opposed to a multiple employer plan." (Doc. # 92-19 at 243:15–21). He also admitted that a single employer of comparable size to an MEP would have lower recordkeeping fees – undercutting Plaintiffs' contention that the size of the plans is the only relevant variable. See (Id. at 192:14–25) ("Q. And you would also expect a multiple employer plan with a certain number of participating employers to have higher recordkeeping and administrative fees than a single employer plan; is that correct? A. Single employer plan of the same number of participants, yes."). According to Mr. Vitagliano, multiemployer plans should also have lower fees than MEPs. (Id. at 235:12–237:4, 241:14–18).

Mr. Vitagliano has not demonstrated that his methodology is reliable, and his testimony is excluded. Therefore, Defendants' <u>Daubert</u> Motion is granted.

### B.   **Defendants' Motion for Summary Judgment**

In their amended complaint, Plaintiffs base their claims for breach of fiduciary duty on two theories: (1) that Defendants imprudently selected underperforming, high-cost investment options and (2) that Defendants caused the Plan participants to pay excessive recordkeeping fees. The Court will address each theory in turn.

### 1.   **Plaintiffs' Recordkeeping Fee Theories**

First, Defendants seek summary judgment as to Plaintiffs' recordkeeping fee theories. (Doc. # 92 at 20-25). They argue that they have demonstrated that the RC diligently monitored the Plan's recordkeeping costs and that Plaintiffs cannot meet their burden of demonstrating that the Plan's recordkeeping costs were excessive. (<u>Id.</u>). In their response, Plaintiffs rely solely on Mr. Vitagliano's report to demonstrate that the 2015 RFP, 2018 RFI, and 2021 RFP processes were flawed and that the recordkeeping costs were excessive. (Doc. # 98).

31

Under ERISA, a plan fiduciary is required to meet a standard of "prudence" in administering the plan holding the participant's retirement assets in a defined contribution plan. 29 U.S.C. § 1104(a)(1)(B) (requiring fiduciaries to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims").

"An ERISA fiduciary's duty is derived from the common law of trusts." Tibble v. Edison Int'l, 575 U.S. 523, 528 (2015). Fiduciaries must prudently select third-party service providers and can be subject to liability if they do not reasonably monitor the fees charged and such fees are excessive. Pizarro v. Home Depot, Inc., --- F. Supp. 3d ---, 2022 WL 4687096, at *14 (N.D. Ga. Sept. 30, 2022) (citation omitted). ERISA empowers a plan participant or beneficiary to sue plan fiduciaries for breach of fiduciary duties. 29 U.S.C. § 1132(a)(2).

To succeed on their claims for breach of fiduciary duty under ERISA, Plaintiffs must prove that (1) Defendants acted as fiduciaries, (2) Defendants breached their fiduciary

32

duties, and (3) the breaches proximately caused a loss to the Plan. Solis v. Seibert, No. 8:09-cv-1726-VMC-AEP, 2011 WL 398023, at *4 (M.D. Fla. Feb. 4, 2011), aff'd, 464 F. App'x 820 (11th Cir. 2012). Because of the proximate causation requirement, fiduciaries are not liable under ERISA where their actions — "although a breach of [their] fiduciary duty — did not cause the loss to the Fund." Perez v. DSI Contracting, Inc., No. 1:14-CV-282-LMM, 2015 WL 12618779, at *5 (N.D. Ga. July 24, 2015) (quoting Ironworkers Local No. 272 v. Bowen, 695 F.2d 531, 536 (11th Cir. 1983)). The only elements at issue here are breach and loss causation.

Plaintiffs have not put forth any evidence demonstrating that Defendants breached their fiduciary duties. In fact, the undisputed record evidence shows the opposite. The RC monitored the Plan's recordkeeping fees, conducting three competitive searches for recordkeepers during the Class Period and conducting regular benchmarking exercises in the interim. (Doc. # 92-2 at ¶¶ 22, 27, 30, 34). The 2015 RFP and the 2021 RFP resulted in price negotiations that reduced the per participant recordkeeping fees. (Id. at ¶¶ 25-26, 32-33); see also Johnson v. PNC Fin. Servs. Grp., Inc., 2021 WL 3417843, at *4 (W.D. Pa. Aug. 3, 2021) ("[T]he fact that the

Plan's recordkeeping fees trend downward for the period at issue points in the direction of prudence rather than imprudence."). This Court joins the refrain of other district courts that have found evidence of regular, competitive searches compelling evidence that there was no breach of fiduciary duty. See, e.g., Marshall v. Northrop Grumman Corp., 2019 WL 4058583, at *11 (C.D. Cal. Aug. 14, 2019) (granting summary judgment to defendants on recordkeeping fees claim where defendants engaged in RFP); Ramos, 461 F. Supp. 3d at 1101 (finding fiduciary committee prudently managed its recordkeepers because it ran regular RFP processes); Sacerdote v. N.Y. Univ., 328 F. Supp. 3d 273, 293 (S.D.N.Y. 2018) (same); Cryer v. Franklin Res., Inc., 2018 WL 6267856, at *10-11 (N.D. Cal. Nov. 16, 2018) (same).

Even if Plaintiffs had adduced evidence of a breach of fiduciary duty, they have no evidence of loss causation. Plaintiffs have not offered specific facts showing that the Plan's recordkeeping costs were excessive. Again, the only evidence to which they cite is Mr. Vitagliano's report, which the Court will not consider. Indeed, the only evidence regarding the reasonableness of the recordkeeping fees comes from Defendants' expert, Mr. Swisher, who concludes that the

Plan paid some of the lowest recordkeeping fees of any MEP in the market, and noted that all MEPs paid more than $30 per participant. (Doc. # 92-18 at 62-65).

Even if the Court did consider Mr. Vitagliano's report, it still would reach the same conclusion, as Mr. Vitagliano did not analyze the specific services provided by MassMutual – an element of the loss causation analysis that courts have found necessary in cases such as this. See Albert v. Oshkosh Corp., 47 F.4th 570, 580 (7th Cir. 2022) (holding that an ERISA plaintiff failed to state a claim where the complaint "failed to allege that the [recordkeeping] fees were excessive relative to the services rendered"); Smith v. CommonSpirit Health, 37 F.4th 1160, 1169 (6th Cir. 2022) (same); Young v. General Motors Inv. Mgmt. Corp., 325 F. App'x 31, 33 (2d Cir. 2009) (same); Ramos, 461 F. Supp. 3d at 1132 ("A high fee alone does not mandate a conclusion that recordkeeping fees are excessive; rather, fees must be evaluated relative to the services rendered."). At best, Plaintiffs have demonstrated that a different type of retirement plan could have paid lower recordkeeping fees for a different package of services. This showing is insufficient to avoid summary judgment.

Summary judgment is therefore granted to Defendants on Plaintiffs' recordkeeping fee theories.

### 2.   **Plaintiffs' Investment Options Theories**

Defendants also seek summary judgment on Plaintiffs' claim that the RC employed an imprudent process in selecting and monitoring the Plan's investments, arguing that Plaintiffs have adduced no evidence to that effect. (Doc. # 92 at 16-20). In their response, Plaintiffs "acknowledge that they never submitted an expert report to calculate damages with respect to its investment-related theories" and state that they are not seeking damages with respect to their investment-related theories. (Doc. # 98 at 20).

Plaintiffs have not met their burden to avoid summary judgment on their investment-related claims. First, while they "maintain Defendants did not follow a prudent process for selecting and monitoring the Plan's investment options," they did not cite to any facts that specifically controvert those Defendants included in their statement of material facts related to the investment selection process. (Id.). Thus, the Court deems admitted all such facts. See (Doc. # 42 at 3) ("In deciding a motion for summary judgment, the Court will deem admitted any fact in the statement of material facts

that the opposing party does not specifically controvert, provided record evidence supports the moving party's statement.").

Second, there is substantial evidence that Defendants prudently monitored the Plan during the class period. The RC regularly met, received detailed reports regarding the performance of Plan investments, and discussed which funds should be included in the Plan. (Doc. # 92-5 at 17-78; Doc. # 92-6 at 1-291). Again, even if the evidence was not indicative of prudence, Plaintiffs' failure to present evidence of a loss stemming from such alleged imprudence is fatal to their claims. See Pizarro, 2022 WL 4687096, at *24 (granting summary judgment in favor of defendants where "even assuming an imprudent monitoring process, Plaintiffs . . . failed to marshal evidence of loss causation"). Likely for this reason, Plaintiffs acknowledge they are not seeking damages related to their investment claims.

Therefore, the Court grants summary judgment in favor of Defendants as to Plaintiffs' investment option theories.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   Defendants' <u>Daubert</u> Motion (Doc. # 93) is **GRANTED**. The Court excludes Mr. Vitagliano's testimony.

(2)   Defendants' Motion for Summary Judgment (Doc. # 92) is **GRANTED**.

(3)   The Clerk is directed to enter judgment in favor of Defendants and against Plaintiffs.

(4)   Thereafter, the Clerk is directed to terminate all pending motions and deadlines and **CLOSE** the case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>25th</u> day of April, 2023.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE